**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **AMERICAN MASSAGE THERAPY ASSOCIATION**, 500 Davis Street, Suite 900, Evanston, IL 60201 <br><br> Plaintiff, <br><br> v. <br><br> **U.S. DEPARTMENT OF EDUCATION and MIGUEL CARDONA,** in his official capacity as Secretary, 400 Maryland Avenue, S.W. Washington, D.C. 20202 <br><br> Defendants. | **Case Number:** _____ |

**COMPLAINT AND PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This is an action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*; Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*; Title 20 of the United States Code, §§ 1070-1099c-2; and Title 34 of the Code of Federal Regulations, Part 668, for declaratory and injunctive relief arising out of the promulgation of a legislative rule by the U.S. Department of Education ("Department") and Secretary of Education Miguel Cardona ("Secretary") (collectively, "Defendants") that is an arbitrary, capricious, unexplained, and unsupported change from longstanding Department policy upon which institutions of massage therapy have relied for 30 years, promulgated in excess of statutory authority, and without observance of procedure required by law.

2.      On October 31, 2023, the Department published a final rule ("Final Rule") modifying 34 C.F.R. § 668.14(b)(26), which, if not vacated or enjoined, will force scores of

massage therapy schools, including hundreds of member schools of plaintiff American Massage

Therapy Association ("AMTA"), to close their doors almost immediately after the rule goes into

effect on July 1, 2024.

3.      For 30 years, massage therapy institutions, as well as other institutions of higher

learning whose programs are based on "clock hours" (as opposed to credit hours, semester hours,

or quarter hours), have relied on a Departmental regulation that allowed such institutions to receive

federal student aid ("FSA") funds on behalf of students so long as the institutions based the length

of their clock hour programs on the minimum number of hours required by their state (or, if

applicable, the federal government) to obtain an entry-level qualification in a related job, *plus* 50

percent.   In other words, if a state required 500 clock hours of training to obtain a license in

massage therapy, a massage therapy school in that state could receive FSA funds so long as its

training program for would-be massage therapists lasted 750 hours or fewer.  This regulation has

long been known as the "150 Percent Rule."  When the 150 Percent rule was finalized in 1994, the

Department found that "150 percent of the State minimum allows enough latitude for institutions

to provide quality programs and furnishes a sufficient safeguard against the abuses of course

stretching."  59 Fed. Reg. 22366.

4.      In 2020—recognizing that students often attend school in a state other than the state

in which they intend to work—the Department expanded the 150 Percent Rule to allow an

institution in one given state to set the length of its clock hour program(s) as *either* 150 percent of

its own state's minimum or 100 percent of the minimum number of training hours required by an

adjacent state.

5.      A mere three years later, the Department not only reversed course from 2020, but

undid the entire 150 Percent Rule that proprietary colleges, vocational schools, and not-for-profit

institutions had relied upon for nearly 30 years.  Under the Final Rule, students may not use FSA funds to pay for programs measured in clock hours unless the program's length is no more than 100 percent of the minimum number of clock hours required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement, or as established by any Federal agency.  Simplified, the decades-old 150 Percent Rule has now become the "100 Percent Rule."  The Final Rule also makes it extremely arduous for an institution to base its clock hour requirement on an adjacent state where its graduates may work.

6.     The Department's rescission of the 150 Percent Rule—passed as part of a suite of new regulatory provisions—is a product of Defendants' misguided meddling in vocational education, in spite of the tangible skills that massage therapy students and students interested in other vocations earn through higher education.

7.     In issuing the Final Rule, the Department flouted its procedures, ignored significant problems, made unwarranted and unacknowledged assumptions, failed to consider reasonable alternatives, and offered no reasoned basis for changing its position in spite of the fact that massage therapy schools, their students, and even state governments, among others, have relied on the 150 Percent Rule for the <u>past 30 years</u> when crafting their respective curriculums, career plans, and licensing standards.  The Final Rule is therefore arbitrary, capricious, not in accordance with law, and the product of a process that failed to observe proper rulemaking procedure.

## **PARTIES**

8.     Plaintiff American Massage Therapy Association is a non-profit professional association serving massage therapists, massage students, and massage schools.  AMTA is based in Evanston, Illinois and has nearly 600 massage school members from all over the country,

3

representing a majority of massage therapy schools in the United States. Among other things, AMTA advocates for fair licensing of massage therapy in all states and high standards in massage therapy education.

9.      Defendant United States Department of Education is an executive department of the United States responsible for, *inter alia*, improving the management and efficiency of federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of federal funds in connection with educational issues. As such, it is subject to the APA.

10.     Defendant Miguel Cardona is the Secretary of Education and the cabinet-level official responsible for the administration of the Department. AMTA sues Secretary Cardona solely in his official capacity.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331, as this matter arises under the laws of the United States, specifically the Administrative Procedure Act, 5 U.S.C. § 706; the Declaratory Judgment Act, 28 U.S.C. § 2201; Title 20 of the United States Code, §§ 1070-1099c-2; and Title 34 of the Code of Federal Regulations, Part 668.

12.     AMTA has associational standing to bring this suit on behalf of its members. Many of AMTA's member schools are directly and adversely affected by the Final Rule and have standing to sue in their own right. Specifically, many of these schools will be unable to timely comply with the Final Rule for reasons entirely outside of their control, will suffer lost revenues, and will be forced to shut their doors because they will be unfairly foreclosed from participating in federal student aid for students to pay for their programs. Massage therapy schools in 20 states will no longer have access to critical Federal Pell Grant and other FSA funding if the Final Rule

goes into effect, preventing thousands of students from using FSA funds to fund their massage education and advance their careers.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(A), as the defendants are located in this district.

## STATUTORY AND REGULATORY BACKGROUND

14.     Certain academic programs at institutions of higher education are known as "Gainful Employment programs" ("GE Programs") because, in order for students to use federal student aid ("FSA") dollars to pay for them, the programs must "provide[ ] an eligible program of training to prepare students for <u>gainful employment</u> in a recognized occupation." *See, e.g.,* 20 U.S.C. § 1002(b) (emphasis added).  A program leading to any type of credential at a proprietary institution or vocational school is a GE Program, as is any educational program at a public or non-profit institution that is at least one year long and leads to a non-degree certificate.

15.     Some GE Programs (like many massage therapy programs) are measured in "clock hours," rather than credit hours, semester hours, quarter hours, or other traditional units of measurement for the length of an academic course.  These clock hour-based programs and the institutions that offer them are endangered by the Final Rule.  To receive academic credit for a clock hour, a student must attend class for at least 50 minutes out of a 60-minute hour.

16.     The 150 Percent Rule first took effect in 1994.  It was, and still is, codified at 34 C.F.R. § 668.14(b)(26).  When it was proposed, the Department believed it would "help curb abuse of the programs by preventing institutions from providing unnecessary training to students in order to receive additional Title IV, HEA program funds."  59 Fed. Reg. 9,526, 9,532-33 (Feb. 28, 1994).

17.     The 150 Percent Rule has always required institutions offering GE Programs to demonstrate a reasonable relationship between the length of the program and the entry-level

requirements for the recognized occupation for which the program prepares the student in order to receive FSA funding under Title IV to the Higher Education Act of 1965, as amended ("Title IV, HEA"). To that end, as originally promulgated, the rule capped the number of clock hours that a school could provide (and charge for) in a clock-hour based GE Program while maintaining eligibility for Title IV FSA funds.

18.     Specifically, the 1994 version of the 150 Percent Rule required institutions offering GE Programs to agree, in their program participation agreements ("PPA"), that they would:

> (i) Demonstrate a reasonable relationship between the length of the program and entry level requirements for the recognized occupation for which the program prepares the student. The Secretary considers the relationship to be reasonable if the number of clock hours provided in the program does not exceed by more than 50 percent the minimum number of clock hours required for training in the recognized occupation for which the program prepares the student, as established by the State in which the program is offered, if the State has established such a requirement, or as established by any Federal agency; and
>
> (ii) Establish the need for the training for the student to obtain employment in the recognized occupation for which the program prepares the student.

59 Fed. Reg. 22,348, 22,427 (Apr. 29, 1994).

19.     The 150 Percent Rule's stated purposes were, and still are, to "allow[ ] enough latitude for institutions to provide quality programs and furnish[ ] a sufficient safeguard against the abuses of course stretching."  *Id*. at 22,366.[1]

20.     In fact, at the time the Department finalized the 1994 rule, the Department *disagreed* with commenters who "recommended that the standard … was too lenient and that the program length should not exceed the minimum State standard" of the state in which schools were

---

[1] Course-stretching is the practice of requiring students to complete (and pay for) more clock hours than are reasonable for a given academic program in order to generate additional revenue.

located, and found that "150 percent of the State minimum allows enough latitude for institutions to provide quality programs and furnishes a sufficient safeguard against the abuses of course stretching." *Id*.

21.     The Department also recognized in 1994 that students and graduates do not always stay in the same state.  The Department wrote, "Training students who will not be able to meet the licensing requirements of the States in which they intend to work is a terrible disservice to those students." *Id*.

22.     The 150 Percent Rule went unchanged from 1994 to 2015.  In 2015, the Department made minor, immaterial changes to some of its language, but the substantive nature of the rule remained identical to the 1994 original.  It did not change for another five years.

23.     In 2020, the Department broadened the 150 Percent Rule *by consensus* during a process known as "negotiated rulemaking."  In negotiated rulemaking, the Department and other industry stakeholders attempt to reach agreement on proposed regulations before issuing them for notice-and-comment.  If they reach a consensus, the Department is obligated to issue the agreed-upon rule for notice-and-comment.  *See* 20 U.S.C. § 1098a(b)(2).  All Title IV, HEA-oriented regulations must undergo negotiated rulemaking before they are proposed in a Notice of Proposed Rulemaking.

24.     When the 150 Percent Rule was amended by consensus in 2020, the Department and industry negotiators agreed, in accordance with the Department's longstanding rule, to maintain the 150 Percent Rule as it had existed for 26 years.  Thus, under the 2020 version of the 150 Percent Rule, a GE Program's length would, like always, still be reasonable if the number of clock hours required to complete the program did not exceed the greater of 150 percent of the minimum number of clock hours required for training in the recognized occupation for which the

program prepares the student, as established by the state in which the institution is located, if the state has established such a requirement, or as established by any Federal agency.

25.     However, the Department and negotiators also agreed that, as an alternative to basing a GE Program's clock hours on 150 percent of its *own* state's minimum, an institution could instead demonstrate a "reasonable relationship" if its GE Program's clock hours did not exceed 100 percent of the hours required by a state *adjacent* to the state in which the institution is located. *See* 85 Fed. Reg. 54,742, 54,816 (Sept. 2, 2020). This change allowed for flexibility in GE Programs whose graduates may work (or permanently relocate) across state lines.

26.     In 2020, the Department cited the fact that "individuals often move from one State to another or live, work, and learn in different States at the same time." *Id*. at 54,776. However, in keeping with the protective nature of the rule, the Department rejected a suggestion to define "adjacent State" to include any state whose border is within 100 miles of a given institution (e.g., deeming New Hampshire "adjacent" to Rhode Island because New Hampshire's border is within 100 miles of some schools in Rhode Island), citing concerns that institutions could use "a significantly longer requirement two States away in order to lengthen their programs for all students." *Id*. at 54,777. Given the consensus between industry groups, advocacy groups, and the Department, the 2020 version of the 150 Percent Rule was clearly reasonable.

27.     The 150 Percent Rule has never been paused or rescinded. It has been in effect for 30 uninterrupted years. The 150 Percent Rule has served students and institutions well, as acknowledged and reaffirmed by the Department, which found that "150 percent of the State minimum allows enough latitude for institutions to provide quality programs and furnishes a sufficient safeguard against the abuses of course stretching." 59 Fed. Reg. 22366. That will change on July 1, 2024, to the detriment of hundreds of AMTA member schools and many others.

## RELIANCE ON THE 150 PERCENT RULE

28.     As set forth above, from 1994 to 2023, the 150 Percent Rule as codified in 34 C.F.R. § 668.14(b)(26) was not materially altered or amended.  It has remained the standard by which massage therapy institutions and accreditors have developed curriculums, and even some states have factored in the rule when setting their training hour requirements for massage therapists and other professionals.

### Reliance by Institutions

29.     At AMTA member institutions, a substantial number of massage therapy students rely on federal Pell Grants to fund some or all of their education.  Federal Pell Grants are usually awarded only to undergraduate students who display exceptional financial need and have not previously earned a bachelor's, graduate, or professional degree.  Unlike a student loan, Pell Grants do not have to be repaid.  In fact, at many of AMTA's member schools, Pell Grants represent the largest source of funding for students (and, accordingly, the schools' largest source of operating revenue).

30.     By rule, students may not use funds from Pell Grants to pay for GE Programs like massage therapy unless the program is at least 600 clock hours long.  *See* 34 C.F.R. § 668.8(d)(1). The Department admits this in the Final Rule and in other guidance issued subsequent to the Final Rule.  *See, e.g.*, 88 Fed. Reg. at 74,640; Implementation of Program Length Restrictions for Gainful Employment Programs, Electronic Announcement GEN-24-06 (Apr. 15, 2024).

31.     At least 20 states require 500 hours of training to become a massage therapist. Schools in these 20 states have relied on the 150 Percent Rule for 30 years to ensure that their massage therapy programs provide students with a comprehensive, quality education and meet the 600-hour threshold to qualify for the federal Pell Grant program.  By participating in the Pell Grant

program, institutions of massage therapy are able to offer training in a practical, marketable skill to individuals who do not have the means to attend a four-year college or who are economically disadvantaged in other ways.

32.     Aside from Pell Grant eligibility, the curriculums, student offerings, tuition rates, and foundational operating strategies of countless massage therapy schools, including AMTA member schools, are premised at least in part on the 150 Percent Rule.   All colleges and universities, whether operating for profit or not, require revenue to function.   As the Department envisioned in 1994, massage therapy schools have used the 150 Percent Rule to strike a balance between (i) the number of hours needed to train a massage therapist (whose work, if done improperly, can cause physical harm) and (ii) the revenues needed simply to stay in business and train these therapists.

33.     The majority of states require that an applicant for a massage therapy license pass the Massage & Bodywork Licensing Examination ("MBLEx").[2]   A study initiated by a coalition of national massage therapy organizations, which includes AMTA and the Federation of State Massage Therapy Boards ("FSMTB") among others, shows that 600 to 650 hours of massage therapy education is the optimal amount for students to pass the MBLEx.[3]   Eighty-one percent of MBLEx applicants who received between 600 and 650 hours of massage therapy education pass the MBLEx on the first attempt.   *Id*.   The Commission on Massage Therapy Accreditation ("COMTA"), the only accreditor fully dedicated to massage therapy and esthetics, has for years required its massage therapy programs to be a minimum of 600 hours.

34.     Based on the abovementioned studies and statistics, institutions offering massage

---

[2] *See* https://fsmtb.org/mblex/

[3] *See* https://massagecompact.org/wp-content/uploads/sites/32/2023/01/Why-625.pdf.

therapy programs—who have been entrusted by the Department with discretion to set reasonable lengths for their programs since 1994—rely on the 150 Percent Rule to structure their curricula so that students obtain the minimum number of training hours to pass the MBLEx and succeed in an entry-level position.

35.     In order to be eligible to participate in FSA programs under Title IV of the HEA, proprietary schools must be accredited.   34 C.F.R. § 600.5(a)(6).   Thus, massage therapy institutions design their curriculums to meet requirements to be accredited by organizations like COMTA, the National Accrediting Commission of Career Arts and Sciences, Inc. ("NACCAS"), and the Accrediting Bureau of Health Education Schools ("ABHES"), among others.   Schools are required to obtain approval from their accreditor for substantive additions or changes to program offerings, such as a reduction in duration.   For example, ABHES considers "a revision of program content in total clock or credit hours" to be a substantive change requiring its approval.[4]   NACCAS considers a 25% increase or reduction in program length to be a substantive change.[5]   COMTA also requires schools to obtain its approval when making a substantive change.[6]

36.     Obtaining accreditation is costly and time-consuming.   To make a change to curriculum, institutions must pay the accreditor a fee to review the proposal.   Reviews can take several months, and the institution has no control over how quickly the accreditor acts.   And there is no guarantee that a modification will be approved.

37.     Some massage therapy programs must also receive approval from the state in which

---

[4] *See* ABHES Accreditation Manual, 19th Edition, Eff. Jan. 1, 2024, Section III.B.1.a. https://www.abhes.org/wp-content/uploads/2024/01/19th-Edition-Accreditation-Manual-Effective-12024.pdf.

[5] *See* NACCAS Handbook Section 4.7(a)(3), https://naccas.org/naccas-handbook.

[6] *See* COMTA Accreditation Standards Eff. Jan. 2024, Section XI.A.3, https://comta.org/accreditation/forms/.

they are located, and would also need to obtain approval for any change to the curriculum.  This process can also take several months and there is no guarantee the change would be approved.

38.     If allowed to take effect, the Final Rule will, *inter alia*:

a.  Compel institutions all over the country to curtail their massage therapy programs—many well below the 600-650 hour range needed to ensure optimal licensing exam passage rates;

b.  Decimate the revenues of institutions with Title IV, HEA-participating massage therapy programs—in particular, institutions which focus solely on teaching massage therapy—forcing a countless number of closures and/or layoffs almost immediately;

c.  Prevent massage therapy schools in at least 20 states (and countless other schools with GE Programs) from participating in the Pell Grant program;

d.  Reduce the overall number of massage therapy schools and cause a concomitant shortage in competent, new massage therapists; and

e.  Force institutions to violate their accreditation by cutting hours without approval from their accreditors (jeopardizing their eligibility to participate in FSA programs) or, alternatively, stopping their massage therapy programs while their accreditors review the reduced-hour curricula (jeopardizing their solvency).

<u>Reliance by States and Associated Entities</u>

39.     States have relied on the 150 Percent Rule in setting policy.  For example, cognizant that massage therapy schools could reach the 600-hour threshold to qualify for Pell Grant eligibility using the 150 Percent Rule, Florida's state legislature relied on the 150 Percent Rule when it reduced the minimum number of training hours for massage therapists to 500.

40.     The Council of State Governments, partnering with the U.S. Department of Defense and the FSMTB, formed the Interstate Massage Compact ("IMC") to support the mobility of licensed massage therapists by creating reciprocity among participating states and reducing the barriers to license portability.  The IMC's "Multistate License Requirements" obligate a massage therapy student to complete at least 625 clock hours of massage therapy education to obtain a license that allows practice in all states governed by the IMC.  However, if the Final Rule takes effect, the IMC will be thwarted and schools in states that require fewer than 625 hours to become licensed as a massage therapist will be forced to reduce the hours of their programs to comport with their state's minimum hours.  In many cases, if the state has a minimum below 600 hours, schools in those states will be legally barred from participating in the Pell Grant program, which is a critical component of FSA funding.  Multi-state licenses will cease to exist or, at minimum, their utility will significantly decline.

## NEGOTIATED RULEMAKING, NOTICE-AND-COMMENT, AND PROMULGATION

41.     In accordance with its duty to engage in negotiated rulemaking, on May 26, 2021, the Department announced its intention to form negotiated rulemaking committees whose work would precede various rules to be issued in 2023 with an effective date of July 1, 2024 (including the Final Rule).  In this announcement, the Department did not include, among the topics for potential rulemaking, any proposal or suggestion that it was considering modifying the 150 Percent Rule.  *See* 86 Fed. Reg. 28,299-300 (May 26, 2021).

42.     From June 21, 2021, to October 27, 2021, the Department held public hearings on its "rulemaking agenda for Post-Secondary Education."  At no time were possible changes to the 150 Percent Rule raised by the Department or proposed by commenters.

43.     On December 8, 2021, the Department announced it would form an "Institutional

and Programmatic Eligibility Committee" to address seven topics—none of which referred to the 150 Percent Rule or 34 C.F.R. § 668.14.  *See* 86 Fed. Reg. 69,607, 69,608 (Dec. 8, 2021).

44.     The Department did not include a person with experience in massage therapy education (or with experience in clock hour-based programs generally) on the Institutional and Programmatic Eligibility Committee.

45.     The Institutional and Programmatic Eligibility Committee met in January, February, and March of 2022.  It was not until the committee's first meeting—after its membership was established, and after the public had its opportunity to comment on rulemaking topics—that the Department first sought "feedback on the appropriate maximum length of aid for a gainful employment program" based on clock hours.

46.     After the Department surprised the committee with potential modifications to the 150 Percent Rule, the negotiators considered several changes but did not reach consensus on whether, or how, the 150 Percent Rule should be modified.

47.     Lacking a consensus, on May 19, 2023, the Department published a Notice of Proposed Rulemaking ("NPRM") in which it invited public comment on a heavily modified 150 Percent Rule, among other issues.  The proposed rule would have amended the 150 Percent Rule to condition a GE Program's eligibility on, *inter alia*, demonstrating that its "clock hours, credit hours, or the equivalent" do not exceed "the required minimum number [hours] required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement, or as established by any Federal agency or the institution's accrediting agency."  88 Fed. Reg. 32,300, 32,492 (May 19, 2023).  The Department had already decided to turn the 150 Percent Rule into the "100 Percent Rule."

48.     The NPRM set forth three scenarios in which an institution could base its length on a different state.  *Id*. at 32,314.  Under the proposed rule, an institution could use another state's minimum hours requirement if any of the following applied: (1) "a majority of students resided in that other State while enrolled in the program during the most recently completed award year;" (2) "a majority of students who completed the program in the most recently completed award year were employed in that State;" or (3) "if the other State is part of the same metropolitan statistical area as the institution's home State," as defined by the Office of Management and Budget, and "a majority of students, upon enrollment in the program during the most recently completed award year[ ] stated in writing that they intended to work in that other State."  *Id*.  A certified public accountant would have to substantiate the accuracy of the institution's claims.  *Id*.

49.     In the NPRM, the Department claimed it proposed changing the 150 Percent Rule because it "believe[s] programs funded in part by taxpayer dollars should meet the requirements for the occupation for which they prepare students as a safeguard of the financial investment in these programs."  *Id*. at 32,314.  The Department also claims that it has concerns about:

    a.  Causing students to use more of their lifetime eligibility for Pell Grants or other federal financial aid;

    b.  Higher debt and a longer period of enrollment without requisite career benefits;

    c.  "Overly long" programs that may end up generating unnecessary transfers from the Department to the institution in the form of financial aid funding courses that are not needed for the borrower to obtain a position in the field for which they are being prepared, or which "may depress students' ability to complete, as [they] introduce more opportunities for life to interfere with academics[ ] and cost students time out of the labor force;"

      d.   "Integrity and accuracy" of the information institutions may file to meet one of the three exceptions to the proposed rule.

*Id*. at 32381-82, 32451.

50.    On October 31, 2023, the Department issued the Final Rule in the Federal Register. *See* 88 Fed. Reg. 74,568-710 (Oct. 31, 2023).  The Department's changes to the 150 Percent Rule appeared alongside other major overhauls to the regulatory environment for Title IV, HEA programs, including multiple new rules (or modifications to existing rules) that have already been found to be likely to violate the APA.  *See Career Colls. & Schs. of Texas v. U.S. Dep't of Educ., et al.*, 98 F.4th 220 (5th Cir. 2024) (staying new borrower defense and closed school discharge rules).

51.    Despite receiving a bevy of comments pointing out the legal and practical flaws of the proposed rule, the Final Rule is not materially different from the rule proposed in the NPRM. The only modifications that the Department made were (1) to eliminate reliance upon an accreditor's (rather than a state's) minimum number of hours, (2) to exempt pure distance/online-learning programs; and (3) to exempt programs for which a degree is also an entry-level requirement under state law.

52.    The text of the Final Rule, in relevant part, is:

§ 668.14      Program participation agreement.

(b) * * *

(26) If an educational program offered by the institution on or after July 1, 2024, is required to prepare a student for gainful employment in a recognized occupation, the institution must—

(i) Establish the need for the training for the student to obtain employment in the recognized occupation for which the program prepares the student; and

(ii) Demonstrate a reasonable relationship between the length of the program and the entry level requirements for the recognized

occupation for which the program prepares the student by limiting the number of hours in the program to the greater of—

(A) The required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement or as established by any Federal agency; or

(B) Another State's required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, if the institution documents, with substantiation by a certified public accountant who prepares the institution's compliance audit report as required under § 668.23 that—

(1) A majority of students resided in that State while enrolled in the program during the most recently completed award year;

(2) A majority of students who completed the program in the most recently completed award year were employed in that State; or

(3) The other State is part of the same metropolitan statistical area as the institution's home State and a majority of students, upon enrollment in the program during the most recently completed award year, stated in writing that they intended to work in that other State; and

(iii) Notwithstanding paragraph (a)(26)(ii) of this section, the program length limitation does not apply for occupations where the State entry level requirements include the completion of an associate or higher-level degree; or where the program is delivered entirely through distance education or correspondence courses[.]

88 Fed. Reg. at 74,696-97.

53.    The Final Rule's stated effective date was July 1, 2024.

54.    On April 9, 2024—five and a half months after publishing the Final Rule—the Department released Electronic Announcement GEN-24-07 ("EA").  In the EA, the Department admitted:

[S]ome institutions face unique challenges outside of their control that may affect their ability to comply with … 34 CFR 668.14(b)(26) . . . .

\* \* \*

[I]nstitutions have expressed concern about their ability to seek and obtain approval from accrediting agencies and States to change the lengths of their GE programs in time to come into compliance with the regulations. Institutions have also expressed concern about their ability to determine the specific requirements for licensure in the States in which they operate and, in some cases, limit the States in which they operate in order to comply with requirements for programs to meet licensure and certification requirements in all States where an institution enrolls students. The Department has also heard concerns from State agencies about their ability to approve a substantial number of program changes in time for their institutions to be in compliance.

\* \* \*

[T]here may be circumstances outside of an institution's control that may prevent compliance with the new requirements under § 668.14(b)(26) . . . by July 1, 2024.  However, the Department believes that most of those concerns and challenges will have been resolved or sufficiently mitigated by January 1, 2025.   The Department has enforcement discretion with respect to an institution's compliance with certain Title IV, HEA requirements. Given the concerns received from institutions and States, particularly for the period between July 1, 2024 and January 1, 2025, we will consider exercising this discretion before taking action regarding the provisions in 34 CFR § 668.14(b)(26) . . . .

55.     The EA—which purports to address an issue that commenters previously brought to the Department's attention (only to be rebuffed)—is the result of just one of the many arbitrary and capricious decisions underlying the Final Rule.

56.     The EA did not push back the effective date of the Final Rule to allow regulated institutions to "seek and obtain approval from accrediting agencies and States to change the lengths of their GE programs in time to come into compliance with the regulations."  The effective date remains July 1, 2024.

**THE FINAL RULE IS ARBITRARY, CAPRICIOUS, AND CONTRARY TO LAW**

57.     A mere three years after reaching consensus with industry stakeholders—a consensus that reaffirmed the 150 Percent Rule and authorized the adoption of an adjacent state's

minimum training time without qualification—the Department reversed course in the Final Rule. Not only does the Final Rule drastically limit an institution's ability to base its clock hour requirement on an adjacent state where its graduates may live or work, but it also eliminates the entire 150 Percent Rule as the industry has known it for decades.  Pursuant to the Final Rule, any GE Program measured in clock hours is not eligible to participate in FSA programs unless its length is no more than 100 percent of the minimum number of clock hours required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement, or as established by any Federal agency.

58.     The Final Rule reflects a disdain for institutions like AMTA's members, disregard for procedure, indifference to significant issues, adoption of unwarranted and unacknowledged assumptions, and a failure of the Defendants to provide a reasoned basis for changing their position in spite of the fact that massage therapy schools, their accreditors, and even state governments had relied on the 150 Percent Rule 30 years.

<u>Disregard for Procedures</u>

59.     The negotiated rulemaking provisions of the HEA require the Defendants to include "individuals with demonstrated expertise or experience in the relevant subjects under negotiation" on the negotiated rulemaking committee.  20 U.S.C. § 1098a(b)(1).

60.     The Defendants concealed their intention to modify the 150 Percent Rule until negotiated rulemaking committees were already formed, thereby making it impossible for massage therapy institutions to know that a change to the 150 Percent Rule was forthcoming before negotiated rulemaking began.

61.     The individuals who represented the entire proprietary institution industry did not

have expertise or experience with clock-hour GE Programs or massage therapy, even though massage therapy institutions are among the schools most affected by the Final Rule.

62.    By withholding the topics for rulemaking, undermining massage therapy schools' right to propose a representative with "demonstrated expertise or experience in the relevant subjects under negotiation," and appointing individuals who lacked the expertise or experience to represent massage therapy institutions and other clock hour-based schools, the Department failed to submit its modifications to the 150 Percent Rule to a negotiated rulemaking process that is compliant with 20 U.S.C. § 1098a.

<u>Arbitrary Reliance on a "Majority" of Students</u>

63.    The Final Rule requires institutions to offer GE Programs whose length does not exceed the minimum training time under the laws of the state in which the institution is located (or, if applicable, the minimum training time set by federal law).  The Final Rule permits an institution to base a GE Program's length on a different state's minimum hours requirement only if institutions can show that a "majority" of students lived in, work in, or said they intend to work in a different state during the prior award year.

64.    Defendants failed to include any justification in the Final Rule for why a "majority" is the appropriate number to establish a "reasonable relationship between the length of the program and the entry level requirements for the recognized occupation for which the program prepares the student."  The Department arbitrarily equates a "majority" of students living or working (or intending to work) in an adjacent state with "an actual need to apply an adjacent State's higher hours."  88 Fed. Reg. at 74,642.

65.    Under the plain language of the Final Rule, the Department's "majority"-based exceptions operate in the disjunctive.  That is, an institution must show that a majority of students

lived in an adjacent state, or that a majority of students worked in an adjacent state, or that a majority of students certified in writing at the time of enrollment that they intended to work in an adjacent state within the same metropolitan statistical area.

66.     The Final Rule ignores the obvious possibility that, while an institution may not have a "majority" of students who satisfy one of those criteria, when adding together all students who satisfy *any* of the three criteria, an institution may have a "majority" of students whose residence or workplace (or intended workplace) is in an adjacent state.  In such a scenario, it would be arbitrary and capricious to preclude an institution from adopting an adjacent state's minimum hours requirement because, no matter the basis of their connection to the adjacent state, the institution's students need to satisfy the adjacent state's training requirements.  Yet, the plain language of the Final Rule precludes exactly that.

67.     An agency acts arbitrarily and capriciously by plucking a number out of thin air when it promulgates rules in which percentage terms play a critical role or by failing to consider obvious alternatives or problems.  In this case, the Department failed to draw a rational connection between the choice made and the facts found or otherwise explain why it chose to do what it did, and also failed to consider whether it would be appropriate to combine students living, working, or intending to work in an adjacent state for purposes of finding a "majority."

Overly Burdensome Procedures for Adopting Adjacent State's Training Requirements

68.     In order to offer a FSA-eligible GE Program whose length is equivalent to the number of hours required for training in an adjacent state, the Final Rule requires institutions to demonstrate that a "majority" of students lived, worked, or said they intend to work in an adjacent state during the prior award year.

69.     The procedures for proving what a "majority" of students have done (or will do)

impose an undue, arbitrary burden on institutions that may try to avail themselves of the Final Rule's grounds for basing GE Program length on the training requirements in an adjacent state.

70.     For example, if an institution wants to prove that a "majority" of its students plan to work in a different state within the same metropolitan statistical area as the institution, the institution, in all likelihood, will have to obtain responses from nearly 100 percent of its students. It is obvious that students within the same two-state metropolitan statistical area may be evenly split on the states in which they intend to work, meaning that it will be necessary to have a response rate approaching 100 percent to definitively show that a "majority" of students intend to work in an adjacent state.

71.     With respect to the 2024-25 award year, the Final Rule makes it impossible for institutions to show that a "majority" of its students who enrolled in the prior year intend to work in an adjacent state within the same metropolitan statistical area.  The Final Rule goes into effect underline immediately on July 1, 2024.  AMTA's member schools have not been obtaining affidavits from enrolling students for the 2023-2024 award year for purposes of showing that the students who enrolled this year intend to work in an adjacent state.  In fact, it would have been impossible for some AMTA schools to obtain written statements "upon enrollment" from students beginning in the 2023-24 award year because the Final Rule was not published until *after* school started and students were already enrolled.

72.     It is arbitrary and capricious for an agency to impose heavy (or impossible) information-gathering burdens that require a near-100 percent response rate on schools or to assume, without explanation, that such a high response rate is necessary to accomplish the objectives of the rule.

<u>Unfounded and Unjustified Assumptions</u>

73.     When an agency's reasoning involves a non-obvious, essential factual assumption, the agency must justify its reliance on that assumption.  The Final Rule is premised on several non-obvious, unjustifiable assumptions.

74.     **Areas with a high concentration of states.**  The Department assumes that it will be possible for institutions in states with a high number of adjacent states to show that a "majority" of students lived or worked in an adjacent state during the prior award year.  All three grounds for adopting an adjacent state's minimum hours requirement are contingent on showing that a "majority" of students lived, or worked, or certified that they intend to work in <u>one</u> state.  However, for institutions located in an area with a high concentration of states (*e.g.*, the northeastern United States, "tri-state" areas, etc.), it may be impossible for any institution to show that a majority of students go to <u>one</u> nearby state for work.

75.     New Jersey, for example, borders Pennsylvania, New York, and Delaware, and is close to Maryland, Connecticut, and Rhode Island.  It is eminently conceivable that students in a New Jersey institution would want to work in any of those jurisdictions.  However, if 10 percent of the institution's students go to (or live in) each of the six nearby states, that means that the institution will never be able to show that a "majority" of its students work, live, or intend to work in any given state outside New Jersey.[7]  Schools in these areas have no meaningful way to avail themselves of the Department's purported alternatives to using their own state's hours limit.  The Department failed to consider this relevant aspect of the alleged issue it is attempting to resolve.

76.     **100 percent response rates.**  As noted above, the Department assumes without

---

[7] The Final Rule fails to define "metropolitan statistical area," so it is unclear what that term even means.  While the Department included a definition of "metropolitan statistical area" in the NPRM, that definition was cut from the Final Rule.

justification that a school will be able to obtain and provide responses from up to 100 percent of its students about where they lived or worked in the prior year or where they intend to work following graduation.

77.     **Changing minds.**  With respect to the Final Rule's purported option for schools to show that a "majority" of students, during enrollment, stated that they intend to work in a different state within the same metropolitan statistical area, the Department arbitrarily assumes that this is a valid measure of whether there is an actual need for an institution to adopt an adjacent state's standard.  Defendants fail to appreciate that individuals—students in particular—may change their minds about the state they intend to work in several times between enrollment and graduation.

78.     **Timely re-accreditation.**  The Department understood that the Final Rule would force institutions with GE Programs to request modifications to their accreditations and approvals from accreditors and state authorities.  *See* 88 Fed. Reg. at 74,641.  However, the Department assumed—wrongly, as it turns out—that accreditors and state authorities would update accreditations and approvals in time for schools to offer shortened GE Programs by the Final Rule's effective date.

79.     The EA illustrates the flaw in the Department's assumption.  After proclaiming that its "concern about the effects of excessive debt on students" trumped institutions' "concern about accrediting agencies and State agencies approving changes in program length and the time needed for these actions," the Department subsequently admitted that "there may be circumstances outside of an institution's control that may prevent compliance with the new requirements under § 668.14(b)(26) . . . by July 1, 2024."  The EA shows that the Department's reasoning was not just arbitrary—it was plain wrong.

80.     While the EA purports to assuage institutions on the basis that it has "enforcement

discretion," the EA provides them with no assurance that the Department will not enforce the Final Rule against them and AMTA's member schools between July 1, 2024, and January 1, 2025. The EA merely states that the Department "will consider" exercising its discretion before taking action and "will seriously consider" certain defenses to enforcement actions such as an institution's inability to obtain approvals from states and/or accrediting agencies for changes in program length, but makes no commitment to excusing "non-compliance" caused by the Defendants' own ill-conceived, rushed Final Rule. Put another way, the Department has reserved for itself the purported authority to decide arbitrarily when or when not to exercise its enforcement discretion. Defendants cannot salvage an arbitrary rule with reference to its arbitrary "discretion."

81.     The Final Rule also assumes, without any support whatsoever, that institutions will survive any delays in obtaining re-accreditation or re-authorization because the Final Rule only applies to individuals who enroll after July 1, 2024. Any delays in enrolling new students will cause immediate and irreparable harm in the form of lost, unrecoverable revenue and a funding gap that will leave schools without the money necessary for continuity of operations.

82.     **Participation in Direct Loan programs.**   Many schools in states with 500-hour (or fewer) requirements rely on the 150 Percent Rule to qualify for participation in the Pell Grant program. The Pell Grant program is the largest federal grant program offered to undergraduates. It is designed to assist students from low-income households who demonstrate financial need based on certain guidelines. A federal Pell Grant, unlike a loan, does not have to be repaid, except under certain circumstances. In the 2022-2023 academic year, approximately six million low-income students used Pell Grants to fund their education.[8]

83.     Defendants admit that schools in states that require fewer than 600 hours would not

---

[8] *See* https://www.statista.com/statistics/235372/recipients-of-federal-pell-grants-in-the-us/.

be eligible for participation in the Pell Grant program.  They counter that such schools could still participate in the Direct Loan program provided they meet other regulatory criteria.  However, unlike Pell Grants, Direct Loans must be repaid.

84.     The Department assumes, without acknowledgement (let alone justification), that students who would otherwise qualify for Pell Grants based on their financial circumstances will still decide to attend massage therapy school even if it would require them to repay a student loan.

### Unexplained and Arbitrary Reversal in Agency Position

85.     The 150 Percent Rule has been a mainstay of the Title IV, HEA regulatory landscape for three decades.  As noted throughout, institutions, states and associated entities have all relied on it to create, deliver, evaluate, and regulate GE Programs in a way that ensures that students have sufficient opportunities to pursue a quality vocational education at a reasonable cost.

86.     Where regulated entities have a demonstrable history of reliance on a regulation, an agency faces a higher burden to explain the bases for changes to that regulation.

87.     Defendants failed to assess whether there were reliance interests, determine whether those reliance interests were significant, or weigh those interests against competing policy concerns before issuing the Final Rule.

88.     Defendants failed to give a reasoned explanation for disregarding the facts and circumstances that underlay the current 150 Percent Rule.  Defendants have not identified any new facts or circumstances that have arisen since the Department first published the 150 Percent Rule in 1994 to justify the changes in the Final Rule.  Defendants have not cited any evidence that the 150 Percent Rule has contributed to higher debt for students enrolled in longer programs or unmanageable debt loads after graduation.  The same concerns about course-stretching and excessive debt existed then as they do now.

89.     By tying a GE Program's maximum length to a state's minimum, the Department upends its longstanding policy of "allow[ing] enough latitude for institutions to provide quality programs."  As set forth above, there are legitimate reasons why many massage schools offer programs that slightly exceed the minimum training requirements in their states.  As noted above, studies show that 600 to 650 hours of massage therapy education is the optimal amount for students to pass a nationally recognized licensure exam on the first attempt.  While the Department may claim it has discretion to disagree with industry stakeholders and experts, it does not have the authority to deviate from a decades-old policy of reasonable deference to institutions and accreditors without explaining why.

90.     Defendants failed to consider alternatives to eliminating the 150 Percent Rule that take into account the longstanding reliance interests of regulated entities.

<u>Failure to Consider or Grapple with a Known Problem</u>

91.     Facing numerous comments from institutions that accrediting agencies and state agencies may not approve changes in program length in time for institutions to achieve compliance with the Final Rule, Defendants' terse response, in its entirety, was:

> The Department does not think an extended legacy eligibility period
> is appropriate given our concerns about the effects of excessive debt
> on students.  As already noted, we will apply [the Final Rule] to new
> program enrollees following the effective date of these regulations,
> so that no currently enrolled student would be negatively affected.

92.     The Department's response to comments about the time needed to achieve compliance fails to grapple with a known and identified problem.  It does not include any explanation why its "concerns"—concerns that the Department has had for 30 years—suddenly override an acute and inevitable problem that would force countless institutions into non-compliance.

93.      The Department's response is also non-responsive, as it focuses on the Final

Rule's effects on <u>students</u>, not on <u>institutions</u>.

<u>Failure to Examine Relevant Data and Reliance on Incorrect Data</u>

94.     The Department's reasoning demonstrates that it was the product of political pressure, not careful analysis of the issues.  The Department failed to examine relevant data and mischaracterized the data it relied upon in supporting the Final Rule.  The Department provided no support for its claims that schools "may have engaged in course stretching."  It also failed to provide any evidence that the 150 Percent Rule has contributed to higher debt for longer programs or that the same is a widespread problem.

95.     The Department mischaracterized the findings of various studies it cited in response to commenters who pointed out that there are benefits to the 150 Percent Rule for employers and the public.  Federal courts have found that when an agency relies on incorrect or inaccurate data or has not made a reasonable effort to ensure that <u>appropriate data was relied upon</u>, its decision is arbitrary and capricious and should be overturned.

<u>Irrational Disregard of an Obvious Alternative</u>

96.     Under the terms of the Final Rule, the Department will not provide any FSA funds under any Title IV program to a GE Program that lasts longer than the minimum number of hours set by the state in which the GE Program is offered.  An obvious alternative to this position is to fund students' participation in GE Programs up to the number of training hours required by the state in which the program is offered.  In other words, if a massage therapy school in Virginia (a 500-hour state) sets its program length at 600 hours, Defendants could allow that student to use federal student aid to pay for the first 500 hours, leaving him or her responsible for funding the last 100 hours.

97.     The Department considered this alternative but rejected it.  The Department's

grounds for rejecting the alternative are arbitrary and capricious.  First, the Department's claim that it lacks legal authority to fund a program partially is unsupported and dubious.  Second, the Department's argument that partially funding programs may cause harm to students who may become unable to complete their programs due to a lack of funds ignores the fact that many students enrolled at public or not-for-profit institutions are only partially funded by the Department already.  The same risks apply to those students.  It is arbitrary for the Department to take action despite a perceived risk while at the same time avoiding the same action because of the same perceived risk.

## CAUSES OF ACTION

### COUNT ONE: Arbitrary and Capricious Agency Action (5 U.S.C. § 706(2)(A)

98.    All preceding paragraphs are incorporated by reference as if restated here in full.

99.    A reviewing court shall hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

100.    The Final Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for the reasons set forth herein, including Defendants' failure to justify the choices they made, arbitrary selection of percentage criteria, overly burdensome requirements for adopting an adjacent state's hours requirements, unfounded and unwarranted assumptions, neglect of reasonable alternatives, disregard for known and identifiable problems, and reversal of a decades-old policy without adequate explanation or reasonable grounds.  Therefore, the Final Rule must be held unlawful and set aside.

### COUNT TWO: Agency Action Without Observance of Procedure (5 U.S.C. § 706(2)(D)

101.    All preceding paragraphs are incorporated by reference as if restated here in full.

102.    A reviewing court shall hold unlawful and set aside agency action found to be without observance of procedure required by law.

103.     By failing to obtain public input on the propriety of modifying the 150 Percent Rule, concealing their intention to eradicate the 150 Percent Rule, and omitting individuals with relevant experience with massage therapy and/or clock hour-based GE Programs from the negotiated rulemaking committee, Defendants failed to follow the mandatory negotiated rulemaking process prescribed by Congress.  Therefore, the Final Rule must be held unlawful and set aside.

## PRAYER FOR RELIEF

AMTA requests the following relief:

A.     A declaration, pursuant to the Declaratory Judgment Act, that the Final Rule is arbitrary, capricious, and is in violation of 5 U.S.C. § 706;

B.     An order vacating those portions of the Final Rule that modify 34 C.F.R. § 668.14(b)(26);

C.     An order enjoining the Defendants from taking any adverse actions against any GE Program or institution offering a GE Program based in whole or in part on the Final Rule's modifications to 34 C.F.R. § 668.14(b)(26);

D.     An order awarding AMTA its reasonable costs, including attorneys' fees, incurred in bringing this action; and

E.     Such other relief as the Court deems just and proper.

Respectfully submitted this 7th day of June, 2024.

            /s/ Drew T. Dorner
John M. Simpson (D.C. Bar No. 256412)
Drew T. Dorner (D.C. Bar No. 1035125)
Duane Morris LLP
901 New York Avenue NW, Suite 700 East
Washington, D.C.  20001-4795
Telephone:  +1 202 776 7800
Fax:  +1 202 776 7801
E-mail:  jmsimpson@duanemorris.com
E-mail:  dtdorner@duanemorris.com

Edward M. Cramp (PHV motion forthcoming)
Duane Morris LLP
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: +1 619 744 2200
Fax: +1 619 744 2201
E-mail: emcramp@duanemorris.com

*Attorneys for Plaintiff*