IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN MASSAGE THERAPY ASSOCIATION, ) ) ) ) | |
| v. ) | Case Number:  1:24-cv-01670 |
| ) U.S. DEPARTMENT OF EDUCATION, et al., ) ) Defendants. ) ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

John M. Simpson (D.C. Bar No. 256412)
Drew T. Dorner (D.C. Bar No. 1035125)
Duane Morris LLP
901 New York Avenue NW, Suite 700 East
Washington, D.C.  20001-4795
Telephone:  +1 202 776 7800
Fax:  +1 202 776 7801
E-mail:  jmsimpson@duanemorris.com
E-mail:  dtdorner@duanemorris.com

Edward M. Cramp (PHV motion forthcoming)
Duane Morris LLP
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: +1 619 744 2200
Fax: +1 619 744 2201
E-mail: emcramp@duanemorris.com

*Attorneys for Plaintiff*

June 7, 2024

## TABLE OF CONTENTS

Page

I.    INTRODUCTION .............................................................................................1

II.   STATEMENT OF FACTS ................................................................................2

      A.    AMTA Serves the Interests of Massage Therapy Institutions Throughout
            the United States. ................................................................................... 2

      B.    Statutory and Regulatory Background ................................................... 2

            1.    Congress Enacts the Higher Education Act of 1965 to Provide Federal
                  Financial Aid for Students in Institutions of Higher Education. ............... 2

            2.    The Department Promulgates a Rule in 1994 to Offer Latitude to
                  Institutions While Simultaneously Protecting Students and Taxpayers. .... 4

            3.    The Department Expands the 150 Percent Rule in 2020 After Consensus
                  in Negotiated Rulemaking. .................................................................. 7

            4.    The Department Eliminates the 150 Percent Rule in October 2023 Without
                  Sufficient Notice, Industry Participation, or Time for the Public to
                  Comment. ......................................................................................... 8

                  a.    The Department Announces Formation of Negotiated
                        Rulemaking Committees Without Mentioning the 150
                        Percent Rule. ........................................................................8

                  b.    The Department Forms an Institutional and Programmatic
                        Eligibility Committee Without Mentioning the 150 Percent
                        Rule or Including a Massage Therapy Representative. ..................9

                  c.    The Department's NPRM Buries Proposed Elimination of
                        the 150 Percent Rule and Provides Only 30 Days for Public
                        Comment. .................................................................................10

                  d.    The Department Acknowledges the Difficulties Educational
                        Institutions Will Face in Complying with the Final Rule But
                        Does Not Delay its Implementation. ...............................................13

      C.    Massage Therapy Education in the United States and the Dangers of the
            Final Rule. ............................................................................................ 14

            1.    AMTA Member Schools Offer Reputable Massage Therapy Programs to
                  Disadvantaged Students Who Wish to Improve Their Financial Condition.
                  ........................................................................................................ 14

2.      The Final Rule Will Decimate AMTA Member Schools Across the U.S.17

III.    LEGAL STANDARD FOR A PRELIMINARY INJUNCTION .......................................19

IV.     ARGUMENT ..........................................................................................................................20

        A.      The Court Should Issue a Preliminary Injunction Because Plaintiff
                Demonstrates a Likelihood of Success on the Merits. .......................................... 20

                1.      The Final Rule is an Arbitrary and Capricious Departure from 30 Years of
                        Practice. ...................................................................................................... 20

                2.      The Defendants Rely on Flawed "Studies" to Support the Final Rule. .... 24

                3.      The Department Makes Improper Assumptions And Ignores Problems
                        With Its Other State Exception. ............................................................... 27

                4.      The Department Failed to Account For the Realities of Accreditation
                        Timelines (Until It Was Too Late). .......................................................... 30

                5.      The Department Did Not Examine An Important Assumption Regarding
                        Students' Ability to Participate in Direct Loan Programs. ..................... 32

                6.      The Defendants Irrationally Disregarded an Obvious Alternative. .......... 33

                7.      Defendants Disregarded Procedures Required by Law. .......................... 35

        B.      Plaintiff's Members Are Likely to Face Imminent Irreparable Harm
                Unless the Final Rule is Preliminarily Enjoined....................................................... 37

                1.      Absent an Injunction, Many AMTA Member Schools Face Irreparable
                        Economic Harm from Loss of Both Title IV Funds and Students............ 37

                2.      Absent an Injunction, Many AMTA Member Schools Face Loss of
                        Accreditation and, Consequently, Loss of Title IV Funds....................... 40

        C.      The Balance of Equities Favors Plaintiff, and Injunctive Relief is in the
                Public's Interest. ...................................................................................................... 41

V.      CONCLUSION AND REQUEST FOR EXPEDITED DECISION..................................42

## I.    INTRODUCTION

Facing the imminent closure of many of its member schools, the American Massage Therapy Association ("AMTA") asks this Court to invalidate the most recent unlawful attempt by the U.S. Department of Education ("Department") and its Secretary, Miguel Cardona ("Secretary," and collectively, "Defendants"), to arbitrarily prevent or severely limit a large number of colleges and their students from participating in certain federal financial aid programs.  The rule at issue (the "Final Rule") modifies 34 C.F.R. § 668.14(b)(26) and—if not enjoined and vacated—is projected to affect a host of post-secondary schools around the nation whose curriculums cover an array of industries when it takes effect on July 1, 2024.  But while its impact may be far-reaching, the Final Rule is expected to deliver one of the biggest blows to massage therapy schools— including those represented by AMTA.

AMTA brings this action under the Administrative Procedure Act and Declaratory Judgment Act seeking declaratory and injunctive relief arising out of the promulgation—without observance of required procedure—of a legislative rule by Defendants that is an arbitrary, capricious, unexplained, and unsupported change from longstanding Department policy upon which institutions of many types, including massage therapy schools, have relied for 30 years.

Defendants hastily included the Final Rule in a package of significant changes to their regulations arising under the Higher Education Act ("HEA") last year without adequate notice, a sufficient public comment period, a lawful negotiated rulemaking process, supportive research, or reasonable justification.  When the Final Rule takes effect on July 1, 2024, it will deprive many of AMTA's member schools of the ability to receive one or more types of federal student aid for certain programs.  As a result, it will be exceptionally difficult (for some schools) and impossible (for many others) to operate and serve their students.  The Final Rule all but blocks massage therapy educational programs—which provide substantial earnings boosts in a matter of months

to students who are overwhelmingly female and demographically and economically diverse—from participating in federal student aid programs that Congress expanded expressly to encourage vocational training.

In light of the multiple infirmities of the Final Rule and the imminent and irreparable harm that it will inflict upon institutions and students, this Court should enjoin the rule from taking effect pending the outcome of this case.

## II.     STATEMENT OF FACTS

### A.     AMTA Serves the Interests of Massage Therapy Institutions Throughout the United States.

AMTA is a non-profit professional association whose mission is "[t]o serve AMTA member schools while advancing the art, science, and practice of massage therapy."  Declaration of Jeffrey Flom ("Flom Decl.") ¶ 4.  To this end, AMTA supports professional competency by advocating for standards in massage therapy education that benefit practitioners and the public alike.  *Id.* ¶ 5.  AMTA conducts and supports research into massage therapy education nationwide, and it surveys its member schools about accreditation, curriculum, duration of massage therapy programs, and clock-hour requirements (a measure of program length) in various states.  *Id.*

AMTA has nearly 600 massage school members across the nation.  *Id.* ¶ 5.  These schools represent a majority of massage therapy educational institutions in the United States, a substantial number of which will suffer imminent and irreparable harm if the Final Rule is allowed to take effect on July 1, 2024.  *Id.* ¶¶ 5, 8, 21–35.

### B.     Statutory and Regulatory Background

#### 1.     Congress Enacts the Higher Education Act of 1965 to Provide Federal Financial Aid for Students in Institutions of Higher Education.

In 1965, Congress enacted the HEA to "strengthen the educational resources of [the nation's] colleges and universities and to provide financial assistance for students in postsecondary

and higher education."  Pub. L. 89-329, Nov. 8, 1965, 79 Stat. 1219.  Central to the HEA is Title

IV, which authorizes various federal student aid ("FSA") programs that provide financial

assistance to students to pursue postsecondary education at eligible institutions of higher

education.  *See* Alexandra Hegji, Cong. Rsch. Serv., R43159, Institutional Eligibility for

Participation in Title IV Student Financial Aid Programs 1 (2023); *see also* 20 U.S.C. §§ 1070–

1099d.  One such Title IV program, the Federal Pell Grant program, "is the single largest source

of federal grant aid supporting undergraduate students."  Cassandra Dortch, Cong. Rsch. Serv.,

R45418, Federal Pell Grant Program of Higher Education Act: Primer 1 (2021) ("Dortch").  "Pell

Grants are need-based aid that is the foundation of all need-based federal student aid awarded to

undergraduates.  Unlike loans, students do not repay Pell Grants."  *Id.*

Any institution that wants to be able to receive FSA funds pursuant to a Title IV program,

including Pell Grants and direct loans under the William D. Ford Direct Loan Program, must meet

several statutory and regulatory eligibility criteria, including the statutory definition of an

"institution of higher education."  *Id*. at 11.  For purposes of Title IV, an institution of higher

education can include a "proprietary institution of higher education," which the HEA defines as

any school that is neither a public nor a nonprofit institution and which "provides an eligible

program of training to prepare students for gainful employment in a recognized occupation,"

among other requirements.  20 U.S.C. §§ 1001(a), 1002(a)(1)(A) & (b).  A vocational school may

also qualify as an "institution of higher education."  20 U.S.C. § 1002(a)(1)(B).  Since every

academic program at a proprietary institution or vocational institution must "prepare[ ] a student

for gainful employment in a recognized occupation" in order to be an "eligible program," academic

programs at proprietary and vocational schools are often called "GE Programs."[1]

On top of the statutory criteria that an institution must satisfy for Title IV eligibility, the Department imposes additional requirements in parts 600 and 668 of Title 34 of the Code of Federal Regulations.  Relevant to this action, an educational program offered by a proprietary institution of higher education or vocational institution qualifies to receive FSA funds under Title IV if, among other things, it "require[s] a minimum of 15 weeks of instruction," it is "at least 600 clock hours, 16 semester hours, or 24 quarter hours," and it "provide[s] undergraduate training that prepares a student for gainful employment in a recognized occupation[.]"  34 C.F.R. § 668.8(d)(1).

The eligibility requirements under the Pell Grant and direct loan programs differ in some material respects.  For this case, one critical difference relates to program length.  In order for students to use *Pell Grant* funds under Title IV for a GE Program, the GE Program must entail at least "600 clock hours of instruction, 16 semester hours, or 24 quarter hours," offered over 15 or more weeks.  20 U.S.C. § 1088(b)(1)(A).  In contrast, to qualify for participation in direct loan programs, a GE Program (among other requirements) must last between 300 and 600 clock hours of instruction over 10 or more weeks.  *Id*. § 1088(b)(2).  Certain GE Programs, including many massage therapy programs offered by AMTA member schools, are measured in "clock hours," as opposed to traditional units for measuring the length of an academic course (e.g., credit, semester, or quarter hours).  *See* Flom Decl. ¶ 8.

        2.    <u>The Department Promulgates a Rule in 1994 to Offer Latitude to Institutions While Simultaneously Protecting Students and Taxpayers.</u>

On February 28, 1994, the Department issued a Notice of Proposed Rulemaking, declaring

---

[1] Programs at not-for-profit and public institutions of higher education that are at least one year long and lead to a certificate or other non-degree credential are also GE Programs.  *See* 34 C.F.R. § 668.8(c)(3).

that the "Federal government's management of its responsibilities to determine eligibility and to certify institutions to participate in Title IV, HEA programs has not always been adequate to prevent abusive practices at institutions that participate in those programs." 59 Fed. Reg. 9,526 (Feb. 28, 1994).  Specific to GE Programs, the Department claimed that many schools were providing excessively long programs that required students to incur additional unnecessary debt. As an example, the Department identified an institution that sought approval of a 600-hour program when the state in which the institution is located required only 40 hours of training for entry level positions for which the program provided training.  *Id*. at 9,547–48.  To address this concern while still seeking to accomplish the HEA's purpose of making federal aid available to postsecondary students, the Department proposed (and later issued) regulations that it concluded would "help curb abuse of the programs by preventing institutions from providing unnecessary training to students in order to receive additional Title IV, HEA program funds."  *Id*. at 9,532–33.

The Department's February 1994 proposal provided that, to be eligible for Title IV FSA funds, any institution offering a GE Program must agree in its Program Participation Agreement ("PPA")[2] to demonstrate a reasonable relationship between the quantity of training provided in the program and entry-level requirements for employment.  *Id*. at 9,548.  The Department declared that it would "consider the relationship . . . to be reasonable if the number of clock hours in the program does not exceed by more than 50 percent any State requirement for the minimum number of clock hours necessary to train the student in the occupation for which the program prepares the student."  *Id*.  In effect, the Department was capping the number of clock hours that a school could

---

[2] Institutions of higher education are required to execute a PPA in order to participate in Title IV federal student aid programs.  The PPA is an agreement between the institution and the Department that certifies that the institution complies with all applicable statutory provisions of Title IV of the HEA.  *See* 34 C.F.R. § 668.14.

provide (and charge for) in a clock-hour based GE Program while maintaining eligibility for Title

IV FSA funds.

On April 29, 1994, the Department published a final version of its proposed rule.  It stated:

> If the stated objectives of an educational program of the
> institution are to prepare a student for gainful employment in a
> recognized occupation, the institution will—
> (i) Demonstrate a reasonable relationship between the length of
> the program and entry level requirements for the recognized
> occupation for which the program prepares the student.  The
> Secretary considers the relationship to be reasonable if the
> number of clock hours provided in the program does not exceed
> by more than 50 percent the minimum number of clock hours
> required for training in the recognized occupation for which the
> program prepares the student, as established by the State in
> which the program is offered, if the State has established such a
> requirement or as established by any Federal agency; and
> (ii) Establish the need for the training for the student to obtain
> employment in the recognized occupation for which the program
> prepares the student.

59 Fed. Reg. 22,348, 22,427 (Apr. 29, 1994).  The rule would be (and still is) codified at 34 C.F.R.

§ 668.14(b)(26).

This rule—which became known in the industry and will be referred to herein as the "150

Percent Rule"—ensured that proprietary institutions could offer their students clock hour-based

programs that lasted up to 150 percent of the state's required minimum clock hours while still

giving students the opportunity to use Pell Grants and other Title IV FSA funds to pay for their

educations.  This built-in flexibility is consistent with the Department's stated purpose for

promulgating the 150 Percent Rule: "[A]llow[ing] enough latitude for institutions to provide

quality programs and furnish[ing] a sufficient safeguard against the abuses of course stretching."

*Id*. at 22,366.  In fact, when the 150 Percent Rule was finalized in 1994, the Department disagreed

with commenters who argued that "the standard . . . was too lenient and that the program length

should not exceed the minimum State standard."  *Id*.

      3.      <u>The Department Expands the 150 Percent Rule in 2020 After Consensus in Negotiated Rulemaking.</u>

Except for minor, immaterial modifications that are not at issue in this action, the substance of the 150 Percent Rule remained unchanged for nearly three decades.[3]  Then, in 2020, the Department changed the 150 Percent Rule to offer even more flexibility to institutions of higher education in light of the Department's recognition that "individuals often move from one State to another or live, work, and learn in different States at the same time."  85 Fed. Reg. 54,742, 54,776 (Sept. 2, 2020).  In accordance with its finding, the Department amended the 150 Percent Rule by consensus in negotiated rulemaking to account for the mobility of students.  *Id*. at 54,743.  Under the 2020 version, an institution offering a GE Program could still demonstrate a "reasonable relationship" between program length and employment entry requirements by showing that its program length did not exceed 150 percent of its own state's minimum required hours.  *Id*. at 54,816.  Alternatively, the institution could demonstrate reasonableness by showing that its GE Program length did not exceed 100 percent of the minimum hours required by an adjacent state.  *Id*.

In issuing the amendment, the Department rejected public commentary claiming that the Department's 2020 version did not go far enough to prevent institutions from lengthening their programs and concluded, based on the reasons outlined in its Notice of Proposed Rulemaking and the supporting comments it received, that the amended language struck "a reasonable balance between supporting students who must qualify for State licensure and preventing abuse."  *Id*. at 54,776.  In the Notice of Proposed Rulemaking, the Department had explained that it "did not want

---

[3] Effective July 1, 2015, the Department made immaterial changes to the text of the rule and added a minor requirement that each institution provide a certification required under 34 C.F.R. § 668.414.  *See* 79 Fed. Reg. 64,890, 65,007 (Oct. 31, 2014).  34 C.F.R. § 668.414 was removed and reserved effective July 1, 2020.  *See* 84 Fed. Reg. 31,392, 31,453 (July 1, 2019).

schools to inflate the number of hours in a program beyond those that a student needs to complete

in order to get a good job in their field[.]" 85 Fed. Reg. 18,638, 18,664 (Apr. 2, 2020).  However,

it kept the "150 percent threshold" because it "need[ed] to afford those pursuing career and

technical education the same opportunities to develop advanced competencies in order to qualify

for higher paying and more secure jobs."  *Id*.  The Department was concerned that a lower

threshold would result in "students fac[ing] disparate treatment [where] Title IV funds can be used

by a student who wishes to pursue a graduate degree simply because they are interested in a topic,

but cannot be used by a student in a [GE] program who wants to complete coursework to develop

advanced skills and competencies that *go beyond basic licensure requirements*."  *Id*. (emphasis

added).

<div style="margin-left:2em">

4.  <u>The Department Eliminates the 150 Percent Rule in October 2023 Without Sufficient Notice, Industry Participation, or Time for the Public to Comment.</u>

a.  *The Department Announces Formation of Negotiated Rulemaking Committees Without Mentioning the 150 Percent Rule.*

</div>

All regulations governing Title IV, FSA programs must undergo "negotiated rulemaking"

before they can be submitted to the public for notice and comment.  *See* 20 U.S.C. § 1098a.  On

May 26, 2021, the Department announced its intention to form negotiated rulemaking committees

to prepare proposed regulations governing FSA programs.  *See* 86 Fed. Reg. 28,299 (May 26,

2021).  In its announcement, the Department listed 14 specific "topics for regulation."  Modifying

the 150 Percent Rule or any aspect of 34 C.F.R. § 668.14 was not among them.  *Id*. at 28,299–300.

The Department also held public hearings on its "rulemaking agenda" starting June 21 through

8

October 27, 2021.  *See* 86 Fed. Reg. 69,607, 69,608–09 (Dec. 8, 2021).  At no time did the Department propose making changes to the 150 Percent Rule.[4]

> b.      *The Department Forms an Institutional and Programmatic Eligibility Committee Without Mentioning the 150 Percent Rule or Including a Massage Therapy Representative.*

Following the conclusion of the public hearings and as the next stage in the negotiated rulemaking process, the Department announced on December 8, 2021 that it would form an "Institutional and Programmatic Eligibility Committee" ("Committee") to address seven topics— none of which referred to the 150 Percent Rule or 34 C.F.R. § 668.14.  86 Fed. Reg. 69,607, 69,608 (Dec. 8, 2021).

Although the Department averred that the Committee "w[ould] include representatives of organizations or groups with interests that are significantly affected by the subject matter of the proposed regulations," *id*. at 69,607, the Department did not include a person with experience in clock hour-based programs, let alone a representative with experience in massage therapy education, on the Committee.  Instead, all proprietary institutions of higher education were represented by South College's Chief Operating Officer, Bradley Adams, and Aviation Institute of Maintenance's Vice President of Administration, Michael Lanouette.[5]

The Committee met in January, February, and March 2022.  It was not until the Committee's first meeting—after its membership was established, and after the public had its opportunity to comment on rulemaking topics—that the Department, out of nowhere, sought

---

[4] The transcripts for the public hearings held on June 21 through October 27, 2021 are available at https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html.

[5] *See* Ex. 1, Dept. of Educ., 2022 Negotiated Rulemaking Institutional and Programmatic Eligibility Committee, Committee Members (2022), https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/revnegregcommlist508.pdf.

"feedback from the [C]ommittee on the appropriate maximum length of aid eligibility" for a gainful employment program.[6]  Over the course of several negotiated rulemaking sessions, the negotiators considered several changes, but did not reach consensus on whether, or how, the 150 Percent Rule should be modified.[7]

> c.      *The Department's NPRM Buries Proposed Elimination of the 150 Percent Rule and Provides Only 30 Days for Public Comment.*

On May 19, 2023—approximately three decades after the 150 Percent Rule was originally adopted and just three years after it was amended by consensus—Defendants published a Notice of Proposed Rulemaking in which they proposed to abandon the 150 Percent Rule.  As initially proposed, the rule would have limited the number of hours in a GE Program to the greater of:

> (A) The required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement, or as establish by any Federal agency or the institution's accrediting agency; or

> (B) Another State's required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, if certain criteria is met.

88 Fed. Reg. 32,300, 32,492 (May 19, 2023) ("NPRM").  Under the proposal in the NPRM, an institution could have relied on paragraph (B) only if "the institution documents, with substantiation by a certified public accountant who prepares the institution's compliance audit report" that, in the most recently completed award year, a majority of the program's students either

---

[6] Ex. 2, Dept. of Educ., Institutional and Programmatic Eligibility Committee, Session 1, Day 4, Morning, at 11 (January 21, 2022), https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/transcjan21am.pdf.

[7] All of the transcripts for the Committee's January 18 through March 18, 2022 meetings are available at: https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html.

lived in the other state, went to work in the other state, or certified at the time of their enrollment that they intend to live in a different state within the same metropolitan statistical area. *Id*.

In the NPRM the Defendants argued, "[P]rograms funded in part by taxpayer dollars should meet the requirements for the occupation for which they prepare students as a safeguard of the financial investment in these programs." *Id*. at 32,314. The Defendants defended their proposed abandonment of the 150 Percent Rule based on purported concerns about:

- Causing students to use more of their lifetime eligibility for Pell Grants or other federal financial aid;

- Higher debt and a longer period of enrollment without requisite career benefits;

- "Overly long" programs that may end up generating unnecessary transfers from the Department to the institution in the form of financial aid funding courses that are not needed for the borrower to obtain a position in the field for which they are being prepared, or which "may depress students' ability to complete, as [they] introduce more opportunities for life to interfere with academics[ ] and cost students time out of the labor force";

*Id*. at 32,381–82, 32,451. The Defendants buried their proposed modifications to the 150 Percent Rule in over 200 pages of complex and new proposed regulations that affected broader sections of the higher education industry. *See generally id*. at 32,300–32,511. To make matters worse, the Department provided only 30 days for the public to submit comments to its lengthy proposal. *See id*. at 32,300 ("We must receive your comments on or before June 20, 2023.").

Notwithstanding the Defendants' unreasonable deadline, commenters identified numerous legal and practical flaws of the NPRM's proposed gutting of the 150 Percent Rule, including (1) the lack of representation of beauty and wellness industries or small, proprietary schools on the Committee; (2) the Department's failure to account for the time it will take accrediting agencies and states to approve changes to the lengths of GE Programs; (3) the preclusion of student mobility post-graduation and diminution of the quality of education received by students; and (4) undermining the Interstate Massage Therapy Compact, which adopts a 625-hour training minimum

based on the massage therapy industry average.  *See* 88 Fed. Reg. 74,568, 74,571–72, 74,639–42

(Oct. 31, 2023).

Despite these (and other) significant flaws, the Defendants were undeterred.  On October

31, 2023, the Defendants published the Final Rule, adopting a regulation that is substantially

similar to what the Defendants proposed in the NPRM, with an effective date of July 1, 2024.  *Id.*

at 74,696–97.  The Final Rule states:

> If an educational program offered by the institution on or after
> July 1, 2024, is required to prepare a student for gainful
> employment in a recognized occupation, the institution must—
>
> (i) Establish the need for the training for the student to obtain
> employment in the recognized occupation for which the program
> prepares the student; and
>
> (ii) Demonstrate a reasonable relationship between the length of
> the program and the entry level requirements for the recognized
> occupation for which the program prepares the student by
> limiting the number of hours in the program to the greater of—
>
> (A) The required minimum number of clock hours, credit hours,
> or the equivalent required for training in the recognized
> occupation for which the program prepares the student, as
> established by the State in which the institution is located, if the
> State has established such a requirement or as established by any
> Federal agency; or
>
> (B) Another State's required minimum number of clock hours,
> credit hours, or the equivalent required for training in the
> recognized occupation for which the program prepares the
> student, if the institution documents, with substantiation by a
> certified public accountant who prepares the institution's
> compliance audit report as required under § 668.23 that—
>
> (1) A majority of students resided in that State while enrolled in
> the program during the most recently completed award year;
>
> (2) A majority of students who completed the program in the
> most recently completed award year were employed in that
> State; or

(3) The other State is part of the same metropolitan statistical area as the institution's home State and a majority of students, upon enrollment in the program during the most recently completed award year, stated in writing that they intended to work in that other State; and

(iii) Notwithstanding paragraph (a)(26)(ii) of this section, the program length limitation does not apply for occupations where the State entry level requirements include the completion of an associate or higher-level degree; or where the program is delivered entirely through distance education or correspondence courses[.]

*Id*. at 74,696–97.

> d.     *The Department Acknowledges the Difficulties Educational Institutions Will Face in Complying with the Final Rule But Does Not Delay its Implementation.*

Not long after issuing it, the Department acknowledged that the Final Rule had a serious problem.  On April 9, 2024, the Department issued Electronic Announcement GEN-24-07 ("EA") in which it admitted that "institutions face unique challenges outside their control that may affect their ability to comply" with 34 C.F.R. 668.8(b)(26).[8]  These challenges—which had been predicted in the public comments—include institutions' inability to obtain approvals from states and accrediting agencies for changes in program length in time to comply with the Final Rule.  *Id*. The Department offered a non-committal statement that it would "seriously consider such challenges, in particular prior to January 1, 2025, when determining whether to seek enforcement of these provisions."  *Id*.  Additionally, the Department announced that "an institution can raise as a defense to an enforcement action that it faced challenges in meeting compliance due to reasons that are unique, time-specific, and outside the control of the institution."  *Id*.  The Department

---

[8] U.S. Dept. of Educ., Updates on New Regulatory Provisions Related to Certification Procedures and Ability-to-Benefit (GE-24-03), Apr. 9, 2024, https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2024-04-09/updates-new-regulatory-provisions-related-certification-procedures-and-ability-benefit.

further speculated that it "believes" that most of those concerns and challenges affecting compliance with the 150 Percent Rule will have been resolved or sufficiently mitigated by January 1, 2025, though it cited no evidence in support of that belief.

Despite finally acknowledging a major problem with the Final Rule that commenters foretold, the Department did *not* change the date on which the Final Rule becomes effective.  The Department also did not offer AMTA member schools or similarly situated educational institutions any affirmative relief on which they can confidently rely as they scramble to adapt to the Department's elimination of a rule on which they and many of their peer schools have relied for nearly 30 years.  The Department merely provided itself with "enforcement discretion" without telling schools how that discretion would be exercised, leaving institutions in regulatory limbo.

### C.    Massage Therapy Education in the United States and the Dangers of the Final Rule.

#### 1.    AMTA Member Schools Offer Reputable Massage Therapy Programs to Disadvantaged Students Who Wish to Improve Their Financial Condition.

Nearly 600 AMTA member schools offer massage therapy programs across the United States.  *See* Flom Decl. ¶ 5.  AMTA member schools pave the way for disadvantaged individuals to have a successful career that offers financial stability and a flexible schedule.  *Id*. ¶ 6.  Most AMTA member schools have demographically and economically diverse student bodies.  *Id*.  The overwhelming majority of students at AMTA member schools are women, and the majority of massage therapists go on to start their own massage therapy businesses.  *Id*.  After graduating from massage therapy programs offered by AMTA member schools, most of these students achieve both a passing score on licensing exams and better employment outcomes.  *See* Declarations of Lydia Benson ("Benson Decl.") ¶¶ 9–10; Mike Williams ("Williams Decl.") ¶¶ 11–12; Lauanda Davis ("Davis Decl.") ¶¶ 3, 8; Joe Lubow ("Lubow Decl.") ¶¶ 10–11; Cisco Arnold ("Arnold Decl.") ¶ 9, and Robin O'Connell ("O'Connell Decl.") ¶ 10.

The programs offered by AMTA member schools ensure that massage therapy students receive the education necessary to pass their licensure exam and competently practice their desired profession. *See* Flom Decl. ¶ 9. These competencies include, *inter alia*, a comprehensive introduction to anatomy, physiology, and medical terminology; kinesiology and joint mobilization; pathology; deep tissue (and other) massage techniques; aromatherapy, hydrotherapy, assessment and treatment planning, ethics, regulations, and guidelines for professional practice aimed at protecting the public. *Id.* In setting the length of these programs, AMTA member schools must satisfy state licensing requirements, the standards of accrediting agencies, and the preferences of the various employers who consistently hire students from these institutions. *Id.*

The majority of states require that an applicant for a massage therapy license pass the Massage & Bodywork Licensing Examination ("MBLEx"). *Id.* ¶ 16. From July 2022 through June 2023, more than 17,000 applicants took the MBLEx for the first time, and 72 percent passed the exam on the first attempt. *Id.* Statistics show that the optimal performance range of massage therapy education hours to achieve a passing score on the MBLEx is between 600 and 650 hours. *Id.* Eighty-one percent (81%) of MBLEx applicants who have received between 600–650 hours of education pass the exam on the first attempt, well above the national average. *Id.* Thus, most massage therapists have more education than the state licensing minimum, and many AMTA member schools offer affordable massage therapy programs that exceed the state licensing minimum where the institutions are located. *Id.* ¶ 9. As shown below, training in excess of the minimum requirements pays off.

Consider the American Institute of Clinical Massage ("AICM"), an AMTA member school in Post Falls, Idaho (a state with a 500-hour education/training minimum) as an example. For the past five years, nearly 100 percent of the graduates from its 750-hour accredited program have

passed the MBLEx on the first attempt and they enjoy an 86 percent job placement rate within six months of graduation. *See* Benson Decl. ¶¶ 3, 4, 9, 10. Ninety percent (90%) of AICM's students use federal funding to pay for their education, with approximately 88 percent of them using Pell Grants. *Id*. ¶ 7.

The Center for Massage & Natural Health ("Center"), an AMTA member school in Asheville, North Carolina (a 500-hour state), located in the Appalachian Mountains, has boasted a 90 percent MBLEx pass rate for the past five years for its 654-hour program. *See* Williams Decl. ¶¶ 3, 11. The Center's graduates are sought-after by employers and have a job placement rate of 75–80 percent within six months of graduation, many of them earning up to $80,000 annually at local destination resort spas. *Id*. ¶ 12. Sixty-six percent (66%) of the Center's students use federal funding to pay for their education, with 39 percent of them using Pell Grant funding. *Id*. ¶ 8.

IBS School of Cosmetology and Massage ("IBS"), an AMTA member school in Kahului, Hawaii (a 570-hour state) is the only massage therapy school on the island of Maui that offers federal financial aid. *See* Davis Decl. ¶ 10. Graduates of IBS, which has a 600-hour program, are sought-after by the hotels and resorts in Hawaii and can earn more than $100,000 annually. *Id*. ¶¶ 9, 12. IBS's 2022 graduates enjoyed a 100 percent job placement rate within one year of graduation. *Id*. ¶ 3. Fifty percent (50%) of IBS's massage therapy students use federal funding to pay for their education, with 40 percent of them using Pell Grants. *Id*. ¶ 10. For 2023, IBS graduates had a licensure rate of 87.5 percent. *Id*. ¶ 8.

At the Sarasota School of Massage Therapy ("SSMT"), an AMTA member school in Sarasota, Florida (a 500-hour state), 90 to 100 percent of graduates of its 750-hour program pass the MBLEx on the first attempt. *See* Lubow Decl. ¶¶ 3, 9, 10. SSMT's graduates are sought-after by local employers and have enjoyed a job placement rate of 88–93 percent for the past 12 years,

earning between $45,000 and $70,000 per year for entry-level positions. *Id.* ¶ 11. More than 86 percent of SSMT's students use federal funding to pay for their education, with 68 percent of them using Pell Grants. *Id.* ¶ 7.

At Eastern Virginia Career College ("EVCC"), an AMTA member school in Fredericksburg, Virginia (a 500-hour state), 95 percent of graduates of its 750-hour massage therapy program pass the MBLEx on the first attempt. *See* Arnold Decl. ¶¶ 9–10. EVCC's students are in high demand by local employers, who seek them out in the first half of the program and court them for future employment. *Id.* ¶ 9. Seventy-six percent (76%) of EVCC's massage therapy students use federal funding to pay for their education, with 68 percent of them using Pell Grants. *Id.* ¶ 7.

At the WellSpring School of Allied Health ("WellSpring"), an AMTA member school in Kansas City, Missouri (a 500-hour state), 80 to 85 percent of graduates of its 750-hour massage therapy program pass the MBLEx on the first attempt, well above the national average of 72 percent. *See* O'Connell Decl. ¶¶ 4, 10. Notably, WellSpring previously offered a separate 500-hour massage therapy program in 2018, but the MBLEx passage rates for graduates of that program were an abysmal 38 percent, so WellSpring terminated the program. *Id.* ¶¶ 12-13. Eighty-eight percent (88%) of WellSpring's massage therapy students use federal aid to fund their education, and 80 percent of those students are Pell Grant recipients. *Id.* ¶ 8. Graduates of WellSpring's massage therapy program enjoy a job placement rate of 82 percent within six months of graduation. *Id.* ¶ 10.

2.    The Final Rule Will Decimate AMTA Member Schools Across the U.S.

The consequences of the Final Rule will be catastrophic to many massage therapy schools and will likely be felt most severely by individuals in the most vulnerable sectors of society. Sixty-five percent (65%) of massage therapy schools nationwide are small or family businesses, which

includes many AMTA member schools. *See* Flom Decl. ¶¶ 5, 10. In addition, because many students at AMTA member schools come from disadvantaged backgrounds, they rely heavily on Pell Grants and direct loans to finance their educations. *Id*. ¶ 6.

For students who lack the financial means to take out loans or pursue a traditional college education, AMTA member schools can still offer training in a practical, marketable skill through their participation in the Pell Grant program. *Id*. ¶ 6. However, under the HEA, students may not use Pell Grants to pay for GE Programs such as massage therapy unless the program is at least 600 clock hours long. *See* 20 U.S.C. § 1088(b); *see also* 34 C.F.R. § 668.8(d)(1). Twenty states have a minimum clock hour requirement for massage therapy that is below 600 hours. *See* Flom Decl. ¶¶ 14, 25. In those states, the Final Rule—which caps GE Programs at the minimum number of hours required by an institution's state—destroys Pell Grant availability for thousands of students.

But the negative impact of the Final Rule extends beyond the loss of Pell Grants. It literally puts AMTA member schools between the proverbial rock and a hard place. Because it takes time for accreditors to approve changes to programs, institutions will be forced to either violate their accreditation by reducing hours without approval from their accreditors (which will jeopardize their eligibility to participate in FSA programs), or pause their massage therapy programs while their accreditors review and approve the reduced-hour curricula (which will jeopardize their ability to stay in business). *Id*. ¶¶ 32, 34; *see also* Benson Decl. ¶ 13, Arnold Decl. ¶¶ 13–16, Lubow Decl. ¶¶ 18–20, Williams Decl. ¶ 24, Davis Decl. ¶ 18, and O'Connell Decl. ¶ 16. The result will be, at best, significant financial loss to more than one-third of AMTA member schools, and, at worst, program losses that threaten the existence of many institutions that have labored for decades to provide high quality massage therapy education. *Id*. ¶¶ 20–35; *see also* Benson Decl. ¶¶ 14–15, Arnold Decl. ¶¶ 13–17, 20, Lubow Decl. ¶¶ 14, 18, 20, Williams Decl. ¶¶ 15, 16, 22, 26, Davis

Decl. ¶¶ 15–16, and O'Connell Decl. ¶ 15.  This devastating financial loss will force many AMTA member schools to terminate the employment of faculty and staff members who rely on their positions to support their families and pay for living expenses.  *Id*. ¶ 35; *see also* Williams Decl. ¶ 16, Davis Decl. ¶ 19, and O'Connell Decl. ¶ 15.

Even those AMTA member schools who manage to reduce their hours to meet the licensure requirement in their state will be forced to provide less education to students who, in turn, may ultimately face difficulty passing the MBLEx and will enter the workforce less qualified than they otherwise would have been had the Department not adopted its Final Rule.  *See* Flom Decl. ¶ 33; *see also* Williams Decl. ¶¶ 18–21, Lubow Decl. ¶ 18, Arnold Decl. ¶¶ 11, 13, and O'Connell Decl. ¶¶ 12, 17.  A lower number of qualified graduates necessarily means that there will be a shortage of massage therapists for hire, which will affect numerous massage therapy employers throughout the United States in a profession projected by the U.S. Bureau of Labor Statistics to grow 18 percent over the next eight years.  *See* Flom Decl. ¶ 33.

## III.    LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

"A plaintiff seeking a preliminary injunction 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)).  Furthermore, when "the Government is the opposing party," the determination of the third and fourth factors regarding "harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 176 (D.D.C. 2021) (same).

Historically, the D.C. Circuit "has applied a 'sliding scale' approach [to injunctive relief] under which a 'strong showing on one factor could make up for a weaker showing on another,'"

but also has suggested, without deciding the issue, that the "sliding scale" analysis might not be viable after *Winter*. *Changji*, 40 F.4th at 726 (citation omitted). Nonetheless, district judges in this Circuit continue to adhere to the "sliding scale" approach as binding precedent. *See Cigar Ass'n of America v. FDA*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018); *see also Navy Seal 1 v. Austin*, No. 22-cv-688, 2022 WL 1294486, at *7 (D.D.C. Apr. 29, 2022) (vacated on unrelated grounds for mootness).

## IV.    ARGUMENT

Each of the *Winter* factors weighs in favor of granting Plaintiff's request for a preliminary injunction enjoining the implementation and enforcement of the Final Rule until this Court can consider the merits of this case.

### A.    The Court Should Issue a Preliminary Injunction Because Plaintiff Demonstrates a Likelihood of Success on the Merits.

Plaintiff's challenge to the Final Rule under the Administrative Procedure Act ("APA") has a strong likelihood of success on the merits. The APA states in relevant part that a reviewing court *shall* hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" or "without observance of procedure required by law." 5 U.S.C. § 706(2). The Final Rule must be set aside under either scenario.

#### 1.    The Final Rule is an Arbitrary and Capricious Departure from 30 Years of Practice.

The Final Rule is arbitrary and capricious because it reflects an unjustified departure from past practice. "An agency's departure from past practice can . . ., if unexplained, render regulations arbitrary and capricious." *Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012). An agency that is changing an existing rule must "adequately explai[n] the reasons for a reversal of policy . . . ." *Id.* Furthermore, "the Supreme Court has held that 'the APA

requires an agency to provide more substantial justification when . . . its prior policy has engendered serious reliance interests that must be taken into account.'" *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 708 (D.C. Cir. 2016) (quoting *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015)). "In such cases, in order to offer a satisfactory explanation for its action, . . . the agency must give a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 719 (D.C. Cir. 2016). Specifically, where an agency is "not writing on a blank slate, . . . it [is] required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020).

Here, institutions of higher education, students, and states have all relied on the 150 Percent Rule for the past thirty years in at least the following ways: (1) institutions developed comprehensive curricula meeting current industry standards and prepared students for licensure examination and work in the field, while understanding that their students would be able to receive Pell Grants, *see* Benson Decl. ¶¶ 3, 7, 8, 11, Arnold Decl. ¶¶ 7, 10, Lubow Decl. ¶¶ 7, 12, Williams Decl. ¶¶ 8, 13, Davis Decl. ¶¶ 10, 13, and O'Connell Decl. ¶¶ 8-9, 11-12; (2) institutions used the 150 Percent Rule to maintain eligibility to receive Title IV FSA funds, *id.*; and (3) states relied on the 150 Percent Rule to set minimum clock hour requirements for licensing that fall below the 600 clock-hour threshold for participation in the Pell Grant program.[9]

The Defendants failed to account for any of these reliance interests adequately in

---

[9] For example, the Florida's state legislature relied on the 150 Percent Rule when it set the minimum number of training hours for massage therapists to 500. *See* Ex. 4 ("[O]n the forefront of every [Florida] legislator's mind was, 'will this reduction in hours cause potential students to lose Title IV financial aid?'").

promulgating the Final Rule, even after receiving myriad comments from students, teachers, small business owners, AMTA member schools, and accrediting agencies in response to the NPRM detailing the severely negative impacts of the Defendants' proposed changes to the 150 Percent Rule. *See, e.g.*, Exs. 4–8. Despite acknowledging that the 150 Percent Rule "has existed in some form, with only slight variation in its effect, since 1994," 88 Fed. Reg. at 74,638, and further acknowledging comments that "institutions rely on the 150 percent rule to qualify their programs for title IV, HEA participation," 88 Fed. Reg. at 74,640, at <u>no point</u> do Defendants actually "assess whether there were reliance interests, determine whether they were significant, [or] weigh any such interests against competing policy concerns." *Univ. of California*, 591 U.S. at 33; *see generally* 88 Fed. Reg. 32,300–32,511; *see also id.* at 74,568–74,710.

Meanwhile, the meager justifications that Defendants give are fatally speculative. For example, Defendants speculate, "Programs that are unnecessarily long *may* interfere with a student's ability to persist and complete a course of study," 88 Fed. Reg. at 74,639 (emphasis added), and that "accreditors "*could* . . . approve programs that they may view to be academically valuable without considering . . . the *potential* harm to students created by . . . loss of Pell Grant lifetime eligibility," *id.* at 74,637 (emphasis added). But Defendants' mere conjecture is insufficient as a matter of law to overturn any regulation, let alone a 30-year-old policy. *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) ("Though an agency's predictive judgments about the likely economic effects of a rule are entitled to deference . . . deference to such . . . judgment[s] must be based on some logic and evidence, not sheer speculation.") (alteration in original).

Moreover, the concerns Defendants cite in support of the Final Rule—safeguarding taxpayer dollars, overuse of Pell Grant eligibility, higher student debt, and "overly long

programs"—are concerns that have been around for decades, and are in fact concerns that the Department considered when it promulgated the 150 Percent Rule in 1994 and when it amended the rule by consensus in 2020.  *See, e.g.*, 59 Fed. Reg. at 9,548 and 22,366 (citing excessive program length and concerns about course stretching and excessive student debt in 1994); 85 Fed. Reg. at 54,776 (considering and rejecting comments claiming that rule did not go far enough to prevent institutions from artificially lengthening their programs).  Defendants have not explained how the facts and circumstances *today* materially differ from the facts and circumstances in 1994 and 2020, or how those changes justify the rule change in light of the heavy reliance interests of schools, industry associations, states, and students over the past thirty years.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (An agency "must" provide a detailed justification when "its prior policy has engendered serious reliance interests that must be taken into account. . . . It would be arbitrary and capricious to ignore such matters.").

These failures mirror other instances in which courts have found arbitrary and capricious action.  For example, in *Council of Parent Attorneys and Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28 (D.D.C. 2019), the Department adopted regulations in 2016 that it later postponed by two years.  The plaintiff challenged the postponement.  This Court found that the Department failed to provide a reasoned explanation for delaying the 2016 regulations, reasoning that the issue the Department offered to justify the delay had been "thoroughly discussed and dealt with years before 2018," and that the Department's reasoning "amount[ed] to the type of speculation the Supreme Court and the D.C. Circuit have rejected."  *Id*. at 48, 51.  The court also found that the Department improperly overlooked the reliance interests of states and local education agencies who had incurred costs to come into compliance with the 2016 regulations, rejecting the Department's

contention that these were "sunk investments," and finding that the Department did not "account for the costs to children, their parents, and society." *Id*. at 54.  The postponement was vacated.

Likewise, in *Casa De Maryland v. U.S. Department of Homeland Security*, 924 F.3d 684 (4th Cir. 2019), the court dealt with the rescission of the Deferred Action for Childhood Arrivals program ("DACA"), which the Secretary of Homeland Security established in 2012.  Under the policy, "certain noncitizens who came to the United States as children could receive deferred action–a decision forbearing their removal from the country." *Id*. at 690.  Hundreds of thousands of individuals structured their lives on the availability of deferred action by applying for and receiving grants of deferred action under DACA.  *Id*. at 690, 705.  But in 2017, the Acting Secretary of Homeland Security rescinded DACA based on the view that it was unlawful.  *Id*. at 690–91.  The Fourth Circuit ruled that the agency's "decision to rescind DACA was arbitrary and capricious," largely because the agency failed to "address the 'facts and circumstances that underlay or were engendered by the prior policy.'" *Id*. at 704.  In fact, the Fourth Circuit found that the memorandum directing rescission of DACA "ma[de] no mention" of the reliance interests of DACA beneficiaries or the reasons why the government's interests suddenly trumped them, and ruled against Homeland Security.  *Id*. at 705.

As in the above cases, Defendants have failed to justify their reversal of a decades-old rule that generated serious reliance interests across Plaintiff's member schools and others throughout the higher education industry.  The Final Rule should be struck down as a result.

2.      The Defendants Rely on Flawed "Studies" to Support the Final Rule.

The Defendants attempt to justify the Final Rule by citing to two studies purportedly showing that there is no connection between longer hours and higher wages in two of the industries most likely to be affected by the Final Rule: massage therapy and cosmetology programs.  *See* 88 Fed. Reg. at 74639, n.31 and n.32.  The Defendants' reliance on both of these studies is arbitrary

24

and capricious because the underlying studies have critical limitations and do not support the Defendants' conclusions. *See, e.g.*, *Lloyd Noland Hosp. & Clinic v. Heckler*, 762 F.2d 1561, 1564 (11th Cir. 1985) (overturning final rule by the Secretary of Health and Human Services because the Secretary relied on data derived from a study whose author acknowledged that the study had serious limitations).

The Defendants claim that the first study they considered (Acevedo Study) examined variations of training hours and found a lack of any correlation between setting higher hours requirements in massage therapy or cosmetology and increased wages. 88 Fed. Reg. at 74,639. But the Acevedo Study is not reliable for this purpose because it took an "average wage" for all individuals in the given occupation, did not control for the location and type (*i.e.*, part-time v. full-time) of employment, and did not distinguish between different ages and experience levels. *See* Nicolas Acevedo, Kathrun J. Blanchard, and Stephanie Riegg Cellini, Occupational Licensing and Student Outcomes," *Postsecondary Equity & Economics Project*, February 2022.

The failure to account for part-time versus full-time employment in calculating wages within an industry results in significant data discrepancies because the conversion of part-time earnings to full-time earnings drastically affects earnings data. The Final Rule does not indicate that the Defendants ascertained the amount of part-time work in the massage therapy industry (or any industry whose graduates come from GE Programs). In addition, wage discrepancies between entry-level and more experienced workers are significant, since employees do not reach their full earnings potential until they have worked for a number of years in their industries.[10] These shortcomings result in unreliable earnings data that undermine the correlation suggested in the

---

[10] *See* Public Comment, ED-2023-OPE-0089-1771, https://www.regulations.gov/comment/ED-2023-OPE-0089-1771.

Acevedo Study.  Therefore, to the extent the Defendants relied on the conclusions in the Acevedo Study to justify the Final Rule, they acted unreasonably.  *See Resolute Forest Prod., Inc. v. USDA*, 187 F. Supp. 3d 100, 123 (D.D.C. 2016) ("[W]here an agency has relied on incorrect or inaccurate data or has not made a reasonable effort to ensure that appropriate data <u>was</u> relied upon, its decision is arbitrary and capricious and should be overturned.") (emphasis in original).

In a second study (Simpson Study), the Department asserted that the study focused on cosmetology and found (1) no correlation between curriculum hours and wages, and (2) no correlation between training hours and safety incidents or complaints.  *See* 88 Fed. Reg. 74,639. Contrary to the Department's characterization, the Simpson Study itself conceded that its wage-related data were not reliable.  *See* Kaila M. Simpson, et al., "Examination of Cosmetology Licensing Issues," *American Institutes for Research*, August 30, 2016, p. 41 ("[T]here are two primary limitations to these data: (1) the data reported incorporate reported hourly wage information, which excludes data on tips–a significant source of income for those in the service industry; and (2) wage estimates are for wage and salary workers only, which excludes self-employed persons."). The Defendants' failure to acknowledge and account for the unreliability of the earnings data is significant, as it undermines their main contention that program length is not related to earnings.  Furthermore, the Simpson Study conceded that the lack of correlation between hours length and safety was due, at least in part, "to the extensive limitations in the available safety data for the cosmetology profession." *Id.* at 46.  On safety incidents, the Simpson Study admitted that the sample sizes for each variable was small and "no inferences" can appropriately be drawn from the dataset. *Id.* at 43.  Given these limitations, the Defendants' reliance on the Simpson Study is unreasonable.  *See*, *e.g*., *St. Lawrence Seaway Pilots Ass'n, Inc. v. United States Coast Guard*, 85 F. Supp. 3d 197, 206 (D.D.C. 2015) (finding the Coast Guard's final rule setting pilotage rates

arbitrary and capricious because the Coast Guard "provided no rational justification for its decision to continue using data *the sources of which* affirmatively stated was inaccurate") (emphasis in original).

> 3.    The Department Makes Improper Assumptions And Ignores Problems With Its Other State Exception.

The Department's promulgation of the Final Rule was also arbitrary and capricious because the Department failed to justify its key assumptions related to the "other state" exception proposed in 34 C.F.R. § 668.14(b)(26)(ii)(B) of the Final Rule, and also failed to grapple with the problems created by that exception. "Agencies always bear the 'affirmative burden' of 'examin[ing] a key assumption' when 'promulgating and explaining a non-arbitrary, non-capricious rule.'" *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018) (quoting *Okla. Dep't of Env'tl Quality v. EPA*, 740 F.3d 185, 192 (D.C. Cir. 2014)). "That means that an agency 'must justify [a key] assumption' underlying its regulation 'even if no one objects during the comment period.'" *Id*. Likewise, "Agency action is arbitrary and capricious 'if the agency … entirely failed to consider an important aspect of the problem[.]'" *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)); *see also Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1064 (11th Cir. 2008) (same).

The Final Rule states that an institution may offer a program based on *another state's* minimum hours requirement only when the institution can show that: (1) a majority of the program's students lived in the other state during the most recent award year; (2) a majority of the program's students who completed the program in the prior award year were employed in the other state; or (3) the institution is located in a metropolitan statistical area ("MSA") shared by two or more states and a majority of students, at the time of enrollment in the program during the most

recently completed award year, stated in writing their intention to work in the other state.  *See* 88 Fed. Reg. at 74,696–97.  These carve-outs may appear to provide some relief from the Final Rule, but they are practically unusable and premised on arbitrary, unsupported, and incorrect assumptions.

For example, the Department fails to explain why the exception is triggered only when a "majority" of students live in, work in, or intend to work in a specific neighboring state.  Why did the Department select 50-percent-plus-one as the triggering percentage?  Why not 33 percent?  Or 25 percent?  Or 75 percent?  And, what about institutions whose students work in a variety of other states, not just one other state?  Or institutions whose students choose to work in a different profession after graduation—or not to work at all?  The Department fails to explain its assumptions or establish a logical connection between the purpose of the exception and the requirement that a school show a "majority" of its students live in, work in, or intend to work in another state.  This failure renders the Final Rule arbitrary and capricious.  *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1153 (D.C. Cir. 2013) ("An agency may not pluck a number out of thin air when it promulgates rules in which percentage terms play a critical role."); *see also Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 377 (D.C. Cir. 2013); *Time Warner Ent. Co., L.P. v. FCC*, 240 F.3d 1126, 1137 (D.C. Cir. 2001).

The Department also unreasonably assumes that institutions will have access to the data necessary to establish eligibility for the exception.  For the most part, the data necessary to establish these exceptions will come from self-reporting by current or former students.  The Department assumes without explanation that institutions will actually be able to obtain sufficient responses from enough students to justify adoption of another state's clock hour requirements.  In order to show that a "majority" of students are working in another state, for example, the Department

28

assumes that institutions can gather enough information to prove that an absolute majority of its prior-year graduates worked in a different state.  Any institution with a thin majority of students practicing, living, or intending to practice in an adjacent state will have to achieve nearly a 100 percent response rate to prove it is entitled to avail itself of one of Defendants' three exemptions in proposed § 668.14(b)(26)(ii)(B).  However, regulations that assume schools can effectively use this alternative process and secure responses from up to 100 percent of students are arbitrary and capricious, as this Court has held before in a case against the Department.  *See Am. Ass'n of Cosmetology Schs. v. DeVos*, 258 F. Supp. 3d 50, 74–75 (D.D.C. 2017) ("*AACS*") (invalidating rule on the bases that it was capricious to assume that a 100 percent response rate was (1) feasible or (2) statistically significant).

The Department's assumptions with respect to the MSA-based exception (§ 668.14(b)(26)(ii)(B)(3)) are even starker: not only does the Department assume a 100 percent response rate is possible, but it assumes, without proof, that students will not change their minds about the state in which they want to work, like they might do when they get their first job offer. Worse, this assumption contradicts the Department's finding in 2020 that "individuals often move from one State to another or live, work, and learn in different States at the same time."  85 Fed. Reg. at 54,776.

Moreover, for AMTA member schools located in an area with a high concentration of states (e.g., the northeastern United States), it may be impossible for any institution to show that a majority of students go to *one* nearby state for work.  New Jersey is one such example.  New Jersey requires massage therapy applicants to complete a program consisting of at least 500 clock hours before they may be licensed.  *See* N.J.A.C. § 13:37A-2.1(a)(1) (2021).  New Jersey borders New York, Pennsylvania and Delaware, and it is close to Connecticut, Maryland, and Washington, D.C.

Students attending an AMTA member school in New Jersey could work in any of those jurisdictions post-graduation.  Or, to borrow the Defendants' words, all of those states would be "close to where they live or attend school."  88 Fed. Reg. at 74,639.  However, if 25 percent of the students at these schools go to (or live in) each of the adjacent states (and even assuming that no students go to work in any of the nearby, but non-adjacent, states), that means these schools will never be able to show that a "majority" of its students work, live, or intend to work in any given state outside New Jersey—and therefore will never be able to qualify for the "other state" exception to the Final Rule.[11]  In practice, the AMTA member schools located in areas with high concentration of states have no way to avail themselves of the Department's purported alternatives, and the Department's failure to support these assumptions or grapple with these problems resulted in arbitrary and capricious decision-making.

4.    The Department Failed to Account For the Realities of Accreditation Timelines (Until It Was Too Late).

The Department also problematically assumes without justification that accreditors will have sufficient time to accredit (and will agree to accredit) modified programs after institutions reduce the number of required hours in accordance with the Final Rule, especially since any program modification must be approved by the institution's accreditor before the program can be offered to students.  *See* 34 C.F.R. § 602.22(a).  The Department failed to justify this assumption

---

[11] The Final Rule's reference to MSAs does not cure this issue.  First, although the Defendants suggested borrowing the Office of Management and Budget's list of MSAs, the Final Rule dropped references to the OMB, making it unclear what the term "MSA" means.  Second, even if the OMB's definition applied, MSAs still cover multiple states, particularly in the Northeast.  For example, Philadelphia's MSA includes Pennsylvania, New Jersey, Delaware, and Maryland.  Washington, D.C.'s MSA includes the District of Columbia, Virginia, Maryland, and West Virginia.  And MSAs can change periodically, further complicating any efforts by an institution to determine what its curriculum will be and what state's hours minimum will apply.  *See* OMB Bulletin No. 23-01 (July 21, 2023), available at https://www.whitehouse.gov/wp-content/uploads/2023/07/OMB-Bulletin-23-01.pdf.

Case 1:24-cv-01670-RJL   Document 3-1   Filed 06/07/24   Page 34 of 46


even though it understood that the Final Rule would force institutions that offer GE Programs to request modifications to their accreditations and approvals from state authorities.  *See* 88 Fed. Reg. at 74,641.

The Court need not speculate whether this assumption is material, whether the Department was unjustified in making it, or whether it will cause irreparable harm, because Defendants have already conceded all three points in the EA.  Just five and one-half months after it issued the Final Rule and proclaimed (again, without justification) that its "concern about the effects of excessive debt on students" outweighed institutions' "concerns about accrediting agencies and State agencies approving changes in program length and the time needed for these actions," 88 Fed. Reg. at 74,641, the Department backpedaled in the EA and admitted that "there may be circumstances outside of an institution's control that may prevent compliance with the new requirements under § 668.14(b)(26) … by July 1, 2024," including "[t]he inability to obtain approvals from States and/or accrediting agencies for changes in program length in order to comply" with the Final Rule. In short, the Department's failure to examine its assumption properly not only shows that the Final Rule is arbitrary and capricious, but also demonstrates that the Department was, in fact, just plain wrong to reject commenters' concerns about a rule that threatens the existence of massage therapy institutions.

As the preamble to the Final Rule admits, commenters raised "concern[s] about accrediting agencies and State agencies approving changes in program length and the time needed for these actions."  88 Fed. Reg. at 74,641.  The commenters suggested a "gradual transition period to bring all GE programs into compliance."  *Id*.  The Defendants' entire response was:

> The Department does not think an extended legacy eligibility period
> is appropriate given our concern about the effects of excessive debt
> on students. As already noted, we will apply this provision to new

> program enrollees following the effective date of these regulations,
> so that no currently enrolled student would be negatively affected.

*Id*.  This terse rejoinder illustrates the Department's failure to "grapple with th[is] issue in any meaningful way."  *AACS*, 258 F. Supp. 3d at 73.  The Department claims that its concerns about excessive student debt trump institutions' concerns about closures brought on by delays in re-accreditation.  But the Department offered no explanation why its concerns are more valid than the institutions' concerns.  Alleged "excessive debt" has *always* been a concern of the Department, *see* 59 Fed. Reg. at 9,548, yet Defendants do not explain why "excessive debt" is suddenly so problematic that it must jeopardize the accreditation of GE Programs across the country and upend a 30-year-old regulation long relied-upon by schools, students, and states.  Defendants also fail to acknowledge or deal with the fact that many schools will run out of funding and cease operations unless they are accredited to enroll students in shortened programs beginning July 1, 2024.  *See SEC v. Chenery*, 318 U.S. 80 (1943) (stating that a court reviewing the determination of an administrative agency must judge the validity of the action solely on the grounds invoked by the agency).

5. <u>The Department Did Not Examine An Important Assumption Regarding Students' Ability to Participate in Direct Loan Programs.</u>

Defendants admit that AMTA member schools in states that require fewer than 600 clock hours for licensure are not eligible to participate in the Pell Grant program.  *See* 88 Fed. Reg. at 74,640.  However, Defendants downplay the effect of the Final Rule by suggesting that such schools could still participate in direct loan programs authorized under Title IV, provided they meet other regulatory criteria.  *Id*.  But direct loans, unlike Pell Grants, must be repaid.  The Defendants assume, without acknowledgment (let alone justification), that low-income students who would otherwise qualify for Pell Grants will still decide to pursue massage therapy programs even if Pell Grants cannot be used to fund massage therapy education.  The same assumption

applies to every other GE Program as well.  Moreover, despite their professed concern about increasing student debt, the Defendants fail to explain why forcing a student to take out a *loan* to replace a Pell *Grant* does not have the untoward effect of actually increasing that student's debt. This outcome conflicts with the legislative findings that impelled Congress to pass Title IV of the HEA.  *See* 79 Stat. at 1232 (The purpose of Title IV is "to provide, through institutions of higher education, educational opportunity grants to … high school graduates of extreme financial need" who otherwise would not obtain the benefits of higher education).

6.   The Defendants Irrationally Disregarded an Obvious Alternative.

"The arbitrary-and-capricious standard . . . also applies to an agency's consideration of regulatory alternatives."  *AACS*, 258 F. Supp. 3d at 75 (citing *Pillai v. Civil Aeronautics Bd.*, 485 F.2d 1018, 1027 (D.C. Cir. 1973)).  While an agency need not consider every conceivable alternative, it must "address obviously germane alternatives proposed by commenters during the notice-and-comment period."  *Id.* (citing *Int'l Ladies' Garment Workers Union v. Donovan*, 722 F.2d 795, 817 (D.C. Cir. 1983)).

According to the Final Rule, if a GE Program's length is longer than the state minimum, the GE Program cannot receive *any* Title IV FSA funds—zero dollars.  One obvious alternative that Defendants should have—and actually did—consider was to fund students' participation in GE Programs up to the number of training hours required by the state in which the program is offered.  In other words, if a massage therapy school in Virginia (a 500-hour state) sets its program length at 600 hours, Defendants could allow that student to use federal student aid to pay for the first 500 hours, leaving him or her responsible for funding the last 100 hours.

While Defendants acknowledged this alternative in the preamble to the Final Rule, they gave it short shrift and came to an indefensible conclusion.  Specifically, without providing any support or legal authority, Defendants claimed that the Department "did not have the legal

authority to partially fund a program."  88 Fed. Reg. at 74,367.  Defendants also offered a second reason for rejecting this alternative: that it would be "[in]appropriate given the potential harms to students who enroll in partially funded programs and are unable to complete their programs due to a lack of title IV, HEA funds."  *Id*.

Neither reason for rejecting this alternative has merit.  As noted above, Defendants' legal argument that they do not have "authority to partially fund a program" is utterly unsupported.  On that basis alone, the Final Rule is arbitrary and capricious.  In *Casa De Maryland*, the Department of Homeland Security attempted to rescind DACA on the basis that it was "unlawful."  924 F.3d at 704.  That action, however, was held to be arbitrary and capricious by the Fourth Circuit because "neither the Attorney General's September 4 letter nor the Department's Rescission Memo identif[ied] any statutory provision with which the DACA policy conflicts."  *Id*. (citing *Encino Motorcars v. Navarro*, 579 U.S. 211, 224 (2016)).  Defendants' bare claim that they "do[ ] not have the legal authority to partially fund a program" presents an identically arbitrary scenario.

Defendants' alternative basis—that it is inappropriate to partially fund a program because students might eventually find themselves unable to complete it—ignores that this *already happens*.  The maximum Pell Grant in 2024–25 is $7,395.[12]  Total tuition and mandatory fees at the University of Maryland in 2024-25 for a resident of Maryland is $7,449.80.[13]  A given student enrolling at the University of Maryland who qualifies for Pell Grants but cannot, or chooses not to, take out a student loan (whether from the government or from a private lender) enters college "partially funded," yet Defendants have no restriction against—and no problem with—giving that student money to fund his or her education.  It is demonstrably arbitrary for Defendants to use

---

[12] *See* Federal Pell Grants, https://studentaid.gov/understand-aid/types/grants/pell.

[13] *See* Undergraduate Tuition & Fees, https://billpay.umd.edu/UndergraduateTuition.

"potential harms" of partial funding against GE Programs when the same risks apply at every other college and university.

7.    Defendants Disregarded Procedures Required by Law.

The Final Rule must be set aside because the Department engaged in rulemaking without observance of the procedure required by law.

Pursuant to 20 U.S.C. § 1098a(a), the Department must "obtain public involvement in the development of proposed regulations," including the "advice of and recommendations from individuals and representatives of the groups involved in student financial assistance programs . . . ." This information is to be obtained through "regional meetings and electronic exchanges of information," and it is to be "take[n] into account . . . in the development of proposed regulations . . . ." Once the Department has done so, and "before publishing proposed regulations" in a Notice of Proposed Rulemaking, the Department must "prepare draft regulations implementing [Title IV programs] and . . . submit such regulations to a negotiated rulemaking process." 20 U.S.C. § 1098a(b)(1). The Department must form a committee consisting of "select individuals with demonstrated expertise or experience in the relevant subjects under negotiation . . . ." *Id*.

In this case, after the Department obtained public comment (through hearings), it published a notice in the Federal Register of its intent to form a rulemaking committee and to seek nominations for committee members. *See* 86 Fed. Reg. at 69,607. This notice did not mention revisions to 34 C.F.R. § 668.14, PPAs, or the 150 Percent Rule as a topic for the Committee's consideration. In fact, the Department never stated that it was considering changing the 150 Percent Rule until it distributed written materials immediately before the Committee's first meeting in January 2022.

The lack of massage therapy or cosmetology representation during the negotiated rulemaking process prejudiced Plaintiff in light of the serious reliance interests that will be impacted by the Final Rule.  Neither of the negotiators representing the interests of the for-profit sector had the requisite knowledge or experience to represent the interests of massage therapy institutions adequately, as acknowledged by the primary negotiator for proprietary schools himself in the sessions: "I don't oversee any cosmetology schools, so we really should have had someone that's a cosmetology expert on this committee." Ex. 3, Institutional and Programmatic Eligibility Committee, Session 3, Day 4, Morning, at 52 (March 17, 2022).[14]  In contrast to most of the institutions represented by the negotiators, many massage therapy programs tie graduation to "clock-hours."  But the negotiators for proprietary institutions, whom the Defendants argue are charged with "consult[ing] with members of their constituency," 88 Fed. Reg. at 74,572, admitted they did not have sufficient understanding of the issues affecting cosmetology and massage therapy programs, which include the intricacies of "clock hour" programs, the value of educating students to a reasonable degree above a state clock hour minimum, or the devastating impact that the Department's proposal would have on AMTA member schools.  That, however, is not the fault of the negotiators.  It is the fault of the Defendants, who concealed their intention to end the 150 Percent Rule until the Committee was already formed and assembled.  Whether the Defendants' concealment was intentional or accidental, it violated 20 U.S.C. § 1098a because it kept "individuals with demonstrated expertise or experience in the relevant subjects under negotiation" off the Committee and precluded legitimate public involvement in the development of topics for negotiated rulemaking.

---

[14] Defendants admitted that massage and cosmetology institutions are the two programs most impacted by the modifications to the 150 Percent Rule.  88 Fed. Reg. at 74,639.

**B.      Plaintiff's Members Are Likely to Face Imminent Irreparable Harm Unless the Final Rule is Preliminarily Enjoined.**

A plaintiff seeking a preliminary injunction must demonstrate: "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'… Second, the harm 'must be beyond remediation.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). Typically, "economic loss" may rise to the irreparable level when "it threatens the very existence of the movant's business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). However, where economic loss will be unrecoverable, such as in a case against a government defendant where sovereign immunity will bar recovery, the movant need only demonstrate that the injury is "significant" or "serious." *Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *10 n.10 (D.D.C. Mar. 12, 2021); *see also Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 67 (D.D.C. 2010) (where economic injury is "irretrievable" the movant must also demonstrate that the loss is "serious in terms of its effect on the plaintiff").

1.      Absent an Injunction, Many AMTA Member Schools Face Irreparable Economic Harm from Loss of Both Title IV Funds and Students.

Continued Pell Grant eligibility is vital to the survival of many AMTA member schools. *See* Flom Decl. ¶¶ 6, 14, 21, 25, 30, 35.  Many students at these schools come from economically disadvantaged backgrounds and rely on Pell Grants to finance their massage therapy educations. *Id*. ¶ 6.  Federal student aid funds, and specifically Pell Grants, represent a majority of the massage therapy program revenue for many AMTA member schools.  *See* Benson Decl. ¶¶ 7, 14–15, Arnold Decl. ¶¶ 7, 13, 17, Lubow Decl. ¶¶ 7, 14, and O'Connell Decl. ¶ 8.  Yet, more than one-third of AMTA member schools are located in states where the minimum clock hours required for licensure in massage therapy are below the 600-hour statutory threshold necessary to qualify for

participation in the Pell Grant program.  *See* Flom Decl. ¶ 14.  Thus, once the Final Rule goes into effect, many of these schools will lose a majority of their revenue and will be forced to eliminate their massage therapy programs.  *Id*. ¶¶ 21–35.  The majority of massage therapy schools in the United States are small or family businesses, including many AMTA member schools.  *Id*. ¶ 10.  Therefore, loss of Pell Grant eligibility will translate into a dramatic decline in the revenue of these institutions, who will have no choice but to shut down their massage therapy programs or their businesses entirely.  *Id*. ¶¶ 21–35, Benson Decl. ¶¶ 14–15, Lubow Decl. ¶¶ 14, 20, Williams Decl. ¶¶ 15–17, 26, Arnold Decl. ¶¶ 13, 14, 16–17, 20, Davis Decl. ¶¶ 15, 19, and O'Connell Decl. ¶ 15.

There can be no doubt that this economic loss is actual, certain, and great.  In fact, at least one court has already found as much.  *See E. Gateway Comm. College v. Cardona*, 2:22-cv-3326, 2022 WL 12930195, at *3 (S.D. Ohio Oct. 21, 2022) (finding irreparable harm where Department's action would cause institution to lose Pell Grant funding and, thus, 74.5 percent of its revenue).  The law in this jurisdiction is consistent.  *See, e.g., Adirondack Transit Lines, Inc. v. Greyhound Lines, Inc.*, No. 1:22-cv-1662, 2022 WL 2452597, at *11 (D.D.C. July 1, 2022) (finding that "'several hundred thousands of dollars a month'" was "a credible claim for significant monetary harm").  Nor is there any doubt that the loss is imminent.  These AMTA member schools will lose access to Pell Grant funds as soon as the Final Rule goes into effect on July 1, 2024.

It is equally clear that this dramatic decline in the revenue of AMTA member schools would be beyond remediation.  *Newby*, 838 F.3d at 8.  Even if these schools attempted to keep operations going with funds from non-Title IV sources, any such expenditures are not recoverable against either the Secretary or the Department once AMTA prevails in this case due to sovereign immunity.  *See Cal. Ass'n of Private Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("[E]conomic loss sustained due to a federal administrative action is typically

'uncompensable' in the sense that federal agencies enjoy sovereign immunity, and the waiver of sovereign immunity in the APA does not reach damages claims . . . .").

Furthermore, although irretrievable economic loss caused by a defendant with sovereign immunity must be "'serious in terms of its effect on the plaintiff'" to be irreparable, *Air Transport Ass'n v. Export-Import Bank*, 840 F. Supp. 2d 327, 336 (D.D.C. 2021) (quoting *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)), that standard is readily satisfied by the fact that many AMTA member schools will lose so much revenue once the Final Rule goes into effect that their massage therapy program will not survive.  *See* Flom Decl. ¶¶ 21–35; *see also* Benson Decl. ¶¶ 14–15, Lubow Decl. ¶¶ 14, 20, Williams Decl. ¶¶ 15–17, 26, Arnold Decl. ¶¶ 13, 14, 16–17, 20, Davis Decl. ¶¶ 15, 19, and O'Connell Decl. ¶ 15.  For the many AMTA member schools whose only program is massage therapy, that is tantamount to closure.

This is "serious" by any measure.  *See, e.g., Canterbury Career Sch. v. Riley*, 833 F. Supp. 1097, 1105 (D.N.J. 1993) ("[W]here denial of an injunction would result in a school no longer receiving income provided by student financial aid programs and where such income is necessary to continue operating the school, this would constitute irreparable injury."); *see also In re NTE Connecticut, LLC*, 26 F.4th 980, 991 (D.C. Cir. 2022) (electric company would suffer irreparable monetary loss without stay of FERC order that barred company from power auction market because "the capacity that NTE would have received at the 2022 auction could not later be clawed back. ... [I]t is unlikely that NTE would have had a claim to lost revenue streams."); *Prof. Massage Training Ctr., Inc. v. Accreditation Alliance*, 951 F. Supp. 2d 851, 854 (E.D. Va. 2012) (finding irreparable injury where 90 percent of school's students would lose Title IV funding absent injunctive relief); *Climate Control Inst. v. Alexander*, No. 93-C-55-E, 1993 WL 840279, at *1, *4 (N.D. Okla. Aug. 16, 1993) (finding irreparable harm where Department's cohort default rates

publication caused schools, whose revenues consisted of 80% in Title IV loans, "to suffer serious cash flow shortages which, if not enjoined, will cause Plaintiffs to either downsize or cease business"); *Ross Univ. Sch. v. Cavazos*, 716 F. Supp. 638, 644 (D.D.C. 1989) (finding irreparable harm for injunction against Department's eligibility termination where a large number of students "pay their tuition with Title IV loans"). In fact, the loss of Title IV aid that AMTA member schools will suffer absent an injunction is not only "significant" or "serious," *Xiaomi Corp.*, 2021 WL 950144, at *10, it "threatens the very existence of the[ir] business[es]." *Wisconsin Gas*, 758 F.2d at 674. This is not up for debate because none of these schools can continue to operate with such a significant decline in revenue, especially since many students at AMTA member schools would not be able to pursue massage therapy education without Pell Grants. *See* Flom Decl. ¶¶ 6, 25; *see also* Arnold Decl. ¶¶ 13, 17, Lubow Decl. ¶ 14, Williams Decl. ¶ 15, Davis Decl. ¶ 15, and O'Connell Decl. ¶ 15.

2.  Absent an Injunction, Many AMTA Member Schools Face Loss of Accreditation and, Consequently, Loss of Title IV Funds.

Maintaining accreditation is essential to AMTA member schools' continued participation in Title IV FSA programs. *See* 34 C.F.R. § 600.5(a)(6). Schools who are affected by the Final Rule will need to request and obtain approval from accrediting agencies to provide a shortened program that is in line with their state's minimum licensing requirements—a process that can take months. *See* Flom Decl. ¶ 32. These member schools will suffer irreparable harm no matter what. On the one hand, these schools could await approval by accrediting agencies; however, they will lose access to all federal student aid funding (given lapse in accreditation status) once the Final Rule becomes effective, and, as a result, will be forced to cease business. *See supra*, Section IV.B.1. On the other hand, the schools could elect to offer shortened programs before receiving approval from accrediting agencies; but, this will mean the schools will be in violation of their

accreditors' requirements and, consequently, will be subject to forfeiting their accreditation and, in turn, their eligibility to participate in Title IV FSA programs.  That constitutes irreparable harm. *See Canterbury*, 833 F. Supp. at 1105 (finding irreparable harm because "unless these [cohort default] rates are suspended and notice of such suspension published, plaintiff will in all likelihood also lose its accreditation"); *see also Prof. Massage Training Ctr.*, 951 F. Supp. 2d at 856 ("Plaintiff also stands to lose business and goodwill due to loss of accreditation, and that harm is irreparable regardless of how close to the brink of insolvency a loss of Title IV funding would (or would not) leave Plaintiff").

### C.     The Balance of Equities Favors Plaintiff, and Injunctive Relief is in the Public's Interest.

Unlike the irremediable impact that the denial of injunctive relief would have on AMTA member schools, Defendants point to no legitimate harm that they will suffer if the Final Rule is enjoined during the pendency of this case.  Although the Department cites protecting students and safeguarding taxpayer dollars as justifications for its revised provision, *see* 88 Fed. Reg. at 74,639, Defendants offer no evidence that the 150 Percent Rule has contributed to higher debt for students enrolled in longer programs or has saddled students with unmanageable debt after graduation.  *See generally id.* at 74,568–74,710.  Defendants certainly have not shown that the 150 Percent Rule has made things worse for students or taxpayers since going into effect in 1994.  *Id*.

If anything, the loss of Pell Grant eligibility for most AMTA member schools and their massage therapy students will, at best, force students, including many economically disadvantaged students, to take on federal direct loans that will have to be repaid (which will in turn result in more significant debt burdens; or, at worst, will prevent socioeconomically disadvantaged students from pursing their desired profession and improving their financial condition).  These facts run counter to the Defendants' purported purposes for adopting the Final Rule.

On the other hand, any harm to the Defendants that would result from the grant of this injunction is, at most, minimal.  Therefore, the balance of equities favors Plaintiff.  *See Canterbury*, 833 F. Supp. at 1105 (granting preliminary injunction because "[t]he harm to [the Department] that would result from a grant of the injunction is minimal"); *see also Climate Control*, 1993 WL 840279, at \*4 (Department had "[n]o evidence … regarding any substantial harm which would accrue to DoE in the event that an injunction were to issue").

In addition, a preliminary injunction will serve the public interest in at least two ways.  First, temporarily enjoining the Final Rule and allowing AMTA member schools to continue participation in the Pell Grant program will permit these institutions to remain in business, retain employees who depend on these schools for a living, and provide much needed education to disadvantaged students who wish to improve their career prospects.  *See Canterbury*, 833 F. Supp. at 1106 ("[g]ranting plaintiff injunctive relief will allow its school to remain operational and would therefore serve the public interest").   Moreover, given the arbitrary and capricious nature of Defendants' Final Rule, as well as their disregard for the rulemaking process, injunctive relief serves the public interest because "[t]here generally is no public interest in the perpetuation of unlawful agency action . . . .  There is, however, a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (citation omitted); *see also Patriot, Inc. v. U.S. Dept. of Housing and Urban Dev.,* 963 F. Supp. 1, 6 (D.D.C. 1997) ("the public interest is best served by having federal agencies comply with the requirements of federal law, particularly the … APA, and the agency's own stated policies").

## V.    CONCLUSION AND REQUEST FOR EXPEDITED DECISION

For the foregoing reasons, Plaintiff respectfully submits that the Court should grant this motion and issue an order enjoining implementation and enforcement of the Final Rule pending

the outcome of this case.  Given the effective date of the Final Rule and the irreparable harm that will immediately result from it, Plaintiff requests, in accordance with LCvR 65.1(d), that a hearing be set no later than 21 days after the filing of this motion.  Plaintiff further requests either an oral decision from the bench or a minute order shortly after the hearing, and in any event at or before 11:59p EDT on June 30, to be followed by a formal opinion and order at a later date if the Court deems it warranted.

Respectfully Submitted,

_____/s/ Drew T. Dorner_____
John M. Simpson (D.C. Bar No. 256412)
Drew T. Dorner (D.C. Bar No. 1035125)
Duane Morris LLP
901 New York Avenue NW, Suite 700 East
Washington, D.C.  20001-4795
Telephone:  +1 202 776 7800
Fax:  +1 202 776 7801
E-mail:  jmsimpson@duanemorris.com
E-mail:  dtdorner@duanemorris.com

Edward M. Cramp (PHV motion forthcoming)
Duane Morris LLP
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: +1 619 744 2200
Fax: +1 619 744 2201
E-mail: emcramp@duanemorris.com

*Attorneys for Plaintiff*

43