**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICAN MASSAGE THERAPY ASSOCIATION**, | ) ) |
| Plaintiff, | ) ) ) |
| v. | )    Case No. 24-cv-1670 (RJL) ) |
| **U.S. DEPARTMENT OF EDUCATION, et al.**, | ) ) |
| Defendants. | ) ) ) |

**DEFENDANTS' BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Last October, the Department of Education issued final regulations that include a revision to one subsection of a rule governing school participation in the Higher Education Act ("HEA"), Title IV federal student aid programs that the Department administers. The revised provision, which will take effect on July 1, 2024, generally requires that, as a condition of Title IV participation, which confers financial benefits on schools, a vocational program's length cannot exceed the relevant State's mandatory training requirements to become licensed or credentialed in the occupation that the program trains students to enter. Faced with billions of taxpayer dollars spent on federal student aid, with many students left with unaffordable debt, the Department sought to align Title IV aid more closely to States' determinations of appropriate program length.

The American Massage Therapy Association ("Plaintiff" or the "Massage Therapy Association") filed suit on June 7, 2024—more than seven months after the challenged rule was published, and just over three weeks before it will take effect—and now seeks emergency injunctive relief. The Court should deny its motion. Plaintiff inexcusably delayed the filing of this case, making its claimed emergency one that it and its member schools chose to manufacture

1

themselves.

Plaintiff's arguments on the merits are also unlikely to prevail.  The Massage Therapy Association fails to show that the revised provision is arbitrary, capricious, or procedurally flawed under the Administrative Procedure Act ("APA").  Although such claims are properly evaluated based on a certified administrative record (which could have occurred by now, had Plaintiff filed suit earlier), currently-available portions of the record show that the Department considered relevant factors and reasonably explained its revision.  For its part, the Massage Therapy Association fails to justify the notion that students should be forced to spend up to 50 percent more time, with correspondingly higher costs that either students or taxpayers must bear, on training that States do not require when instead they could enter the workforce earlier—which is generally students' goal in such programs.  Congress intended Title IV aid to help students, but the only parties that benefit unequivocally from overlength programs are the schools that gain risk-free money from students' federally-funded tuition payments.  The Department has long imposed limits on program length as a condition of schools' Title IV participation and now reasonably determined that those limits should match States' occupational licensing requirements.

Equitable factors also counsel against emergency relief, but even if the Court grants such relief it should be limited to the specific provision Plaintiff challenges—34 C.F.R. § 668.14(b)(26), as revised last year, *see* 88 Fed. Reg. 74,568 (Oct. 31, 2023)—and should not extend beyond the Massage Therapy Association and its members schools.

## BACKGROUND

### A.    Statutory Framework

While other HEA titles focus on schools and teachers, Title IV is devoted to students, detailing various grant, loan, and work study assistance programs.  *See* 20 U.S.C. §§ 1070–1099d;

*cf. id.* §§ 1070(a), 1087a(a) (recognizing purpose of Title IV's grant and loan programs is to help students pursue their courses of study at participating schools). In recent years, the Department has annually disbursed more than $100 billion in new Title IV federal aid to millions of postsecondary students and their families, including around $72 billion in loans. 88 Fed. Reg. at 70,103, 70,107.

Although students are the intended beneficiaries of Title IV aid, postsecondary schools benefit when student aid recipients choose to attend their programs and thereby funnel federal grant and loan money to those programs in the form of tuition and fees. The HEA's Title IV framework holds schools accountable through statutory conditions and requirements administered by the Secretary. The HEA limits Title IV participation to "eligible" schools and requires such schools to enter into program participation agreements with the Department. *See* 20 U.S.C. §§ 1087c, 1087d, 1094. Participation agreements condition a school's continuing Title IV eligibility on the school's compliance both with express statutory requirements and with further requirements that the Secretary "determines are necessary to protect the interests of the United States and to promote the purposes of" Title IV. *Id.* § 1087d(a)(6).

In the Higher Education Amendments of 1992, Congress modified the HEA's statutory descriptions of vocational programs eligible to participate in Title IV. Pub. L. No. 102-325, § 481 (codified as amended at 20 U.S.C. § 1088(b)). As modified, eligible vocational programs now had to provide at least "600 clock hours of instruction, 16 semester hours, or 24 quarter hours," among other requirements, to participate in both the Pell Grant and loan programs. 20 U.S.C. § 1088(b)(1). Programs of "at least 300 clock hours," but "less than 600 clock hours of instruction," may be eligible to participate in Title IV's loan program if they meet regulatory requirements promulgated by the Secretary, *id.* § 1088(b)(2)(A), which Congress specified must

"determine the quality of programs of less than 600 clock hours in length," requiring "at a minimum" that such programs "have a verified rate of completion of at least 70 percent and a verified rate of placement of at least 70 percent." Pub. L. No. 102-325, § 481.

## B.   Regulatory History

At the time of the 1992 law's enactment, vocational programs were traditionally described in terms of "clock hours." *See Career College Ass'n v. Riley*, No. 94-830, 1995 WL 17958540, at *2 (D.D.C. June 16, 1995) ("Vocational classes, by contrast [to those offered in collegiate and university settings], have typically been measured in 'clock' or 'contact' hours."). However, after Congress' 1992 revisions, many vocational programs "sought to increase the amount of federal financial aid to which their students are entitled"—thus increasing the amount of Title IV funds the programs themselves would receive—"by strategically converting from the clock to the credit hour unit of measurement." *Id.*; *see id.* at *3 ("[I]t seems reasonably clear that many vocational schools artificially inflated the amount of instruction they appeared to be offering their students in order to increase their financial aid eligibility."). In response to such abuse, the Secretary made clear that, for certain non-degree vocational programs less than two years in length that chose to identify their offerings in credit hours for other purposes, the Department would apply a uniform formula for converting credit hours to clock hours for purposes of assessing Title IV eligibility. *See* 58 Fed. Reg. 39,618 (July 23, 1993) (34 C.F.R. §§ 668.8(k), (*l*), 668.9, as amended).

The Department promulgated additional regulations in 1994 to comply with the 1992 Act's directives. 59 Fed. Reg. 9526, 9527 (Feb. 28, 1994). The 1992 Act's revisions meant that certain short-term programs of less than 600 clock hours would cease to be Title IV-eligible while other vocational programs providing at least 300 clock hours could become eligible to participate in Title IV's loan programs for the first time. *Id.* at 9527, 9531. In response to those statutory

4

changes, the Department exercised its express authority under the statute to prescribe quality control regulations by requiring, as a condition of Title IV participation, that programs may not exceed by more than 50 percent the minimum number of clock hours required for occupational training by the State in which the program was located. *Id.* at 9532. The Department explained this measure "will help curb abuse" of Title IV "by preventing institutions from providing unnecessary training to students in order to receive additional Title IV, HEA program funds"—a practice known as "course stretching." *Id.* at 9532–33; 59 Fed. Reg. 22,348, 22,366 (Apr. 29, 1994) ("course stretching" is an abuse whereby vocational schools extend the length of their programs "purely for the purpose of exceeding the statutory 600 clock hour minimum" for Pell Grant eligibility, as set forth in 20 U.S.C. § 1088(b)(1)(A)); *see also id.* at 9547–48 (recognizing that "excessive length of programs requires a student to incur additional unnecessary debt"). When adopting the final provision—set forth at 34 C.F.R. § 668.14(b)(26) (version effective until June 30, 2020)—the Department recognized that some commenters favored lowering the limit to 100 percent of State requirements, but believed at the time that the 150 percent limit would "furnish[] a sufficient safeguard against the abuses of course stretching." 59 Fed. Reg. at 22,366.

In 2020, the Department revised § 668.14(b)(26) by allowing programs to rely on longer minimum requirements of adjacent States. *See* 85 Fed. Reg 54742, 54776-77 (Sept. 2, 2020); 34 C.F.R. § 668.14(b)(26) (version effective until July 1, 2024). This revision was intended to balance the competing concerns with "setting proper safeguards to ensure program length is not inflated and ensuring students are able to meet States' occupational licensure requirements," "especially in regional economies that cross State boundaries." *See id.*

In May 2023, the Department issued a Notice of Proposed Rulemaking ("NPRM") proposing, among other things, a further revision to § 668.14(b)(26) that would (1) reduce the

number of clock hours that the Secretary would generally consider reasonable from 150% to 100% of the home State's licensing requirements while (2) replacing the "adjacency" criterion for reliance on another State's licensing rule with the requirement that a majority of the program's students reside or be employed in that State, or, if part of same metropolitan statistical area, that a majority of students intend to work in that State upon graduation. 88 Fed. Reg. 32,300, 32,381–82 (May 19, 2023).  The Department explained its concerns that students who received Title IV aid to attend programs longer than necessary for State licensure were "using up more of their lifetime eligibility for Pell Grants or other Federal financial aid," and were more likely to face higher debt and longer loan repayment periods, without requisite career benefits. *See id.* at 32,381.

The Department issued final regulations on October 31, 2023, which included a final revision to § 668.14(b)(26) among other regulations.  88 Fed. Reg. 74,568, 74,696–97.  (The Department will refer to this provision and the rulemaking through which it was adopted as the "revised provision" or the "challenged rule.")  This revised provision adopted the proposed 100 percent limit based on the home State or a State where most students live, work, or intend to work, but the Department clarified that students enrolled before the effective date would not be affected. *Id.* at 74,636.

Department guidance indicates that it will not require schools to report new program lengths until all students who enrolled before July 1, 2024 have graduated, transferred, or withdrawn.  *See* Decl. of David Musser ("Musser Decl."), Ex. B at 2, attached hereto.  Further guidance indicates that, particularly for an initial six-month period after the revised provision goes into effect, the Department will seriously consider any circumstances beyond a school's control that delay its ability to reduce program lengths when deciding whether to take enforcement action. *See id.*, Ex. A.

**C.      Procedural History**

The Massage Therapy Association brought this case and sought preliminary injunctive relief on June 7, 2024, more than seven months after the challenged rule was published, and just over three weeks before it was scheduled to take effect.  ECF Nos. 1, 3.

## ARGUMENT

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (cleaned up).  It is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted), and a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in" its absence, "that the balance of equities tips in his favor, and that an injunction is in the public interest," *id.* at 20, 24.  *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (discussing the effect of *Winter* on the D.C. Circuit's prior sliding-scale approach to this four-factor test).  The last two factors merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The Massage Therapy Association fails at every step.

**A.      After waiting more than seven months to challenge this rule, the Massage Therapy Association cannot demonstrate a likelihood of irreparable harm.**

The Massage Therapy Association has not shown that its members are likely to suffer irreparable harm in the absence of preliminary injunctive relief.  The challenged rule was finalized in October of last year, fully eight months before its effective date.  Having allowed more than seven of those months to pass before bringing this challenge and seeking a preliminary injunction, Plaintiff now argues that the imminence of the rule's effectiveness threatens its member schools with irreparable harm.  In support of its argument that injunctive relief is necessary before July 1, the Massage Therapy Association's CEO suggests that schools wishing to shorten their programs

to maintain Title IV eligibility will need to seek "accreditor approval for a substantive change to a program," which can take "several months."  Decl. of Jeffrey Flom ¶ 32, ECF No. 3-2 ("Flom Decl."); *see* Decl. of Lydia Benson ¶ 13, ECF No. 3-3 ("Benson Decl.") (explaining that accreditor approval of a reduction in hours "could take several months").  He declares that, "[g]iven the short period of time before the Final Rule goes into effect, it will be extremely difficult for any institution to prepare a modified curriculum and have it approved by its accreditor and state licensing agencies by July 1, 2024."  Flom Decl. ¶ 34.  But the "short period of time before the Final Rule goes into effect" is entirely a creature of Plaintiff's delay, and cannot support a showing of irreparable harm.

To the contrary, "Courts have found that '[a]n unexcused delay in seeking extraordinary injunctive relief . . . implies a lack of urgency and irreparable harm.'"  *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)).  And "[t]he D.C. Circuit has held that a delay of forty-four days before bringing action for injunctive relief was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue . . . .'"  *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 403 (D.D.C. 2020) (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)); *see Zarei v. Blinken*, 2021 WL 9146060, at *2 (D.D.C. Sept. 30, 2021) (holding that a delay of 51 days in seeking injunctive relief is an "extensive delay" that "weighs heavily against a finding of irreparable harm"); *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 340 (D.D.C. 2012) (holding that, among other reasons, plaintiff's delay of at least 47 days "dictates against the granting of injunctive relief"); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay of two months "militates against a finding of irreparable harm").

If the challenged rule genuinely threatened the members of the Massage Therapy Association with serious irreparable harm, Plaintiff surely would not have waited so long to seek

relief.  Its failure to do so—and indeed to offer any explanation for its delay—"undercuts its asserted harms" and "weighs against granting preliminary injunctive relief."  *Florida EB5 Investments, LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020) (Leon, J.).  On that basis alone, its motion should be denied.  *See id.* (finding that plaintiff had not demonstrated irreparable harm, and denying preliminary injunction without reaching the likelihood of success on the merits).

Nor are Plaintiff's efforts to show irreparable harm persuasive on their own terms.  The Massage Therapy Association asserts two such threatened harms: the potential loss of Pell Grant eligibility for students at massage therapy schools that shorten their programs to less than 600 clock hours, Mot. at 37–40, and the potential loss of accreditation in the absence of "approval from accrediting agencies to provide a shortened program that is in line with [a] state's minimum licensing requirements—a process that can take months" to "request and obtain," *id.* at 40. Regarding the second harm, as discussed above, "[i]nstitutions could have begun the process of seeking such approval at any time after the final regulations were published on October 31, 2023"—and indeed, "many institutions have already begun the process of obtaining approvals for the reduced program lengths in order to be in compliance with the new regulations."  Musser Decl. ¶ 4.  It was no accident that schools had eight months to adjust to the challenged rule: in the "Master Calendar Provision" of the HEA, Congress required that any regulatory changes affecting Title IV programs must be made by November 1, if they are to take effect the following July.  20 U.S.C. § 1089(c)(1); *see Bauer v. DeVos*, 325 F. Supp. 3d 74, 85 (D.D.C. 2018).   Congress thus determined that eight months was a reasonable amount of time for schools to adjust to such regulatory changes.  That some members of the Massage Therapy Association put themselves in a difficult position by allowing seven months to pass without either adjusting to those changes or seeking relief from them does not justify an extraordinary injunction at the eleventh hour.  "It is

'well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.'"  *Safari Club Int'l v. Salazar*, 852 F. Supp. 102, 123 (D.D.C. 2012) (quoting *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001)).[1]

As for the potential loss of federal funding, no massage therapy program will lose its Title IV eligibility if it lasts "at least 300 clock hours," 20 U.S.C. § 1088(b)(2)(A), and meets the regulatory requirements to ensure the "quality" of such programs.  Pub. L. No. 102-325, § 481 (requiring "at a minimum" that such programs "have a verified rate of completion of at least 70 percent and a verified rate of placement of at least 70 percent").[2]  And no student currently enrolled in a massage therapy program will lose his or her Pell Grant eligibility as a result of the challenged rule.  88 Fed. Reg. at 74,636 (explaining that the challenged rule will not "affect students who are already enrolled in eligible programs").  It is true that future students of massage therapy schools that shorten their programs to less than 600 clock hours will not be eligible for Pell Grants, because Congress has limited Pell Grant eligibility for vocational programs to those lasting at least 600 clock hours, 20 U.S.C. § 1088(b)(1).  The loss of such eligibility will not harm any massage therapy school directly, because it does not matter to those schools whether their students pay tuition from grants, loans, savings, or other means.  The Massage Therapy Association argues, however, that the loss of eligibility for students in some shortened programs will cause those schools to lose revenue, because potential students will choose not to attend.  And it is that potential loss of

---

[1] Moreover, because the Department, in exercising its enforcement discretion, will "take into account circumstances beyond an institution's control that prevent it from obtaining [state and accreditor] approvals" for shortened programs by July 1, 2024, "there are not likely to be any immediate compliance consequences for institutions" that continue to operate longer programs beyond that date, "so long as institutions document their attempts to comply with the new requirements."  Musser Decl. ¶ 5 (discussing guidance).

[2] Plaintiff's suggestion that its member schools with programs shorter than 600 clock hours would be forced "to keep operations going with funds from non-Title IV sources" is simply incorrect.  Mot. at 38.

revenue to the schools, rather than the loss of Pell Grant eligibility for their students, that the Massage Therapy Association puts forward as an irreparable harm.

Plaintiff frames the potential revenue loss in dramatic terms. *See* Mot. at 38 (suggesting that "many" massage therapy schools "will lose a majority of their revenue" and "have no choice but to shut down their massage therapy programs or their businesses entirely"). Such revenue loss is entirely speculative, however, and will only occur if affected students are unwilling to fund the relatively modest cost of massage therapy programs through federal student loans—for which they will remain eligible—or other financial means. Two of the massage therapy schools that have offered declarations cost less than $10,000, *see* Decl. of Mike Williams ¶ 9, ECF No. 3-4 ("Williams Decl."); Decl. of Lauanda Davis ¶ 11, ECF No. 3-5 ("Davis Decl."), while others cost between $12,500 and $15,750, *see* Benson Decl. ¶ 7; Decl. of Joe Lubow ¶ 8, ECF No. 3-6 ("Lubow Decl."); Decl. of Cisco Arnold ¶ 7, ECF No. 3-7 ("Arnold Decl."). The schools aver that their programs are worth the investment, because they lead to lucrative job opportunities. *See* Williams Decl. ¶ 12; Davis Decl. ¶ 12; Lubow Decl. ¶ 11. Yet the schools also maintain that a significant percentage of their potential students would not be willing to fund that investment themselves, by taking out federal student loans that they would need to repay from their future earnings. *See* Benson Decl. ¶ 14; Williams Decl. ¶ 15; Davis Decl. ¶ 15; Lubow Decl. ¶ 14. The Massage Therapy Association and its member schools prefer to describe this reluctance to pay for their programs as inability, rather than unwillingness. *See* Mot. at 40 (asserting that "many students at . . . member schools would not be able to pursue massage therapy education without Pell Grants") (citing declarations). But Title IV funding would remain available for any program that met the applicable quality standards, and any student who believed that the program provided a value that was worth its cost. To suggest that most students would reach the opposite conclusion

is pure speculation, which can never support a preliminary injunction.  *See, e.g.*, *Nat'l Parks Conservation Assoc. v. Semonite*, 282 F. Supp. 3d 284, 290 (D.D.C. 2017).

The Massage Therapy Association has not shown that its member schools are likely to suffer an irreparable harm, and its motion should therefore be denied.

**B.** **Plaintiff is not likely to succeed on the merits of its claims.**

"[W]hen a party seeks review of agency action under the APA," as the Massage Therapy Association does here, "the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  "The entire case on review is a question of law," and the "complaint, properly read . . . presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *accord Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009); *Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n. 3 (D.C. Cir. 1999); *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996).  The district court's review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously," *Rempfer*, 583 F.3d at 865, or in violation of another standard set out in 5 U.S.C. § 706(2).

The Massage Therapy Association suggests that the challenged rule was arbitrary or capricious on six separate grounds, and concludes with a procedural claim.  But it is unlikely to succeed on the merits of these claims because the Department reasonably exercised its statutory authority in promulgating the challenged rule and followed all required procedures.

**i.** **The Department reasonably exercised its statutory authority in promulgating the challenged rule.**

Congress authorized the Secretary to administer Title IV's federal grant and loan programs, in part by issuing and amending rules that "govern[] the manner of operations of, and govern[] the

applicable programs administered by, the Department." 20 U.S.C. § 1221e-3; *see also id.* § 3474 (authorizing Secretary to prescribe rules that he deems "necessary or appropriate to administer and manage" the Department's functions). More specifically, the HEA directs the Secretary to "prescribe such regulations as may be necessary" to establish "reasonable standards of financial responsibility and appropriate institutional capability" for schools, "including any matter the Secretary deems necessary to the sound administration of [Title IV] financial aid programs." *Id.* §1094(c)(1)(B). The HEA further requires schools that are eligible to participate in Title IV to enter into program participation agreements with the Department. *See* 20 U.S.C. §§ 1087c, 1087d, 1094. Those agreements condition a school's continuing Title IV eligibility on the school's compliance with requirements that the Secretary "determines are necessary to protect the interests of the United States and to promote the purposes of" Title IV. *Id.* § 1087d(a)(6); *cf. id.* § 1094(a)(21).

The Department listed the conditions to which schools entering into Title IV program participation agreements must agree in 34 C.F.R. § 668.14(b). The revised provision is one such condition. *See* 34 C.F.R. § 668.14(b)(26). The provision reflects the Department's conclusion that non-degree vocational programs "exceeding the length the State has set for licensure or certification in a given occupation should not be supported by Federal student financial aid." 88 Fed. Reg. at 74637. It does not prevent schools from "offer[ing] longer programs," but simply makes State-aligned program length a condition of the schools' Title IV participation, which funnels billions of federal taxpayer dollars to those schools. *Id.* As such, it falls squarely within the Secretary's administrative authority to ensure Title IV's purpose to help students is served. Moreover, it does so by deferring to State determinations regarding appropriate program length. Ultimately, the revised provision recognizes that States, with oversight responsibility for

occupational licensing, are best positioned to determine appropriate training levels for such occupations, and it would serve neither students' nor States' nor taxpayers' interests to invest federal funds just so that students could delay their graduation and go deeper into debt by taking coursework beyond what States require.  "When a student seeks training for a specific occupation, their goal is to meet the requirements [set by the State] for that occupation."  *Id.* at 74,638.

The Massage Therapy Association does not deny the Secretary's authority to adopt the revised provision, but suggests that he did so in an arbitrary or capricious fashion.  An emergency motion is particularly ill-suited to evaluation of whether a final agency action is arbitrary or capricious under the APA, 5 U.S.C. § 706(2)(A).  APA review properly takes place at summary judgment based on "the whole [administrative] record" before the agency, "or those parts of it cited by a party."  *Id.* § 706.  "The APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained," and "[j]udicial review under that standard is deferential."  *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021).

Although Plaintiff's belated filing prevented the Department from compiling and certifying the administrative record in time for the Court's review prior to July 1, all available material suggests that the Department's decision to revise the maximum non-degree vocational program length for Title IV participation to match State licensing requirements was eminently reasonable. The NPRM makes clear that the Department's recent rulemakings all have occurred against a backdrop of ballooning Title IV expenditures by the Department and a student debt crisis of epic proportions.  In the 2022 award year, the Department disbursed approximately $5 billion in Pell Grant funding and $11 billion in loans to students attending Title IV-eligible vocational programs. 88 Fed. Reg. at 32398.  All this money was in turn passed on to the programs in the form of tuition and fees.  Yet, when programs are longer than States require for licensing or certification, students

14

must spend time and money unnecessarily.  *See* 88 Fed. Reg. at 74,682.  Given that the vocational programs subject to the revised provision "are certificate programs that result in low-to-moderate incomes, the cost of added credits," beyond what is needed for State licensure, "may well undercut a program's positive financial return on investment" and "also represents more time a student must spend enrolled as opposed to making money in the workforce."  *Id.*

  **ii.**  **Plaintiff's arguments to the contrary are unavailing.**

  Despite offering seven separate arguments, the Massage Therapy Association fails to show that the Department's decision to condition Title IV funding on limiting program length in accord with State requirements was arbitrary, capricious, or procedurally flawed.

  1. Plaintiff asserts that the Department failed to explain its revision of § 668.14(b)(26) consistent with an agency's burden when a prior rule engendered reliance interests.  Here, the Department has ensured that any students already enrolled in an overlength program before the revised provision's effective date, in reliance on the prior rule, will continue to receive the same Title IV aid until they complete their training.  88 Fed. Reg. at 74,636.  As for the asserted reliance interests of massage therapy schools, *see* Mot. at 21, the Department was plainly aware that such schools were offering programs in excess of State licensing requirements, and that future students in programs shortened to less than 600 clock hours would generally be eligible for Title IV loans, but not for Pell Grants.  88 Fed. Reg. at 74,640.  The Department reasonably determined that any such reliance interests were outweighed by students' and taxpayers' interests in avoiding the time and expense of "training that is not necessary to obtain employment."  *Id.* at 74,638.

  Even where serious reliance interests are implicated, an agency may change its policy as long as it shows "awareness that it is changing position" and "that there are good reasons for the new policy."  *Encino Motorcars*, 579 U.S. at 221–22; *see FCC v. Fox Television Stations, Inc.*,

556 U.S. 502, 514–15 (2009).  The Department has met that burden.  As detailed above, the Department adopted the original § 668.14(26) in response to statutory changes that could otherwise encourage the abusive practice of "course stretching"—whereby schools extend the length of their programs beyond State requirements simply in order to meet the clock hour thresholds for Title IV Pell Grant and/or loan eligibility. 59 Fed. Reg. at 9532–33; 59 Fed. Reg. at 22,366. That concern has never gone away, but the Department has tried different forms of flexibility to limit adverse impacts on students who wished to work in a different State from where they were trained. Thus, the original 1994 Rule incorporated a standard buffer, approving Title IV eligibility for programs up to 50 percent longer than their State's requirement. 59 Fed. Reg. at 22,366.  The 2020 Rule added the possibility of relying on adjacent States.  85 Fed. Reg. at 54,776. And the 2023 Rule removes the 50 percent buffer while adjusting the circumstances where a program can extend its length to match other States' requirements. 88 Fed. Reg. at 74,696–97. Among other alternatives, the 2023 Rule considered retaining the 50 percent buffer but concluded that allowing Title IV-participating programs to exceed what States require "risks students taking on greater amounts of loan debt that will not result in appreciably higher earnings." *Id.* at 74,686.

As the Department pointed out in its rulemaking, neither taxpayers nor students should be "paying for training programs that exceed the program length required for State licensure"; longer programs have higher tuition overall, requiring students either to borrow more or use up their lifetime Title IV Pell Grant allotments unnecessarily, and force students to delay entry into the workforce. 88 Fed. Reg. at 74,639–40.  Plaintiff assumes that it is fine to force taxpayers to pay for unnecessary training through Pell Grants just to enrich schools with vocational programs.  The Department instead weighed the relevant factors and concluded that, in light of the absence of research supporting a connection between longer programs and higher wages and the net impacts

on both students and taxpayers of allowing overlong programs to participate in Title IV, the revised provision was appropriate. *See* 88 Fed. Reg. at 74,639, 74,641; *see id.* at 74,640 ("The Department defers to State authorities regarding the appropriate number of instructional hours required to qualify to practice in a given profession. If a State has set a minimum requirement that is lower than" the Title IV participation thresholds set by Congress, "it would be inappropriate" to use Title IV aid for such programs.).

The Department further emphasized that no commenter had explained why the challenged rule should deviate from "States' judgments regarding the appropriate amount of training required," when exceeding that threshold to train for occupations that typically yield low earnings risked either leaving students with unaffordable debt or imposing unnecessary costs on taxpayers. *Id.* at 74,639 (citing Cellini & Blanchard, *Quick college credentials: Student outcomes and accountability policy for short-term programs* (2021), which suggested graduates of cosmetology and massage therapy programs under 600 hours in length typically had relatively little debt but earned less than the average high school graduate); *see id*. at 74,640 (recognizing States "carefully consider their hour requirements, which are often set through a body convened for this purpose").

The Department more than adequately demonstrated "that there are good reasons for the new policy," which is all that it was required to do. *Fox Television*, 556 U.S. at 515. The Massage Therapy Association relies on two inapposite cases to argue the contrary. The first was a challenge to a Department of Education rule delaying the effective date of a regulation amending procedures for assessing racial disproportionality under the Individuals with Disabilities Education Act. *Council of Parent Attorneys and Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28 (D.D.C. 2019). The district court found that the delay rule was motivated by a concern that the regulation being delayed "could incentivize [regulated entities] to use racial quotas to avoid findings of significant

disproportionality," which "did not have adequate support in the rulemaking record." *Id.* at 48. The second case challenged the rescission of the Deferred Action for Childhood Arrivals (DACA) policy. *Casa De Maryland v. U.S. Dep't of Homeland Security*, 924 F.3d 684 (4th Cir. 2019). The Fourth Circuit held that the document effecting the rescission reversed the government's position on the scope of its legal authority "without any explanation for why that [prior] analysis was faulty," and without even discussing the "[h]undreds of thousands of people had structured their lives on the availability of deferred action during the over five years between the implementation of DACA and the decision to rescind." *Id.* at 705. As explained above, the Department's decision here was amply supported by the rulemaking record, and all relevant reliance interests were considered.

  2. In support of its decision to condition Title IV funding on limiting program length in accord with State requirements, the Department also noted that studies were unable to identify a correlation between higher training hour requirements and higher wages in massage therapy or cosmetology. 88 Fed. Reg. at 74,639 (citing Acevedo, Blanchard, & Cellini, Occupational Licensing and Student Outcomes (2022); American Institutes for Research, Examination of Cosmetology Licensing Issues (2016)). The Massage Therapy Association suggests that these studies were so flawed that it was arbitrary or capricious to discuss them in the rulemaking. Mot. at 24–27. Plaintiff criticizes the first study for relying on an average wage in a given occupation, rather than distinguishing between part-time and full-time earnings, and between the ages and experience levels of each individual. It faults the second study for excluding tips and self-employed individuals from its wage data, and for the limitations of its safety data. Although the studies cited by the Department followed standard research practices by frankly acknowledging the limitations of their data, they were the best available information before the Department at the

time of its decision.  *See APSCU v. Duncan*, 110 F. Supp. 3d 176, 195 (D.D.C. 2015).  Plaintiff

cites no research submitted during the rulemaking process—which the declarations of its member

schools were not, *see* Mot. at 15–17—contradicting the Department's conclusion that training

beyond State licensure requirements would not financially benefit students, and offers no argument

that a study conducted as Plaintiff suggests would return contradictory results.  The Department

was required to make a "rational" policy choice, but "was not required to base [its] regulations

only on perfect information."  *Brown v. Secretary of Health and Human Services*, 46 F.3d 102,

109–10 (1st Cir. 1995) (holding that purported statistical flaws in a study  upon which an agency

relied did not render regulations arbitrary and capricious); *see Am. Iron & Steel Inst. v. EPA*, 115

F.3d 979, 1004 (D.C. Cir. 1997) (upholding agency's decision to "proceed on th[e] basis" of the

"imperfect . . . information" in its possession rather than "invest the resources to conduct the

perfect study").  The Department's policy choice was eminently rational, and its discussion of

these studies does not undermine its rulemaking in any way.

      3.     The challenged rule also revised the exception at 34 C.F.R. § 668.14(b)(26)(ii)(B),

which allows a program to rely on the licensing standards of another State in certain circumstances.

The Department explained that under the previous rule, which allowed covered programs to rely

on the licensing standards of any adjacent State, some schools had adopted another State's program

length even when that state "was many miles away and students were unlikely to seek to become

employed there."  88 Fed. Reg. at 32,382.  The revised provision allows programs to go by another

State's requirements only if a majority of their students live, work, or intend to work there.  *See*

88 Fed. Reg. at 74,639.  The Department responded to comments on this issue by citing research

showing that "most students seek or obtain employment close to where they live or attend school"

and by pointing out that "States may also adjust their requirements for those with out-of-state

training where they deem appropriate, and many do so through participation in licensure compacts and reciprocity agreements." *Id.* The Department repeatedly emphasized its deference to State determinations of appropriate program length. *See id.* at 74,639–41.

The Massage Therapy Association argues that the Department's revision of this regulatory provision arbitrarily requires that *most* of a program's students live, work, or intend to work in another state before the program can avail itself of the exception at 34 C.F.R. § 668.14(b)(26)(ii)(B), and that schools will not have the data necessary to avail themselves of this exception. Mot. at 27–30. To begin with, it appears that these objections were waived when they were not made during the public comment period. *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) (per curiam) ("It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review."); *see Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148–50 (D.C. Cir. 2005). But even taken on their own terms, Plaintiff's arguments are unavailing.

In the challenged rulemaking, the Department chose to "defer[] to State authorities regarding the appropriate number of instructional hours" in a vocational program leading to professional licensure or certification. 88 Fed. Reg. at 74,640. As the Department explained, "States establishing licensure or certification requirements for specific professions carefully consider their hour requirements, which are often set through a body convened for this purpose." *Id.* The Department therefore concluded that "it is appropriate to rely on States' determinations regarding the proper length of the program." *Id.* Each school relies on its own State's determinations in the first instance, because most of its students will probably work nearby. *Id.* at 74,639. But where a school can show that it primarily serves another State—because its students

20

primarily live, work, or intend to work there—then it can rely on that State's program length determinations instead. Schools that do not primarily serve any single State, because their students scatter to many different jurisdictions, are governed by the program length determinations of their home State. This is a perfectly reasonable regulatory design to account for the fact that most schools serve their home State and some primarily serve other nearby States, without allowing programs to rely on the program length determinations of other, less relevant States. Although the Massage Therapy Association suggests that its members will have difficulty compiling the data to avail themselves of the exceptions set out in the revised 34 C.F.R. § 668.14(b)(26)(ii)(B), their own declarations indicate that they know quite a lot about the working lives of their former students. *See* Benson Decl. ¶¶ 6, 10; Williams Decl. ¶¶ 7, 12; Davis Decl. ¶¶ 9, 12; Lubow Decl. ¶ 11; Arnold Decl. ¶ 6 (discussing the jurisdictions in which graduates of their programs work, job placement rates, places of employment, salary levels, etc.). And the supposed difficulty in data collection for programs that barely meet a numerical threshold would occur at any given threshold; it does not depend on the Department's decision to rely on a program's home State or else the State that it principally serves.

4.  The Massage Therapy Association next reframes some of its arguments for irreparable harm, to suggest that the Department arbitrarily concluded "that accreditors will have sufficient time to accredit . . . modified programs after institutions reduce the number of required hours." Mot. at 30. With eight full months between the publication of the challenged rule and its effective date, this assumption was accurate—as declarants for both the Department and the Massage Therapy Association agree. Plaintiff's declarants say that accreditor approval generally takes "several months," Benson Decl. ¶ 13, Flom Decl. ¶ 32, while the Department notes that "[i]nstitutions could have begun the process of seeking such approval at any time after the final

regulations were published on October 31, 2023"—and indeed, "many institutions have already begun the process of obtaining approvals for the reduced program lengths in order to be in compliance with the new regulations." Musser Decl. ¶ 4.  In the event that "circumstances beyond an insititution's control prevent it from obtaining [state and accreditor] approvals" for shortened programs by July 1, 2024, Department guidance indicates that "there are not likely to be any immediate compliance consequences for institutions" that continue to operate longer programs for an additional six months, "so long as institutions document their attempts to comply with the new requirements." Musser Decl. ¶ 5 (discussing guidance).  There was nothing arbitrary in the Department's decision to allow eight full months—the congressionally-mandated period for schools to adjust to regulatory changes affecting Title IV programs, *see* 20 U.S.C. § 1089(c)(1)— for a process that Plaintiff's declarants agree generally takes "several months," then offer guidance indicating that leniency would be particularly available for another six months in the case of circumstances beyond an institution's control.

5.      The Massage Therapy Association argues that the Department's discussion of the challenged rule's effect on students' Pell Grant eligibility was unreasonable.  Mot. at 32–33. Congress has determined that students at vocational programs shorter than 600 clock hours should not be eligible for Pell Grants.  20 U.S.C. § 1088(b)(1).  (The congressional policy determination appears to be that students at shorter, and therefore less expensive, programs do not require Pell Grant support.)  The Department has the authority—which is undisputed here—to establish a maximum length for such programs.  *See supra* at 12–15.  In the challenged rule, the Department looked to "State authorities" for a determination "regarding the appropriate number of instructional hours" in a vocational program leading to professional licensure or certification.  88 Fed. Reg. at 74,640.  There is no dispute that future students of programs shortened to less than 600 clock hours

will not be eligible for Pell Grants, because Congress has decided not to extend Pell Grant eligibility to programs of that length.  And it is obviously possible that some individuals who would have attended such a program with Pell Grant support will decide not to spend their own money or incur student debt to fund their tuition.  The Department does not suggest otherwise in the rulemaking, but merely notes that such students will generally remain eligible for Title IV loans if they choose to rely on them.  88 Fed. Reg. at 74,640.  To imply that the Department should have endorsed extended program lengths beyond what States require for licensure in order to preserve students' Pell Grant eligibility is to adopt just the sort of "course stretching" that the Department has consistently opposed, because it results in "increased costs to taxpayers and students."  *Id.*  The Department's  commitment "to not overpaying for programs beyond what the State requires for licensure and certification," *id.*, is entirely reasonable, even if some individual students decide that the program is not a worthwhile investment without Pell Grant eligibility.

6.     The Massage Therapy Association also challenges (at 33–35) the Department's conclusion "that programs exceeding the length the State has set for licensure or certification in a given occupation should not be supported by Federal student financial aid," and especially its determination "that it did not have the legal authority to partially fund a program," for example by making students at a 600 clock hour program eligible for only 500 clock hours' worth of Title IV aid.  88 Fed. Reg. at 74,637.  This determination was entirely reasonable, and Plaintiff does not offer any serious argument against it.

"The amount of a student's financial aid award is determined by Title IV's 'need analysis' provisions," which "set forth a statutory formula."  *St. Louis Univ. v. Duncan*, 97 F. Supp. 3d 1106, 1110 (E.D. Mo. 2015).  This formula calculates the "amount of need of any student for financial assistance"—*i.e.*, the Title IV funding for which that student is statutorily eligible—by first

establishing "the cost of attendance of such student," then subtracting his or her expected family contribution and estimated financial assistance received from other sources.  20 U.S.C. § 1087kk. The Department does not have the authority to make awards based on something less than the true "cost of attendance" for the student, *id.* § 1087kk(1), as the Massage Therapy Association suggests that it should have seriously considered doing.  Plaintiff offers the example of a student who "chooses not[] take out a student loan" to cover the difference between a Pell Grant and the full cost of her program," but instead pays the difference through other funds.  Mot. at 34.  That is not to the point: no student is required to use all of the Title IV aid for which he or she is eligible, but the Department may not lawfully base a student's eligibility for such aid on something less than the full "cost of attendance" for the program in which the student is enrolled.

7.      Under the 1992 HEA amendments, the Department must "select individuals with demonstrated expertise or experience in the relevant subjects" to participate in a negotiated rulemaking process before proceeding with notice-and-comment rulemaking under the Higher Education Act.  20 U.S.C. § 1098a(b)(1).  The Massage Therapy Association argues that "[t]he lack of massage therapy or cosmetology representation during the negotiated rulemaking process" violated the statute.  Mot. at 36.  But such specific representation was not required.  The committee included two representatives of proprietary institutions like those in Plaintiff's membership.  The Massage Therapy Association's member schools could have contacted those committee members to insure that their specific views were represented.  And even if the composition of the negotiated rulemaking committee were flawed, "[n]either the 1992 amendment nor the Negotiated Rulemaking Act specifies a remedy for such a case, and the latter act strongly implies there is none."  *USA Grp. Loan Servs., Inc. v. Riley*, 82 F.3d 708, 714 (7th Cir. 1996) (citing 5 U.S.C. § 570, which precludes judicial review); *see Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d

1152, 1162 (D.C. Cir. 2005) (finding that "Appellants lack standing to challenge the Secretary's selection of committee members" in a negotiated rulemaking).

Plaintiff does not offer a single case in which a rule was vacated or enjoined on the basis of an improperly-composed negotiated rulemaking committee, nor does it offer the Court any legal standard by which to assess the composition of the committee at issue here.  It acknowledges that the rulemaking committee contained two representatives of proprietary institutions.  Mot. at 36.  It does not dispute that their "expertise or experience" was "relevant" to the "subjects under negotiation" in the negotiated rulemaking, which ranged far beyond the rule challenged here.  20 U.S.C. § 1098a(b)(1).  Plaintiff's argument seems to be that the expertise of representatives of massage therapy or cosmetology schools would have been *more relevant* to *certain aspects* of the negotiated rulemaking than the individuals chosen by the Department.  But that is not the standard imposed by the statute, if indeed it makes the composition of negotiated rulemaking committees reviewable at all.  Plaintiff has not carried its burden to demonstrate a likelihood of success on the merits of its procedural claim.

**C.    Equitable considerations do not favor preliminary injunctive relief.**

The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.  Moreover, when assessing whether to grant a preliminary injunction before the merits have been adjudicated, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (citation omitted).  Any preliminary relief should be carefully tailored to address only the harms that plaintiffs have established. 11A Wright *et al*., FPP § 2947 (3d ed.)).

Here, these combined factors strongly counsel against issuing the requested emergency injunction.  The Department has a strong interest in implementing rules on schedule according to

25

the master calendar, 20 U.S.C. § 1089(a), so that student financial assistance can be properly administered.  Last-minute changes cause disruption to all participants and require numerous adjustments.  The Department issued the revised provision following a lengthy rulemaking based on its determination that the revision would allow it to safeguard Title IV funds and prevent abuse. Moreover, many schools have already prepared to comply with the revision by applying to States and accreditors to reduce program hours, and program lengths and Title IV aid for students enrolling on or some time after July 1, 2024 have been determined.  Musser Decl. ¶¶ 4, 6.  The revised provision should take effect as scheduled.

**D.      Any injunctive relief should be limited to Plaintiff and its member schools.**

Any injunction issued by this Court should be limited to the revised provision, which is only one among numerous provisions set forth in the October 31, 2023 Final regulations.  The Court should also limit relief to Plaintiff's established injury, based on the constitutional and equitable principles mandating that "[a] plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury," *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018) (emphasis added), and that equitable relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Any broader relief is inconsistent with Article III's judicial power, which "exists *only* to redress or otherwise protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (emphasis added).  It is also inconsistent with traditional equitable principles premised on "providing equitable relief only to parties." *Trump v. Hawaii*, 585 U.S. 667, 718 (2018) (Thomas, J., concurring); *cf. Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).

The APA's § 705 likewise explicitly incorporates the constitutional and equitable limitations on non-party relief.  *See* 5 U.S.C. § 705 (permitting a court to stay agency action only

"to the extent necessary to prevent irreparable injury"); *cf.* H.R. Rep. No. 79-1980, at 43 (1946) (recognizing § 705 relief "would normally, if not always, be limited to the parties complainant"). Any relief granted by the Court should be limited to the Massage Therapy Association and its member schools.

**CONCLUSION**

For the reasons set forth above, the Massage Therapy Association's motion for a preliminary injunction should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

*/s/ James Bickford*
JAMES BICKFORD
Trial Attorney (N.Y. Bar No. 5163498)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
James.Bickford@usdoj.gov
Telephone: (202) 305-7632
Facsimile: (202) 616-8470

*Counsel for Defendants*

Date: June 17, 2024