**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **AMERICAN MASSAGE THERAPY ASSOCIATION,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 24-cv-1670 (RJL) |
| | ) | |
| **U.S. DEPARTMENT OF EDUCATION, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

A.    Statutory Framework ........................................................................................ 2

B.    Regulatory History ........................................................................................... 3

LEGAL STANDARD ..................................................................................................... 6

ARGUMENT ................................................................................................................... 7

A.    The challenged rule is lawful. ........................................................................... 7

      i.    The Department reasonably exercised its unquestioned statutory authority in
           promulgating the challenged rule ................................................................... 7

      ii.    Plaintiff's claims are unavailing. .................................................................. 9

B.    Any relief should be limited to Plaintiff and its members. ............................... 18

CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*360 Degrees Educ., LLC v. U.S. Dep't of Educ.*,
  2024 WL 3092459 (N.D. Tex. June 21, 2024) ....................................................... 6, 10

*Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.*,
  429 F.3d 1136 (D.C. Cir. 2005) ...................................................................... 13

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ....................................................................... 19

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ....................................................................... 6

*Career College Ass'n v. Riley*,
  No. 94-830, 1995 WL 17958540 (D.D.C. June 16, 1995) ...................................... 3

*Ctr. for Law & Educ. v. Dep't of Educ.*,
  396 F.3d 1152 (D.C. Cir. 2005) ..................................................................... 17

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ................................................................................... 19

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ................................................................................... 10

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .............................................................................. 10, 12

*FCC v. Prometheus Radio Proj.*,
  592 U.S. 414 (2021) ................................................................................. 8, 9

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) .............................................................................. 18, 19

*James Madison Ltd. v. Ludwig*,
  82 F.3d 1085 (D.C. Cir. 1996) ........................................................................ 7

*Marshall Cnty. Health Care Auth. v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ...................................................................... 6

*Nuclear Energy Inst., Inc. v. EPA*,
  373 F.3d 1251 (D.C. Cir. 2004) (per curiam) ................................................... 13

*Rempfer v. Sharfstein*,
  583 F.3d 860 (D.C. Cir. 2009) ..................................................................... 6, 7

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024) ................................................................. 18, 19

*St. Louis Univ. v. Duncan*,
    97 F. Supp. 3d 1106 (E.D. Mo. 2015) ........................................... 16

*United States v. Texas*,
    599 U.S. 670 (2023) ...................................................................... 19

*Univ. Med. Ctr. of S. Nev. v. Shalala*,
    173 F.3d 438 (D.C. Cir. 1999) ..................................................... 6, 7

*USA Grp. Loan Servs., Inc. v. Riley*,
    82 F.3d 708 (7th Cir. 1996) .......................................................... 17

**Statutes**

5 U.S.C. § 570 ................................................................................... 17

5 U.S.C. § 702 ................................................................................... 19

5 U.S.C. § 703 ................................................................................... 19

5 U.S.C. § 706 .......................................................................... 7, 8, 18

20 U.S.C. § 1087 ......................................................................... 2, 7, 16

20 U.S.C. § 1088 ......................................................................... 3, 4, 15

20 U.S.C. § 1089 ................................................................................ 15

20 U.S.C. § 1094 ........................................................................ *passim*

20 U.S.C. § 1098a .............................................................................. 17

20 U.S.C. § 1221e-3 ............................................................................. 7

20 U.S.C. § 3474 ................................................................................. 7

20 U.S.C. §§ 1070–1099d ..................................................................... 2

**Regulations**

34 C.F.R. § 668.14 ..................................................................... *passim*

34 C.F.R. §§ 668.8(k), (*l*), 668.9 .................................................... 3, 4

58 Fed. Reg. 39,618 (July 23, 1993) ................................................ 3, 4

59 Fed. Reg. 22,348 (Apr. 29, 1994) ......................................... 4, 10, 11

59 Fed. Reg. 9526 (Feb. 28, 1994) ................................................. 4, 10

85 Fed. Reg. 54,742 (Sept. 2, 2020) ............................................... 5, 11

88 Fed. Reg. 32,300 (May 19, 2023) .......................................... 5, 9, 12

88 Fed. Reg. 70,004 (Oct. 10, 2023) .................................................... 2

88 Fed. Reg. 74,568 (Oct. 31, 2023) ............................................ *passim*

Pub. L. No. 102-325 .................................................................................................... 3

**Other Authorities**

Cellini & Blanchard,
    *Quick college credentials: Student outcomes and accountability policy for short-term
    programs* (2021) ................................................................................................. 12

**INTRODUCTION**

Last October, the Department of Education issued final regulations including a revision to one subsection of a rule governing school participation in the Higher Education Act ("HEA"), Title IV federal student financial aid programs that the Department administers. The revised provision generally requires that, as a condition of Title IV participation, a vocational program's length cannot exceed the relevant State's mandatory training requirements to become licensed or credentialed in the occupation that the program trains students to enter. Faced with billions of taxpayer dollars spent on federal student aid, with many students left with unaffordable debt, the Department sought to align Title IV aid more closely to States' determinations of appropriate program length.

The American Massage Therapy Association ("Plaintiff" or the "Massage Therapy Association") filed suit, asserting that the revised provision is arbitrary, capricious, or procedurally flawed under the Administrative Procedure Act ("APA"). But the record shows that the Department considered relevant factors and reasonably explained its revision. For its part, the Massage Therapy Association fails to justify the notion that students should be forced to spend up to 50 percent more time, with correspondingly higher costs that either students or taxpayers must bear, on training that States do not require when instead they could enter the workforce earlier— which is generally students' goal in such programs. Congress intended Title IV aid to help students, but the only parties that benefit unequivocally from overlength programs are the schools that gain risk-free money from students' federally-funded tuition payments. The Department has long imposed limits on program length as a condition of schools' Title IV participation and now reasonably determined that those limits should match States' occupational licensing requirements. It is therefore entitled to summary judgment in its favor.

1

## BACKGROUND

### A.     Statutory Framework

While other HEA titles focus on schools and teachers, Title IV is devoted to students, detailing various grant, loan, and work study assistance programs. *See* 20 U.S.C. §§ 1070–1099d; *cf. id.* §§ 1070(a), 1087a(a) (recognizing purpose of Title IV's grant and loan programs is to help students pursue their courses of study at participating schools). In recent years, the Department has annually disbursed more than $100 billion in new Title IV federal aid to millions of postsecondary students and their families, including around $72 billion in loans. 88 Fed. Reg. 70,004, 70,103, 70,107 (Oct. 10, 2023). The Department implements the Title IV programs to ensure that the taxpayer funds disbursed through those programs serve their intended purpose.

Although students are the intended beneficiaries of Title IV aid, postsecondary schools benefit when student aid recipients choose to attend their programs and thereby funnel federal grant and loan money to those programs in the form of tuition and fees. Schools such as the members of the Massage Therapy Association do not have to repay any of the funds received if students default; rather, that risk is borne entirely by students, who suffer long-lasting adverse consequences if they cannot repay their loans, and taxpayers, who cover the resulting loss. The HEA's Title IV framework holds schools accountable through statutory conditions and requirements administered by the Secretary. The HEA limits Title IV participation to "eligible" schools and requires such schools to enter into program participation agreements with the Department. *See* 20 U.S.C. §§ 1087c, 1087d, 1094. Participation agreements condition a school's continuing Title IV eligibility on the school's compliance both with express statutory requirements and with further requirements that the Secretary "determines are necessary to protect the interests of the United States and to promote the purposes of" Title IV. *Id.* § 1087d(a)(6).

In the Higher Education Amendments of 1992, Congress modified the HEA's statutory descriptions of vocational programs eligible to participate in Title IV. Pub. L. No. 102-325, § 481 (codified as amended at 20 U.S.C. § 1088(b)). As modified, eligible vocational programs now had to provide at least "600 clock hours of instruction, 16 semester hours, or 24 quarter hours," among other requirements, to participate in both the Pell Grant and loan programs. 20 U.S.C. § 1088(b)(1). Programs of "at least 300 clock hours," but "less than 600 clock hours of instruction," may be eligible to participate in Title IV's loan programs if they meet regulatory requirements promulgated by the Secretary, *id. §* 1088(b)(2)(A), which Congress specified must "determine the quality of programs of less than 600 clock hours in length," requiring "at a minimum" that such programs "have a verified rate of completion of at least 70 percent and a verified rate of placement of at least 70 percent." Pub. L. No. 102-325, § 481.

## B.    Regulatory History

At the time of the 1992 law's enactment, vocational programs were traditionally described in terms of "clock hours." *See Career College Ass'n v. Riley*, No. 94-830, 1995 WL 17958540, at *2 (D.D.C. June 16, 1995) ("Vocational classes, by contrast [to those offered in collegiate and university settings], have typically been measured in 'clock' or 'contact' hours."). However, after Congress' 1992 revisions, many vocational programs "sought to increase the amount of federal financial aid to which their students are entitled"—thus increasing the amount of Title IV funds the programs themselves would receive—"by strategically converting from the clock to the credit hour unit of measurement." *Id.*; *see id.* at *3 ("[I]t seems reasonably clear that many vocational schools artificially inflated the amount of instruction they appeared to be offering their students in order to increase their financial aid eligibility."). In response to such abuse, the Secretary made clear that, for certain non-degree vocational programs less than two years in length that chose to

identify their offerings in credit hours for other purposes, the Department would apply a uniform formula for converting credit hours to clock hours for purposes of assessing Title IV eligibility. *See* 58 Fed. Reg. 39,618 (July 23, 1993) (34 C.F.R. §§ 668.8(k), (*l*), 668.9, as amended).

The Department promulgated additional regulations in 1994 to comply with the 1992 Act's directives. 59 Fed. Reg. 9526, 9527 (Feb. 28, 1994). The 1992 Act's revisions meant that certain short-term programs of less than 600 clock hours would cease to be Title IV-eligible while other vocational programs providing at least 300 clock hours could become eligible to participate in Title IV's loan programs for the first time. *Id.* at 9527, 9531. In response to those statutory changes, the Department exercised its express authority under the statute to prescribe quality control regulations by requiring, as a condition of Title IV participation, that programs may not exceed by more than 50 percent the minimum number of clock hours required for occupational training by the State in which the program was located. *Id.* at 9532. The Department explained this measure "will help curb abuse" of Title IV "by preventing institutions from providing unnecessary training to students in order to receive additional Title IV, HEA program funds"—a practice known as "course stretching." *Id.* at 9532–33; 59 Fed. Reg. 22,348, 22,366 (Apr. 29, 1994) ("course stretching" is an abuse whereby vocational schools extend the length of their programs "purely for the purpose of exceeding the statutory 600 clock hour minimum" for Pell Grant eligibility, as set forth in 20 U.S.C. § 1088(b)(1)(A)); *see also id.* at 9547–48 (recognizing that "excessive length of programs requires a student to incur additional unnecessary debt"). When adopting the final provision—set forth at 34 C.F.R. § 668.14(b)(26) (version effective until June 30, 2020)—the Department recognized that some commenters favored lowering the limit to 100 percent of State requirements, but believed at the time that the 150 percent limit would "furnish[] a sufficient safeguard against the abuses of course stretching." 59 Fed. Reg. at 22,366.

In 2020, the Department revised § 668.14(b)(26) by allowing programs to rely on longer minimum requirements of adjacent States. *See* 85 Fed. Reg 54742, 54776–77 (Sept. 2, 2020); 34 C.F.R. § 668.14(b)(26) (version effective until July 1, 2024). This revision was intended to balance the competing concerns with "setting proper safeguards to ensure program length is not inflated and ensuring students are able to meet States' occupational licensure requirements," "especially in regional economies that cross State boundaries." *See id.*

In May 2023, the Department issued a Notice of Proposed Rulemaking ("NPRM") proposing, among other things, a further revision to § 668.14(b)(26) that would (1) reduce the number of clock hours that the Secretary would generally consider reasonable from 150% to 100% of the home State's licensing requirements while (2) replacing the "adjacency" criterion for reliance on another State's licensing rule with the requirement that a majority of the program's students reside or be employed in that State, or, if part of the same metropolitan statistical area, that a majority of students intend to work in that State upon graduation. 88 Fed. Reg. 32,300, 32,381–82 (May 19, 2023). The Department explained its concerns that students who received Title IV aid to attend programs longer than necessary for State licensure were "using up more of their lifetime eligibility for Pell Grants or other Federal financial aid," and were more likely to face higher debt and longer loan repayment periods, without requisite career benefits. *See id.* at 32,381.

The Department issued final regulations on October 31, 2023, which included a final revision to § 668.14(b)(26) among other regulations. 88 Fed. Reg. 74,568, 74,696–97 (Oct. 31, 2023). (The Department will refer to this provision and the rulemaking through which it was adopted as the "revised provision" or the "challenged rule.") This revised provision adopted the proposed 100 percent limit based on the home State or a State where most students live, work, or

intend to work, but the Department clarified that students enrolled before the effective date would not be affected. *Id.* at 74,636. The revised provision was scheduled to take effect on July 1, 2024. *Id.* at 74,568.

### C.    Procedural History

The Massage Therapy Association brought this case and sought preliminary injunctive relief on June 7, 2024. ECF Nos. 1, 3. On June 21, another district court issued a preliminary nationwide injunction against the revised 34 C.F.R. § 668.14(b)(26)(ii)(A), which reduced the number of clock hours that the Secretary would generally consider reasonable from 150% to 100% of the home State's licensing requirements. *360 Degrees Educ., LLC v. U.S. Dep't of Educ.*, 2024 WL 3092459 (N.D. Tex. June 21, 2024).[1] In light of that injunction, the Massage Therapy Association withdrew its motion for preliminary injunctive relief, ECF No. 19, and the Court set a schedule for summary judgment briefing.

### LEGAL STANDARD

"[W]hen a party seeks review of agency action under the APA," as the Massage Therapy Association does here, "the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The entire case on review is a question of law," and the "complaint, properly read . . . presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *accord Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009); *Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n. 3 (D.C.

---

[1] The district court has stayed all deadlines in *360 Degrees* and administratively closed the matter pending the results of a potential enforcement action based on an unrelated regulatory provision, but the preliminary injunction remains in effect. *See 360 Degrees Educ., LLC v. U.S. Dep't of Educ.*, No. 4:24-cv-508-P, ECF No. 57 at 6 (N.D. Tex. Sept. 6, 2024).

Cir. 1999); *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996). The district court's review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously," *Rempfer*, 583 F.3d at 865, or in violation of another standard set out in 5 U.S.C. § 706(2).

## ARGUMENT

The Massage Therapy Association alleges that the challenged rule was arbitrary or capricious on several grounds, and concludes with a procedural claim. But the Department reasonably exercised its statutory authority in promulgating the challenged rule and followed all required procedures.

### A. The challenged rule is lawful.

#### i. The Department reasonably exercised its unquestioned statutory authority in promulgating the challenged rule.

Congress authorized the Secretary to administer Title IV's federal grant and loan programs, in part by issuing and amending rules that "govern[] the manner of operations of, and govern[] the applicable programs administered by, the Department." 20 U.S.C. § 1221e-3; *see also id.* § 3474 (authorizing Secretary to prescribe rules that he deems "necessary or appropriate to administer and manage" the Department's functions). More specifically, the HEA directs the Secretary to "prescribe such regulations as may be necessary" to establish "reasonable standards of financial responsibility and appropriate institutional capability" for schools, "including any matter the Secretary deems necessary to the sound administration of [Title IV] financial aid programs." *Id.* §1094(c)(1)(B). The HEA further requires schools that are eligible to participate in Title IV to enter into program participation agreements with the Department. *See* 20 U.S.C. §§ 1087c, 1087d, 1094. Those agreements condition a school's continuing Title IV eligibility on the school's compliance with requirements that the Secretary "determines are necessary to protect the interests

of the United States and to promote the purposes of" Title IV.  *Id.* § 1087d(a)(6); *cf. id.* § 1094(a)(21).

The Department listed the conditions to which schools entering into Title IV program participation agreements must agree in 34 C.F.R. § 668.14(b).  The revised provision is one such condition.  *See* 34 C.F.R. § 668.14(b)(26).  The provision reflects the Department's conclusion that non-degree vocational programs "exceeding the length the State has set for licensure or certification in a given occupation should not be supported by Federal student financial aid."  88 Fed. Reg. at 74,637.  It does not prevent schools from "offer[ing] longer programs," but simply makes State-aligned program length a condition of the schools' Title IV participation, which funnels billions of federal taxpayer dollars to those schools.  *Id.*  As such, it falls squarely within the Secretary's administrative authority to ensure Title IV's purpose to help students and responsibly disburse taxpayer funds is served.  Moreover, it does so by deferring to State determinations regarding appropriate program length.  Ultimately, the revised provision recognizes that States, with oversight responsibility for occupational licensing, are best positioned to determine appropriate training levels for such occupations, and it would serve neither students' nor States' nor taxpayers' interests to invest federal funds just so that students could delay their graduation and go deeper into debt by taking coursework beyond what States require.  "When a student seeks training for a specific occupation, their goal is to meet the requirements [set by the State] for that occupation."  *Id.* at 74,638.

The Massage Therapy Association does not challenge the Secretary's authority to adopt the revised provision, but suggests that he did so in an arbitrary or capricious fashion.  *See* 5 U.S.C. § 706(2)(A).  APA review properly takes place at summary judgment based on "the whole [administrative] record" before the agency, "or those parts of it cited by a party."  *Id.* § 706.  "The

APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021).

The Department is entitled to summary judgment on the Massage Therapy Association's arbitrary-and-capricious challenge, because the Department's decision to revise the maximum non-degree vocational program length for Title IV participation to match State licensing requirements was eminently reasonable. The NPRM makes clear that the Department's recent rulemakings have all occurred against a backdrop of ballooning Title IV expenditures by the Department and a student debt crisis of epic proportions. In the 2022 award year, the Department disbursed approximately $5 billion in Pell Grant funding and $11 billion in loans to students attending Title IV-eligible vocational programs. 88 Fed. Reg. at 32,398. All of this money was in turn passed on to the programs in the form of tuition and fees. Yet, when programs are longer than States require for licensing or certification, students must spend time and money unnecessarily. *See* 88 Fed. Reg. at 74,682. Given that the vocational programs subject to the revised provision "are certificate programs that result in low-to-moderate incomes, the cost of added credits," beyond what is needed for State licensure, "may well undercut a program's positive financial return on investment" and "also represents more time a student must spend enrolled as opposed to making money in the workforce." *Id.*

### ii. Plaintiff's claims are unavailing.

The Massage Therapy Association's complaint fails to show that the Department's decision to condition Title IV funding on limiting program length in accord with State requirements was arbitrary, capricious, or procedurally flawed. The Department responds to the arguments that are clearly discernible from Plaintiff's complaint below, and reserves the right to respond in opposition to any additional arguments that Plaintiff may make in its motion for summary judgment.

1. Plaintiff suggests that the Department failed to explain its revision of § 668.14(b)(26) consistent with an agency's burden when a prior rule engendered reliance interests. Compl. ¶¶ 85–90. Here, the Department has ensured that any students already enrolled in an overlength program before the revised provision's effective date, in reliance on the prior rule, will continue to receive the same Title IV aid until they complete their training. 88 Fed. Reg. at 74,636. As for the asserted reliance interests of massage therapy schools, the Department was plainly aware that such schools were offering programs in excess of State licensing requirements, and that future students in programs shortened to less than 600 clock hours would generally be eligible for Title IV loans, but not for Pell Grants. 88 Fed. Reg. at 74,640. The Department reasonably determined that any such reliance interests were outweighed by students' and taxpayers' interests in avoiding the time and expense of "training that is not necessary to obtain employment." *Id.* at 74,638.

Even where serious reliance interests are implicated, an agency may change its policy as long as it shows "awareness that it is changing position" and "that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009). Despite one district court's terse conclusion to the contrary when it entered preliminary injunctive relief, *360 Degrees*, 2024 WL 3092459, at *4 (finding "a dearth of justification"), the Department has met that burden. As detailed above, the Department adopted the original § 668.14(26) in response to statutory changes that could otherwise encourage the abusive practice of "course stretching"—whereby schools extend the length of their programs beyond State requirements simply in order to meet the clock hour thresholds for Title IV Pell Grant and/or loan eligibility. 59 Fed. Reg. at 9532–33; 59 Fed. Reg. at 22,366. That concern has never gone away, but the Department has tried different forms of flexibility to limit adverse impacts on students who wished to work in a different State from

where they were trained. Thus, the original 1994 Rule incorporated a standard buffer, approving Title IV eligibility for programs up to 50 percent longer than their State's requirement. 59 Fed. Reg. at 22,366. The 2020 Rule added the possibility of relying on adjacent States. 85 Fed. Reg. at 54,776. And the 2023 Rule removes the 50 percent buffer while adjusting the circumstances where a program can extend its length to match other States' requirements. 88 Fed. Reg. at 74,696–97. Among other alternatives, the 2023 Rule considered retaining the 50 percent buffer but concluded that allowing Title IV-participating programs to exceed what States require "risks students taking on greater amounts of loan debt that will not result in appreciably higher earnings." *Id.* at 74,686.

As the Department pointed out in its rulemaking, neither taxpayers nor students should be "paying for training programs that exceed the program length required for State licensure"; longer programs have higher tuition overall, requiring students either to borrow more or use up their lifetime Title IV Pell Grant allotments unnecessarily, and force students to delay entry into the workforce. 88 Fed. Reg. at 74,639–40. There is no reason to force taxpayers to pay for unnecessary training through Pell Grants just to enrich schools with vocational programs. The Department instead weighed the relevant factors and concluded that, in light of the absence of research supporting a connection between longer programs and higher wages and the net impacts on both students and taxpayers of allowing overlong programs to participate in Title IV, the revised provision was appropriate. *See* 88 Fed. Reg. at 74,639, 74,641; *see id.* at 74,640 ("The Department defers to State authorities regarding the appropriate number of instructional hours required to qualify to practice in a given profession. If a State has set a minimum requirement that is lower than" the Title IV participation thresholds set by Congress, "it would be inappropriate" to use Title IV aid for such programs.).

11

The Department further emphasized that no commenter had explained why the challenged rule should deviate from "States' judgments regarding the appropriate amount of training required," when exceeding that threshold to train for occupations that typically yield low earnings risked either leaving students with unaffordable debt or imposing unnecessary costs on taxpayers. *Id.* at 74,639 (citing Cellini & Blanchard, *Quick college credentials: Student outcomes and accountability policy for short-term programs* (2021), which suggested graduates of cosmetology and massage therapy programs under 600 hours in length typically had relatively little debt but earned less than the average high school graduate); *see id.* at 74,640 (recognizing States "carefully consider their hour requirements, which are often set through a body convened for this purpose").

The Department more than adequately demonstrated "that there are good reasons for the new policy," which is all that it was required to do. *Fox Television*, 556 U.S. at 515. The Department's decision here was amply supported by the rulemaking record, and all relevant reliance interests were considered.

2. The challenged rule also revised the exception at 34 C.F.R. § 668.14(b)(26)(ii)(B), which allows a program to rely on the licensing standards of another State in certain circumstances. The Department explained that under the previous rule, which allowed covered programs to rely on the licensing standards of any adjacent State, some schools had adopted another State's program length even when that state "was many miles away and students were unlikely to seek to become employed there." 88 Fed. Reg. at 32,382. The revised provision allows programs to go by another State's requirements only if a majority of their students live, work, or intend to work there. *See* 88 Fed. Reg. at 74,639. The Department responded to comments on this issue by citing research showing that "most students seek or obtain employment close to where they live or attend school" and by pointing out that "States may also adjust their requirements for those with out-of-state

training where they deem appropriate, and many do so through participation in licensure compacts and reciprocity agreements." *Id.* The Department repeatedly emphasized its deference to State determinations of appropriate program length. *See id.* at 74,639–41.

The Massage Therapy Association alleges that the Department's revision of this regulatory provision arbitrarily requires that *most* of a program's students live, work, or intend to work in another state before the program can avail itself of the exception at 34 C.F.R. § 668.14(b)(26)(ii)(B), and that schools will not have the data necessary to avail themselves of this exception. Compl. ¶¶ 63–72. To begin with, it appears that these objections were waived when they were not made during the public comment period. *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) (per curiam) ("It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review."); *see Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148–50 (D.C. Cir. 2005). But even taken on their own terms, Plaintiff's claims are unavailing.

In the challenged rulemaking, the Department chose to "defer[] to State authorities regarding the appropriate number of instructional hours" in a vocational program leading to professional licensure or certification. 88 Fed. Reg. at 74,640. As the Department explained, "States establishing licensure or certification requirements for specific professions carefully consider their hour requirements, which are often set through a body convened for this purpose." *Id.* The Department therefore concluded that "it is appropriate to rely on States' determinations regarding the proper length of the program." *Id.* Each school relies on its own State's determinations in the first instance, because most of its students will probably work nearby. *Id.* at 74,639. But where a school can show that it primarily serves another State—because its students

primarily live, work, or intend to work there—then it can rely on that State's program length determinations instead. Schools that do not primarily serve any single State, because their students scatter to many different jurisdictions, are governed by the program length determinations of their home State. This is a perfectly reasonable regulatory design to account for the fact that most schools serve their home State and some primarily serve other nearby States, without allowing programs to rely on the program length determinations of other, less relevant States. Although the Massage Therapy Association suggests that its members will have difficulty compiling the data to avail themselves of the exceptions set out in the revised 34 C.F.R. § 668.14(b)(26)(ii)(B), *see* Compl. ¶ 71, their own declarations submitted in support of their motion for a preliminary injunction indicate that they know quite a lot about the working lives of their former students. *See* Benson Decl. ¶¶ 6, 10, ECF No. 3-3; Williams Decl. ¶¶ 7, 12, ECF No. 3-4; Davis Decl. ¶¶ 9, 12, ECF No. 3-5; Lubow Decl. ¶ 11, ECF No. 3-6; Arnold Decl. ¶ 6, ECF No. 3-7 (discussing the jurisdictions in which graduates of their programs work, job placement rates, places of employment, salary levels, etc.). And the supposed difficulty in data collection for programs that barely meet a numerical threshold would occur at any given threshold; it does not depend on the Department's decision to rely on a program's home State or else the State that it principally serves.

3.      The Massage Therapy Association also alleges that the Department arbitrarily concluded that accreditors would have sufficient time to accredit modified programs after institutions reduced the number of required hours. Compl. ¶ 78–81. With eight full months between the publication of the challenged rule and the date it was intended to take effect, the Department's assumption was accurate. Plaintiff's preliminary injunction declarants said that accreditor approval generally takes "several months," Benson Decl. ¶ 13; Flom Decl. ¶ 32, ECF No. 3-2, while the Department noted that "[i]nstitutions could have begun the process of seeking

such approval at any time after the final regulations were published on October 31, 2023"—and indeed, "many institutions have already begun the process of obtaining approvals for the reduced program lengths in order to be in compliance with the new regulations."  Musser Decl. ¶ 4, ECF No. 12-1.  In the event that "circumstances beyond an institution's control prevent it from obtaining [state and accreditor] approvals" for shortened programs by July 1, 2024, Department guidance indicates that "there are not likely to be any immediate compliance consequences for institutions" that continue to operate longer programs for an additional six months, "so long as institutions document their attempts to comply with the new requirements."  Musser Decl. ¶ 5 (discussing guidance).  There was nothing arbitrary in the Department's decision to allow eight full months— the congressionally-mandated period for schools to adjust to regulatory changes affecting the Title IV programs, *see* 20 U.S.C. § 1089(c)(1)—for a process that Plaintiff's declarants agree generally takes "several months," then offer guidance indicating that leniency would be particularly available for another six months in the case of circumstances beyond an institution's control.

4.    The Massage Therapy Association suggests that the Department's discussion of the challenged rule's effect on students' Pell Grant eligibility was unreasonable.  Compl. ¶¶ 82–84. Congress has determined that students at vocational programs shorter than 600 clock hours should not be eligible for Pell Grants.  20 U.S.C. § 1088(b)(1).  (The congressional policy determination appears to be that students at shorter, and therefore less expensive, programs do not require Pell Grant support.)  The Department has the authority—which is undisputed here—to establish a maximum length for such programs.  In the challenged rule, the Department looked to "State authorities" for a determination "regarding the appropriate number of instructional hours" in a vocational program leading to professional licensure or certification.  88 Fed. Reg. at 74,640. There is no dispute that future students of programs shortened to less than 600 clock hours will not

15

be eligible for Pell Grants, because Congress has decided not to extend Pell Grant eligibility to programs of that length.  And it is obviously possible that some individuals who would have attended such a program with Pell Grant support will decide not to spend their own money or incur student debt to fund their tuition.  The Department does not suggest otherwise in the rulemaking, but merely notes that such students will generally remain eligible for Title IV loans if they choose to rely on them.  88 Fed. Reg. at 74,640.  To imply that the Department should have endorsed extended program lengths beyond what States require for licensure in order to preserve students' Pell Grant eligibility is to adopt just the sort of "course stretching" that the Department has consistently opposed, because it results in "increased costs to taxpayers and students."  *Id.*  The Department's  commitment "to not overpaying for programs beyond what the State requires for licensure and certification," *id.*, is entirely reasonable, even if some individual students decide that the program is not a worthwhile investment without Pell Grant eligibility.

5.    The Massage Therapy Association also challenges, *see* Compl. ¶¶ 96–97, the Department's conclusion "that programs exceeding the length the State has set for licensure or certification in a given occupation should not be supported by Federal student financial aid," and especially its determination "that it did not have the legal authority to partially fund a program," for example by making students at a 600 clock hour program eligible for only 500 clock hours' worth of Title IV aid.  88 Fed. Reg. at 74,637.  This determination was entirely reasonable.

"The amount of a student's financial aid award is determined by Title IV's 'need analysis' provisions," which "set forth a statutory formula."  *St. Louis Univ. v. Duncan*, 97 F. Supp. 3d 1106, 1110 (E.D. Mo. 2015).  This formula calculates the "amount of need of any student for financial assistance"—*i.e.*, the Title IV funding for which that student is statutorily eligible—by first establishing "the cost of attendance of such student," then subtracting his or her expected family

contribution and estimated financial assistance received from other sources.  20 U.S.C. § 1087kk. The Department does not have the authority to make awards based on something less than the true "cost of attendance" for the student, *id.* § 1087kk(1), as the Massage Therapy Association suggests that it should have seriously considered doing.  No student is required to use all of the Title IV aid for which he or she is eligible, but the Department may not lawfully base a student's eligibility for such aid on something less than the full "cost of attendance" for the program in which the student is enrolled.

6.    Under the 1992 HEA amendments, the Department must "select individuals with demonstrated expertise or experience in the relevant subjects" to participate in a negotiated rulemaking process before proceeding with notice-and-comment rulemaking under the Higher Education Act.  20 U.S.C. § 1098a(b)(1).  The Massage Therapy Association suggests that the lack of massage therapy or cosmetology representation during the negotiated rulemaking process violated the statute.  *See* Compl. ¶¶ 44, 61, 103.  But such specific representation was not required. The committee included two representatives of proprietary institutions like those in Plaintiff's membership.  The Massage Therapy Association's member schools could have contacted those committee members to insure that their specific views were represented.   And even if the composition of the negotiated rulemaking committee were flawed, "[n]either the 1992 amendment nor the Negotiated Rulemaking Act specifies a remedy for such a case, and the latter act strongly implies there is none."  *USA Grp. Loan Servs., Inc. v. Riley*, 82 F.3d 708, 714 (7th Cir. 1996) (citing 5 U.S.C. § 570, which precludes judicial review); *see Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005) (finding that "Appellants lack standing to challenge the Secretary's selection of committee members" in a negotiated rulemaking).

Plaintiff's argument seems to be that the expertise of representatives of massage therapy

or cosmetology schools would have been *more relevant* to *certain aspects* of the negotiated rulemaking than the individuals chosen by the Department.  But that is not the standard imposed by the statute, if indeed it makes the composition of negotiated rulemaking committees reviewable at all.  Plaintiff has not carried its burden to demonstrate a likelihood of success on the merits of its procedural claim.  The Department is therefore entitled to summary judgment on the Massage Therapy Association's procedural claim.

**B.      Any relief should be limited to Plaintiff and its members.**

If the Court concludes that challenged rule is unlawful, and even if the APA authorizes vacatur of agency action,[2] the Court should decline, as a matter of equitable discretion, to enter a universal vacatur of the revised provision.  Text and precedent both make clear that whether to enter vacatur—and the scope of any such relief—is constrained by equitable principles.  And those principles limit proper relief to redressing the injuries of the named parties, thus foreclosing universal vacatur in this case.

The APA is not properly read to require vacatur—much less universal vacatur—of challenged action, in light of traditional equitable principles generally restricting relief beyond the parties.  Congress enacted the APA against a background rule that statutory remedies must be construed in accordance with "traditions of equity practice."  *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).  The Supreme Court has recently reinforced this principle of interpretation, instructing that, "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity."  *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024).  And the Court explained that even

---

[2] The Department preserves for further review the argument that the APA's provision for the courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize the type of universal vacatur that Plaintiff seeks.

seemingly mandatory statutory language—such as a directive "that an injunction 'shall be granted' if" certain conditions are met—will not "supplant the traditional equitable principles" governing relief. *Id.* at 1577. "[S]uch an abrupt departure from traditional equity practice" as requiring relief no matter the equities requires "plain[er]" language than that. *Id.*; *see also Hecht Co.*, 321 U.S. at 329 (Congress's authorization for courts to issue a remedy "hardly suggests an absolute duty" to grant such relief "under any and all circumstances.").

So too with the APA. As an initial matter, the APA itself provides for traditional forms of equitable actions and relief, such as "declaratory judgments or writs of prohibition or mandatory injunction," 5 U.S.C. § 703, and explicitly preserves "the power or duty of the court to … deny relief on any … equitable ground," *id.* § 702. In light of the traditional equitable principles against which the statute was enacted—and which are explicitly incorporated into the statute—there is no sound reason to conclude that Congress did not merely authorize but compelled courts to abandon the "bedrock practice of case-by-case judgments with respect to the parties in each case" by adopting the unremarkable "set aside" language in § 706. *United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring in the judgment) (quotation omitted).

The D.C. Circuit has treated universal vacatur of agency action as a discretionary equitable remedy—not a remedy that is automatic or compelled. *See, e.g.*, *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993) (allowing remand without vacatur and noting that an "inadequately supported rule, however, need not necessarily be vacated"). And the APA is explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground," 5 U.S.C. § 702(1), and equitable relief does not "automatically follow[] a determination" that a defendant acted illegally, *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392–93 (2006).

In accordance with these equitable principles, any relief in this case should be limited to an injunction barring enforcement of the revised provision against the Massage Therapy Association and its members.

## CONCLUSION

For the reasons set forth above, summary judgment should be entered in the Department's favor on all claims.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

*/s/ James Bickford*
JAMES BICKFORD
Trial Attorney (N.Y. Bar No. 5163498)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
James.Bickford@usdoj.gov
Telephone: (202) 305-7632
Facsimile: (202) 616-8470

*Counsel for Defendants*

Date: November 26, 2024