# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN MASSAGE THERAPY ASSOCIATION, | ) ) ) |
|  | ) |
| Plaintiff, | ) ) |
| v. | ) Case Number:  1:24-cv-01670-RJL ) |
| U.S. DEPARTMENT OF EDUCATION and MIGUEL CARDONA, | ) ) ) |
|  | ) |
| Defendants. | ) ) ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

John M. Simpson (D.C. Bar No. 256412)
Drew T. Dorner (D.C. Bar No. 1035125)
Duane Morris LLP
901 New York Avenue NW, Suite 700 East
Washington, D.C.  20001-4795
Telephone:  +1 202 776 7800
Fax:  +1 202 776 7801
E-mail:  jmsimpson@duanemorris.com
E-mail:  dtdorner@duanemorris.com

Edward M. Cramp (admitted *pro hac vice*)
Deanna J. Lucci (admitted *pro hac vice*)
Duane Morris LLP
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: +1 619 744 2200
Fax: +1 619 744 2201
E-mail: emcramp@duanemorris.com
E-mail: djlucci@duanemorris.com

*Attorneys for the American Massage Therapy Association*

## Table of Contents

Page

I.    STATEMENT OF FACTS ........................................................................2

    A.    AMTA Advocates for Massage Therapy Institutions in the United States. ........... 2

    B.    Statutory and Regulatory Background................................................................ 2

        1.    Congress Enacts the Higher Education Act of 1965 to Provide Financial Aid for Students in Institutions of Higher Education. ................................ 3

        2.    The Department Promulgates a Rule in 1994 to Offer Latitude to Institutions While Protecting Students and Taxpayers. ............................ 5

        3.    The Department Expands the 150 Percent Rule in 2020 by Consensus. .... 7

        4.    The Department Eliminates the 150 Percent Rule in 2023 Without Sufficient Notice, Industry Participation, or Time for Comment. ............. 9

        5.    The Department Acknowledges the Difficulties Educational Institutions Will Face in Complying with the Final Rule But Pushes the Final Rule's Implementation Forward........................................................................ 13

    C.    Institutions Challenge the Final Rule in Two Lawsuits....................................... 14

        1.    The Two Lawsuits................................................................................ 14

        2.    The Texas Court Enjoins the Final Rule.................................................. 14

    D.    The Final Rule Endangers Massage Therapy Education. ..................................... 15

        1.    Loss of Pell Grants............................................................................... 16

        2.    Suspension of Enrollments .................................................................... 17

        3.    Undermining Industry Standards and Licensure Examination Results .... 18

II.    ARGUMENT AND CITATION OF AUTHORITY ..........................................19

    A.    Summary Judgment Standard ........................................................................... 19

    B.    Plaintiff Has Standing and Its Case is Ripe for Resolution. ................................. 20

    C.    The Final Rule Arbitrarily Departs from 30 Years of Practice............................. 21

    D.    Defendants' Reliance on Studies to Support the Final Rule is Misplaced. .......... 28

1.      Defendants' Studies Answered Irrelevant, Inapplicable Questions.......... 28

2.      Data Limitations Undermine Defendants' Reliance on the Studies. ........ 31

E.      The Department Makes Improper Assumptions and Ignores Problems
        With its "Other State" Exception. ........................................................... 33

1.      Unjustified Assumptions Affecting All Three Scenarios ......................... 34

2.      Invalid Assumptions Affecting the "MSA" Exception............................ 36

F.      Defendants Disregarded the Accreditation and Legislative Processes. ............... 38

G.      Defendants Respond Capriciously to the Loss of Pell Grant Access. .................. 41

H.      Defendants Irrationally Disregard an Obvious Alternative. .................................. 42

I.      Defendants Disregarded Procedures Required by Law. ....................................... 43

III.    CONCLUSION.........................................................................................................45

## Table of Authorities

**Federal Cases**

*360 Degree Education, LLC v. U.S. Dep't of Educ.*, No. 4:24-cv-00508-P (N.D. Tex.) ................................................................................................ 14-15, 27-28, 40

*Am. Ass'n of Cosmetology Schs. v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017) .... 20, 35, 39, 41-42

*Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602 (D.C. Cir. 2017) .......................... 33, 36, 41

*Ardmore Consulting Grp., Inc. v. Contreras-Sweet,* 118 F. Supp. 3d 388 (D.D.C. 2015) .................................................................................................................. 19, 30

*Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012) .................................................................................................................... 21, 39

*Beverly Enters., Inc. v. Herman*, 50 F. Supp. 2d 7 (D.D.C. 1999) ........................................ 20-21

*Casa De Maryland v. U.S. Department of Homeland Security*, 924 F.3d 684 (4th Cir. 2019) .............................................................................................................. 27, 43

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440 (2024) ............ 20-21, 23

*Council of Parent Attorneys and Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28 (D.D.C. 2019) ................................................................................................................ 25-26

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020) ....................... 21, 23

*Desa Grp., Inc. v. U.S. Small Bus. Admin.*, 190 F. Supp. 3d 61 (D.D.C. 2016) ............................ 19

*Dist. Hosp. Partners v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015) .................................................... 32

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ...................................................... 21-23

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ............................................................ 25

*Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169 (D.C. Cir. 2012) ..................................................... 17

*Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018) ................................. 33-34, 36

*Home Box Off., Inc. v. FCC,* 567 F.2d 9 (D.C. Cir. 1977) ...................................................... 33, 41

*Int'l Org. of Masters, Etc. v. NLRB*, 61 F. 4th 169 (D.C. Cir. 2023) ............................................ 24

*Inv. Co. Inst. v. CFTC*, 720 F.3d 370 (D.C. Cir. 2013) ................................................................ 34

*Lloyd Noland Hosp. & Clinic v. Heckler*, 762 F.2d 1561 (11th Cir. 1985) .................................. 31

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................20

*MediNatura, Inc. v. FDA*, 998 F.3d 931 (D.C. Cir. 2021).............................................22

*Mingo Logan Coal Co. v. EPA*, 829 F.3d 710 (D.C. Cir. 2016)..............................21, 39

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................33

*NAACP v. Trump*, 315 F. Supp. 3d 457 (D.D.C. 2018)..........................................35, 43

*Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115 (D.C. Cir. 2013)............................34

*Nat'l Educ. Ass'n v. DeVos*, 379 F. Supp. 3d 1001 (N.D. Cal. 2019) .....................................44-45

*National Lifeline Ass'n v. FCC*, 941 F.3d 1102 (D.C. Cir. 2019) .................................24

*Nissan Chem. Corp. v. FDA*, No. 22-1598, 2024 WL 3724686 (D.D.C. Aug. 8, 2024)........................................................................................................22

*Resolute Forest Prod., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100 (D.D.C. 2016) ........................................................................................... 28, 30-31

*Sherley v. Sibelius*, 689 F.3d 776 (D.C. Cir. 2012)........................................................32

*Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014) .................................24

*St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*, 85 F. Supp. 3d 197 (D.D.C. 2015) .......................................................................................................32

*Time Warner Ent. Co., L.P. v. FCC*, 240 F.3d 1126 (D.C. Cir. 2001) .........................34

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) .......................................21

*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319 (D.C. Cir. 2006) .......................................................................................................35

**Federal Statutes and Rules of Court**

Pub. L. 89-329 (Nov. 8, 1965).................................................................................3, 42

5 U.S.C. § 702.............................................................................................................20

5 U.S.C. § 706.......................................................................................................19, 45

20 U.S.C. §§ 1001........................................................................................................4

20 U.S.C. § 1002..........................................................................................................4

20 U.S.C. § 1070..........................................................................................................3

20 U.S.C. § 1088 ....................................................................................................4, 16

20 U.S.C. § 1098a ..........................................................................................7-8, 43-44

Fed. R. Civ. P. 56(c) ...............................................................................................19

**Federal Regulations and Federal Register Entries**

34 C.F.R. 668.8 ............................................................................................4, 13, 16

34 C.F.R. § 668.13 ..................................................................................................19

34 C.F.R. § 668.14 ........................................................................1, 6, 9, 14, 33, 35, 39

34 C.F.R. § 602.22 ............................................................................................17, 38

34 C.F.R. § 668.414 ..................................................................................................7

59 Fed. Reg. 9,526 (Feb. 28, 1994) ..........................................................5, 25, 39

59 Fed. Reg. 22,348 (Apr. 29, 1994) ........................................................................6

79 Fed. Reg. 64,890 (Oct. 31, 2014) ........................................................................7

84 Fed. Reg. 31,392 (July 1, 2019) ..........................................................................7

85 Fed. Reg. 18,638 (Apr. 2, 2020) ..........................................................................8

85 Fed. Reg. 54,742 (Sept. 2, 2020) ........................................................7-8, 25, 36

86 Fed. Reg. 28,299 (May 26, 2021) ........................................................................9

86 Fed. Reg. 69,607 (Dec. 8, 2021) ....................................................................9, 44

88 Fed. Reg. 32,300 (May 19, 2023) ........................................................11-12, 23, 37

88 Fed. Reg. 74,568 (Oct. 31, 2023)..............................1-3, 11-17, 20-21, 23-43, 45

**State Laws and Regulations**

Va. Code § 54.1-3029 ..............................................................................................37

17 D.C. Mun. Regs. § 7502.2 ....................................................................................1

COMAR § 10.65.01.07 ..............................................................................................38

**Abbreviations and Acronyms Used**

| AMTA | American Massage Therapy Association |
|---|---|
| APA | Administrative Procedure Act |
| COMTA | Commission on Massage Therapy Accreditation |
| DACA | Deferred Action for Childhood Arrivals program |
| DOL | U.S. Department of Labor |
| EA | Electronic Announcement GEN-24-07 (Apr. 9, 2024) |
| FLSA | Fair Labor Standards Act of 1938 |
| FSA | Federal Student Aid |
| FSMTB | Federation of State Massage Therapy Boards |
| GE | Gainful Employment |
| HEA | Higher Education Act of 1965 |
| IMpact | Interstate Massage Compact |
| MBLEx | Massage & Bodywork Licensing Examination |
| MSA | Metropolitan Statistical Area |
| NPRM | Notice of Proposed Rulemaking, 88 Fed. Reg. 32,300 (May 19, 2023) |
| PI | AMTA's Motion for Preliminary Injunction |
| PPA | Program Participation Agreement |

For 30 years, institutions of higher education that offer "gainful employment" programs, such as massage therapy and cosmetology, have maintained their eligibility to participate in Title IV federal student aid ("FSA") programs by relying on a regulation from the U.S. Department of Education ("the Department") widely known as the 150 Percent Rule. That rule permits these "gainful employment" programs, which train students for certain recognized professions, to last up to 150 percent of the minimum number of clock hours required for a student to become licensed in that profession in the state in which his or her school is located. *See* 34 C.F.R. § 668.14(b)(26). For example, in the District of Columbia, where one must study a minimum of 500 clock hours to become a licensed massage therapist,[1] schools may offer a massage therapy program that is up to 750 hours in duration and still be eligible to participate in FSA programs. The flexibility of the 150 Percent Rule has allowed institutions to design curricula that best meet their students' needs and position graduates to be competitive in the marketplace. All that changed on October 31, 2023, when the Department and its Secretary, Miguel Cardona (collectively, "Defendants") published a rule at 88 Fed. Reg. 74,568 ("Final Rule") that will eliminate this flexibility and cap these programs at no more than 100 percent of the minimum clock hours in a school's state.

The plaintiff, the American Massage Therapy Association ("AMTA"), brings this action under the Administrative Procedure Act ("APA") and Declaratory Judgment Act seeking declaratory and injunctive relief arising out of the promulgation—without good reason or observance of required procedure—of the Final Rule because it is an arbitrary, capricious, unexplained, and unsupported change from longstanding Department policy upon which many institutions, including hundreds of massage therapy schools, have relied for 30 years.

Defendants hastily included the Final Rule in a package of significant changes to their

---

[1] *See* 17 D.C. Mun. Regs. § 7502.2.

regulations arising under the Higher Education Act ("HEA") without adequate notice, proper negotiated rulemaking, supportive research, or reasonable justification.  Aside from upsetting a decades-old regulatory balance, if the Final Rule takes effect, it will deprive many of AMTA's member schools of the ability to participate in one or more types of FSA programs.  Other member schools will have to significantly cut the length of their massage therapy programs, which, in turn, will cause significant drops in revenue, school closures, and loss of learning opportunities for students, most of whom are female or demographically and economically diverse—all this in spite of Congress's express intention in the HEA to encourage vocational training.  The Court should set aside Defendants' arbitrary regulation.

## I.    STATEMENT OF FACTS

### A.    AMTA Advocates for Massage Therapy Institutions in the United States.

AMTA is a non-profit professional association whose mission is "[t]o serve AMTA member schools while advancing the art, science, and practice of massage therapy."  Declaration of Jeffrey Flom dated June 7, 2024 ("June 7 Flom Decl."), ECF No. 3-2, ¶ 4.  To this end, AMTA supports professional competency by advocating for standards in massage therapy education that benefit practitioners and the public alike.  *Id.* ¶ 5.  AMTA conducts and supports research into massage therapy education nationwide, and it surveys its members about accreditation, curriculum, duration of school programs, and clock hour requirements (a measure of program length).  *Id.*

AMTA has more than 600 massage school members nationwide.  *Id.* ¶ 5.  These schools represent a majority of U.S. massage therapy educational institutions, a substantial number of which will suffer catastrophic harm if the Final Rule takes effect.  *Id.* ¶¶ 5, 8, 21–35.

### B.    Statutory and Regulatory Background

The HEA is designed to "mak[e] available the benefits of postsecondary education to

2

eligible students" through a series of grants, loans, and other programs.  20 U.S.C. § 1070(a).  For decades, the Department's regulations governing program length have been consistent with that purpose.  The Final Rule, however, unjustifiably and irrationally departs from Congress's purpose and the Department's longstanding practice.

1.    <u>Congress Enacts the Higher Education Act of 1965 to Provide Financial Aid for Students in Institutions of Higher Education.</u>

In 1965, Congress enacted the HEA to "strengthen the educational resources of [the nation's] colleges and universities and to provide financial assistance for students in postsecondary and higher education."  Pub. L. 89-329, Nov. 8, 1965, 79 Stat. 1219.  Central to the HEA is Title IV, which authorizes various FSA programs that provide financial assistance to students to pursue postsecondary education at eligible institutions of higher education.  *See* 20 U.S.C. §§ 1070–1099d.  One such Title IV program, the federal Pell Grant program, "is the single largest source of federal grant aid supporting undergraduate students."  Cassandria Dortch, Cong. Rsch. Serv., R45418, Federal Pell Grant Program of Higher Education Act: Primer , Nov. 6, 2024.  "Pell Grants are need-based aid that is intended to be the foundation for all need-based federal student aid awarded to undergraduates.  Unlike loans, students do not repay Pell Grants."  *Id.*  For relatively low-tuition programs like massage therapy, Pell Grants are a vital resource.  The maximum Pell Grant for 2024-25 is $7,395.[2]  Thus, for a hypothetical massage therapy course that costs $10,000, a Pell Grant alone would defray, debt-free to the student, nearly 75% of the cost.

Any institution that wants to receive FSA funds pursuant to a Title IV program, including Pell Grants and direct loans under the William D. Ford Direct Loan Program, must meet several statutory and regulatory eligibility criteria, including the statutory definition of an "institution of

---

[2] Don't Miss Out on Federal Pell Grants, Office of Federal Student Aid, (last visited Oct. 7, 2024), https://studentaid.gov/articles/dont-miss-out-on-pell-grants.

3

higher education." 20 U.S.C. § 1002. For purposes of Title IV, an institution of higher education can include a "proprietary institution of higher education," which the HEA defines as any school that is neither a public nor a nonprofit institution and which "provides an eligible program of training to prepare students for gainful employment in a recognized occupation," among other requirements. 20 U.S.C. §§ 1001(a), 1002(a)(1)(A) & (b). A vocational school may also qualify as an "institution of higher education" if it prepares students for "gainful employment." 20 U.S.C. § 1002(a)(1)(B). Since all academic programs at proprietary institutions and vocational institutions must meet the "gainful employment" requirement to be Title IV-eligible, programs at proprietary and vocational schools are often called "GE Programs."[3]

Department regulations impose additional Title IV requirements in parts 600 and 668 of Title 34 of the Code of Federal Regulations. Relevant to this action, a program offered by a proprietary institution of higher education or vocational institution qualifies under Title IV if, among other things, it "require[s] a minimum of 15 weeks of instruction," it is "at least 600 clock hours, 16 semester hours, or 24 quarter hours" long, and it "provide[s] undergraduate training that prepares a student for gainful employment in a recognized occupation[.]" 34 C.F.R. § 668.8(d)(1).

The eligibility requirements under the Pell Grant and direct loan programs differ in some material respects. One critical difference relates to program length. Pell Grants are only available for GE Programs that entail at least "600 clock hours of instruction, 16 semester hours, or 24 quarter hours," offered over 15 or more weeks. 20 U.S.C. § 1088(b)(1)(A). In contrast, direct loans under the Ford Direct Loan Program are available if a GE Program lasts between 300 and 600 clock hours of instruction over 10 or more weeks (among other requirements). *Id*. §

---

[3] Programs at not-for-profit and public colleges that are at least one year long and lead to a certificate or other non-degree credential are also GE Programs. *See* 34 C.F.R. § 668.8(c)(3).

1088(b)(2).  Certain GE Programs, including many massage therapy programs offered by AMTA member schools, are measured in "clock hours,"[4] as opposed to traditional units for measuring the length of an academic course (e.g., credit, semester, or quarter hours).  *See* ECF No. 3-2, ¶ 8.

2.     The Department Promulgates a Rule in 1994 to Offer Latitude to Institutions While Protecting Students and Taxpayers.

On February 28, 1994, the Department issued a Notice of Proposed Rulemaking, declaring that the "Federal government's management of its responsibilities to determine eligibility and to certify institutions to participate in Title IV, HEA programs has not always been adequate to prevent abusive practices at institutions that participate in those programs."  59 Fed. Reg. 9,526 (Feb. 28, 1994).  Specific to GE Programs, the Department claimed that many schools were offering excessively long programs that required students to incur unnecessary debt.  As an example, the Department identified an institution that sought approval of a 600-hour program when the state in which the institution was located required only 40 hours of training for entry-level positions for which the program provided training.  *Id*. at 9,547–48.  To address this concern while still seeking to fulfill the HEA's purpose of making federal aid widely available to postsecondary students, the Department proposed (and later issued) regulations that it concluded would "help curb abuse of the programs by preventing institutions from providing unnecessary training to students in order to receive additional Title IV, HEA program funds."  *Id*. at 9,532–33.

The Department's February 1994 proposal provided that, to be Title IV-eligible, any institution offering a GE Program must agree in its Program Participation Agreement ("PPA")[5] to

---

[4] Clock hours are the total number of actual hours per week a student spends attending class or other instructional activities that count toward completing a program of study.  *See* U.S. Dep't of Homeland Sec., The Difference Between Clock Hours and Credit Hours, March 2, 2016, https://studyinthestates.dhs.gov/2016/03/difference-between-clock-hours-and-credit-hours     (last visited Nov. 25, 2024).

[5] Institutions of higher education must execute a PPA to participate in Title IV federal student aid

demonstrate a reasonable relationship between the quantity of training provided in the program and entry-level requirements for employment. *Id*. at 9,548. A "reasonable relationship" would exist "if the number of clock hours in the program d[id] not exceed by more than 50 percent any State requirement for the minimum number of clock hours necessary to train the student in the occupation for which the program prepares the student." *Id*. In effect, the Department was capping the number of clock hours that a school could require (and charge for) in a clock hour-based GE Program while still remaining eligible to receive Title IV FSA funds.

On April 29, 1994, the Department published a final version of its proposed rule. It stated:

> If the stated objectives of an educational program of the institution are to prepare a student for gainful employment in a recognized occupation, the institution will—
>
> (i) Demonstrate a reasonable relationship between the length of the program and entry level requirements for the recognized occupation for which the program prepares the student. The Secretary considers the relationship to be reasonable if the number of clock hours provided in the program does not exceed by more than 50 percent the minimum number of clock hours required for training in the recognized occupation for which the program prepares the student, as established by the State in which the program is offered, if the State has established such a requirement or as established by any Federal agency; and
>
> (ii) Establish the need for the training for the student to obtain employment in the recognized occupation for which the program prepares the student.

59 Fed. Reg. 22,348, 22,427 (Apr. 29, 1994). The rule was codified at 34 C.F.R. § 668.14(b)(26).

This was the origin of the 150 Percent Rule. The new rule ensured that institutions offering clock hour-based GE Programs that lasted up to 150 percent of the state's required minimum clock hours could still accept students who intended to use Pell Grants and other Title IV FSA funds to pay for their education. This built-in flexibility is consistent with the Department's stated purpose for promulgating the 150 Percent Rule: "[A]llow[ing] enough latitude for institutions to provide

---

programs. The PPA is an agreement between the institution and the Department that certifies that the institution complies with all applicable Title IV provisions. *See* 34 C.F.R. § 668.14.

quality programs and furnish[ing] a sufficient safeguard against the abuses of course stretching." *Id*. at 22,366. It is noteworthy that, when the 150 Percent Rule was finalized in 1994, the Department disagreed with commenters who argued that "the standard . . . was too lenient and that the program length should not exceed the minimum State standard." *Id*.

### 3. The Department Expands the 150 Percent Rule in 2020 by Consensus.

The substance of the 150 Percent Rule remained unchanged for nearly three decades.[6] Then, in 2020, the Department changed the 150 Percent Rule to offer even *more* flexibility to institutions of higher education in light of the Department's recognition that "individuals often move from one State to another or live, work, and learn in different States at the same time." 85 Fed. Reg. 54,742, 54,776 (Sept. 2, 2020). In accordance with its finding, the Department amended the 150 Percent Rule to better account for the acknowledged mobility of students. *Id*. at 54,743.

Unlike ordinary APA rulemaking, Title IV regulations must undergo "negotiated rulemaking," in which the Department solicits input from "individuals and representatives of the groups involved in student financial assistance programs." 20 U.S.C. § 1098a. Proper negotiated rulemaking will facilitate input from the various interested sectors, including "students, legal assistance organizations that represent students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies." *Id*. Some of these stakeholders naturally have diverging interests. Legal assistance organizations representing students may disagree with collection agencies, for example. However, if these groups can reach consensus during negotiated

---

[6] Effective July 1, 2015, the Department made immaterial changes to the rule and added a minor requirement that each institution provide a certification required under 34 C.F.R. § 668.414. *See* 79 Fed. Reg. 64,890, 65,007 (Oct. 31, 2014). None of this is at issue. 34 C.F.R. § 668.414 was removed and reserved effective July 1, 2020. *See* 84 Fed. Reg. 31,392, 31,453 (July 1, 2019).

rulemaking on what a regulation should say, then the Department is obligated to present that consensus as a proposed rule.  20 U.S.C. § 1098a(b)(2).

The 2020 amendment to the 150 Percent Rule is an example of <u>consensus</u> rulemaking; <u>all</u> interested parties agreed to it.  Under the 2020 consensus version of the regulation, an institution offering a GE Program could still demonstrate a "reasonable relationship" between program length and entry-level job requirements by showing that its program length did not exceed 150 percent of its own state's minimum required hours (as had always been the case).  *Id*. at 54,816.  But as modified, the institution could also demonstrate reasonableness by showing that its GE Program length did not exceed 100 percent of the minimum hours required by an *adjacent* state.  *Id*.

The Department rejected public commentary arguing that the amended 2020 version failed to prevent institutions from over-stretching their programs, finding that the amended language struck "a reasonable balance between supporting students who must qualify for State licensure and preventing abuse."  *Id*. at 54,776.  When proposing the 2020 rule to the public, the Department explained that it "did not want schools to inflate the number of hours in a program beyond those that a student needs to complete in order to get a good job in their field[.]"  85 Fed. Reg. 18,638, 18,664 (Apr. 2, 2020).  On the other hand, the Department recognized that keeping the "150 percent threshold" would "afford those pursuing career and technical education the same opportunities to develop advanced competencies in order to qualify for higher paying and more secure jobs."  *Id*.  The Department reasoned that a lower course length threshold for GE Programs would result in disparate treatment where "Title IV funds can be used by a student who wishes to pursue a graduate degree simply because they are interested in a topic, but cannot be used by a student in a [GE] program who wants to complete coursework to develop advanced skills and competencies that *go beyond basic licensure requirements*."  *Id*. (emphasis added).

4.      The Department Eliminates the 150 Percent Rule in 2023 Without
        Sufficient Notice, Industry Participation, or Time for Comment.

On May 26, 2021, the Department announced its intention to form negotiated rulemaking committees to prepare proposed regulations governing FSA programs.  *See* 86 Fed. Reg. 28,299 (May 26, 2021).  The Department's announcement listed 14 specific "topics for regulation." Modifying the 150 Percent Rule or any aspect of 34 C.F.R. § 668.14 was *not* among them.  *Id*. at 28,299–300.  The Department also held public hearings on its "rulemaking agenda" on June 21, 23, and 24, 2021.[7]  *See* AR-00003, AR-00053, AR-00120, AR-00186; 86 Fed. Reg. 69,607 (Dec. 8, 2021).  At no time did the Department propose making changes to the 150 Percent Rule.

After the public hearings, and as the next stage in the negotiated rulemaking process, the Department announced on December 8, 2021 that it would form an "Institutional and Programmatic Eligibility Committee" ("Committee") to address seven topics—none of which referred to the 150 Percent Rule or changes to 34 C.F.R. § 668.14.[8]  86 Fed. Reg. 69,607–08.

Although the Department averred that the Committee "w[ould] include representatives of organizations or groups with interests that are significantly affected by the subject matter of the proposed regulations," *id*. at 69,607, the Department did not include a person with experience in clock hour-based GE Programs, massage therapy programs, or beauty and wellness programs on the Committee.  South College's Chief Operating Officer, Bradley Adams, and Aviation Institute of Maintenance's Vice President of Administration, Michael Lanouette, represented proprietary

---

[7] The public hearing transcripts are found in AR-00003, AR-00053, AR-00120.

[8] These topics included: "(1) 90/10 under 34 CFR 668.28; (2) Ability to benefit under 34 CFR 668.156; (3) Certification procedures for participation in title IV, HEA programs under 34 CFR 668.13; (4) Change of ownership and change in control of institutions of higher education under 34 CFR 600.31; (5) Financial responsibility for participating institutions of higher education under 34 CFR 668.15 and 34 CFR part 668, subpart L, such as events that indicate heightened financial risk; (6) Gainful employment (formerly located in 34 CFR part 668, subpart Q); and (7) Standards of administrative capability under 34 CFR 668.16."

institutions.[9]  Neither South College nor the Aviation Institute of Maintenance offers a massage therapy, cosmetology, or other wellness or beauty industry program.[10]

The Committee met in January, February, and March 2022.  It was not until prior to the Committee's first meeting on January 21, 2022—after its membership was established, and after the public had its opportunity to comment on rulemaking topics—that the Department, out of nowhere, sought "feedback from the [C]ommittee on the appropriate maximum length of aid eligibility" for a gainful employment program.[11]  Over the course of several negotiated rulemaking sessions, the negotiators considered several changes, but did not reach consensus on whether, or how, the 150 Percent Rule should be modified.[12]  Defendants, however, were undeterred.

On May 19, 2023—approximately three decades after the 150 Percent Rule was originally adopted and just three years after it was reaffirmed and amended by consensus—Defendants published a Notice of Proposed Rulemaking proposing to abandon the 150 Percent Rule altogether. The initial proposal would have limited the number of hours in a GE Program to the greater of:

> (A) The required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement, or as established by any Federal agency or the institution's accrediting agency; or
>
> (B) Another State's required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, if certain criteria is [sic] met.

---

[9] *See* ECF 3-9; AR-00189.

[10] *See* Aviation Inst. of Maintenance, https://aviationmaintenance.edu/ (last visited Oct. 10, 2024); Programs and Degrees, South Univ., https://www.south.edu/about/ (last visited Oct. 10, 2024).

[11] ECF 3-10 at 11; AR-00208; AR-00203.

[12] The transcripts for the Committee's January 18 through March 18, 2022 meetings are available at: AR-00463, AR-00500, AR-00527, AR-00553, AR-00667, AR-00864, AR-00884, AR-00905, AR-00925, AR-00946, AR-00985, AR-01165, AR-01227, AR-01247, AR-01268, AR-01291.

88 Fed. Reg. 32,300, 32,492 (May 19, 2023) ("NPRM").  Under the proposal in the NPRM, an institution could have relied on paragraph (B) only if "the institution document[ed], with substantiation by a certified public accountant who prepares the institution's compliance audit report" that, in the most recently completed award year, a majority of the program's students either lived in the other state, went to work in the other state, or certified at the time of their enrollment that they intend to live in a different state within the same metropolitan statistical area.  *Id*.

The proposed modifications to the 150 Percent Rule were buried in over 200 pages of complex and new proposed regulations that affected broader sections of the higher education industry.  *See generally id*. at 32,300–32,511.  To make matters worse, the Department provided only 30 days for the public to submit comments to its lengthy proposals.  *See id*. at 32,300.

Notwithstanding the Defendants' needlessly truncated deadline, commenters, including AMTA, identified numerous legal and practical flaws of the proposed gutting of the 150 Percent Rule, including (1) the lack of representation of beauty and wellness industries or small, proprietary schools on the Committee; (2) the Department's failure to account for the time it will take accrediting agencies and states to approve changes to the lengths of GE Programs; (3) limiting post-graduation student mobility and diminishing the quality of education; (4) undermining the Interstate Massage Therapy Compact, which adopts a 625-hour training minimum based on the massage therapy industry average; and (5) the nationwide shortage of massage therapists in a growing industry.  *See* 88 Fed. Reg. 74,568, 74,572, 74,639–42 (Oct. 31, 2023) (noting commenters' concerns about Committee make-up); AR-07012, AR-02046, AR-03593, AR-03606, AR-04043, AR-04675, AR-04774, AR-06483, AR-07007, AR-05442, AR-05570, AR-08698, AR-05680, AR-06265, AR-06295, AR-06311.

The government was dismissive of these (and other) significant flaws.  On October 31,

2023, Defendants published the Final Rule, adopting a regulation that is even more draconian than

what Defendants proposed in the NPRM, with an effective date of July 1, 2024. *Id*. at 74,696–97.

The Final Rule states:

> If an educational program offered by the institution on or after July 1, 2024, is required to prepare a student for gainful employment in a recognized occupation, the institution must—
>
> (i) Establish the need for the training for the student to obtain employment in the recognized occupation for which the program prepares the student; and
>
> (ii) Demonstrate a reasonable relationship between the length of the program and the entry level requirements for the recognized occupation for which the program prepares the student by limiting the number of hours in the program to the greater of—
>
> (A) The required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement or as established by any Federal agency; or
>
> (B) Another State's required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, if the institution documents, with substantiation by a certified public accountant who prepares the institution's compliance audit report as required under § 668.23 that—
>
> (1) A majority of students resided in that State while enrolled in the program during the most recently completed award year;
>
> (2) A majority of students who completed the program in the most recently completed award year were employed in that State; or
>
> (3) The other State is part of the same metropolitan statistical area as the institution's home State and a majority of students, upon enrollment in the program during the most recently completed award year, stated in writing that they intended to work in that other State; and
>
> (iii) Notwithstanding paragraph (a)(26)(ii) of this section, the program length limitation does not apply for occupations where the State entry level requirements include the completion of an associate or higher-level degree; or where the program is delivered entirely through distance education or correspondence courses[.]

*Id*. at 74,696–97. The only significant change—which also operates against AMTA members—is

that minimum training hours required for accreditation could no longer be used as the maximum

length of a GE Program. *See* 88 Fed. Reg. at 74,637. Only the state minimum matters. *Id*.

    5. <u>The Department Acknowledges the Difficulties Educational Institutions Will Face in Complying with the Final Rule But Pushes the Final Rule's Implementation Forward.</u>

  Not long after issuing it, the Department acknowledged that the Final Rule had a serious problem. On April 9, 2024, in Electronic Announcement GEN-24-07 ("EA"), Defendants admitted that "institutions face unique challenges outside their control that may affect their ability to comply" with 34 C.F.R. 668.8(b)(26). *See* Exhibit 1, U.S. Dep't of Educ., Updates on New Regulatory Provisions Related to Certification Procedures and Ability-to-Benefit (GE-24-03), Apr. 9, 2024, https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/ 2024-04-09/updates-new-regulatory-provisions-related-certification-procedures-and-ability- benefit. These challenges—which commenters raised in no uncertain terms during the comment period—include institutions' inability to obtain approvals from states and accrediting agencies for changes in program length in time to comply with the Final Rule. *Id*.; *see also* 88 Fed. Reg. at 74,641. The Department offered a non-committal statement that it would "seriously consider such challenges, in particular prior to January 1, 2025, when determining whether to seek enforcement of these provisions." *See* Exhibit 1. Additionally, the Department announced that "an institution can raise as a defense to an enforcement action that it faced challenges in meeting compliance due to reasons that are unique, time-specific, and outside the control of the institution." *Id*. The Department speculated that it "believes" that most of those concerns and challenges affecting compliance with the 150 Percent Rule will have been resolved or sufficiently mitigated by January 1, 2025, though it cited no evidence in support of that belief.

  Despite finally acknowledging a major problem with the Final Rule that commenters foretold, the Department did *not* change the date on which the Final Rule was to take effect or provide a mechanism for affirmative relief on which institutions can confidently rely to avoid

losing out on the 150 Percent Rule's 30-year-old, mission-critical benefits. The Department merely granted unto itself "enforcement discretion," leaving schools in limbo as to how (and if) that discretion would be exercised.

### C. Institutions Challenge the Final Rule in Two Lawsuits.

#### 1. The Two Lawsuits.

On May 31, 2024, a career college and a coalition of other interested plaintiffs filed a lawsuit in the United States District Court for the Northern District of Texas against Defendants under the APA to set aside the changes in 34 C.F.R. § 668.14(b)(26)(ii)(A), which limit a Title IV GE Program's clock hours to the state minimum. *See 360 Degree Education, LLC v. U.S. Dep't of Educ.*, 4:24-cv-00508-P ("*Cortiva*"), ECF No. 1. The same day, the *Cortiva* plaintiffs filed a Motion for Temporary Restraining Order, Injunction and Stay, seeking to enjoin the changes made to 34 C.F.R. § 668.14(b)(26)(ii)(A). *Id.*, ECF No. 5.

One week later, on June 7, 2024, AMTA filed the instant lawsuit and a Motion for Preliminary Injunction seeking to enjoin implementation of the Final Rule. *See* ECF Nos. 1, 3.

#### 2. The Texas Court Enjoins the Final Rule.

On June 21, 2024, the *Cortiva* court granted the plaintiffs' motion for a preliminary injunction, ordering that enforcement and implementation of 34 C.F.R. § 668.14(b)(26)(ii)(A), as amended in the Final Rule (referred to by that court as the "the Bare Minimum Rule"), be enjoined pending resolution of that lawsuit. *See Cortiva*, ECF No. 30. Prompted by a motion from the government, the court confirmed on July 1, 2024 that the injunction applies nationwide. *See Cortiva*, ECF No. 39. The Department did not appeal the injunction and issued guidance on July 3, 2024, informing institutions that they "must continue to comply with the maximum program length regulations that were in effect prior to July 1, 2024." *See* Exhibit 2, U.S. Dep't of Educ., Temporary Injunction on Program Length Regulations (GEN-24-83), July 3, 2024,

https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2024-07-03/temporary-injunction-program-length-regulations.

In the meantime, on June 27, 2024, the parties in the instant case appeared for a hearing on AMTA's Motion for Preliminary Injunction ("PI"). Because the nationwide injunction in *Cortiva* mooted AMTA's PI motion, AMTA withdrew its PI motion without prejudice and the parties agreed to cross-move for summary judgment. ECF Nos. 18, 19.

A month later, the Department filed a motion to dismiss in *Cortiva* for (alleged) lack of standing, and alternatively sought a transfer of *Cortiva* to this Court. *See Cortiva*, ECF Nos. 42, 43. The government argued that the institution at the center of *Cortiva* is ineligible to participate in Title IV, FSA programs, and thus, will not be affected by the Final Rule. *Id*. Rather than rule on the institution's Title IV eligibility itself, the *Cortiva* court instead directed the government to initiate administrative proceedings to determine the institution's eligibility, and it administratively closed *Cortiva*. *Cortiva*, ECF No. 57. However, the court kept the injunction in place. *Id*.

### D.    The Final Rule Endangers Massage Therapy Education.

AMTA's membership includes more than 600 schools offering massage therapy programs across the United States. *See* ECF No. No. 3-2, ¶ 5. Many, if not most, of these member schools face one or more inevitable hardships if the Final Rule takes effect. These hardships include loss of eligibility to participate in critical FSA programs; compelled, indefinite shut-downs of enrollments in massage therapy programs; disruptions to established industry-wide compacts; reputational harm; and outright cessation of business operations. Compounding the problem is the irreversible collateral damage that the Final Rule will cause for students of those schools—the very individuals the Final Rule is purportedly intended to help.

1.    Loss of Pell Grants

The overwhelming majority of students at AMTA member schools are women, and many come from a diverse racial or ethnic background.  *Id.* ¶ 6.  A similarly high number of students at AMTA member schools come from disadvantaged backgrounds and rely heavily on Pell Grants to finance their educations.  *Id.*; *see also* AR-05960, AR-08074, AR-08094, AR-10644.  Given the demographics of their student bodies, massage therapy schools structure their curricula to fit within the federal Pell Grant program, to support these underserved students, and to offer them training in a practical, marketable trade.  *See, e.g.,* AR-08513 ("I take advantage of the 150% rule to ensure our enrollees can access Title IV student loans and Pell Grants.").  However, under the HEA, students may not use Pell Grants to pay for GE Programs such as massage therapy unless the program is at least 600 clock hours long.  *See* 20 U.S.C. § 1088(b).[13]

Twelve states currently have a minimum clock hour requirement for massage therapy that is below 600 hours.[14]  *See* Exhibit 3, Declaration of Jeffrey Flom dated November 26, 2024, ("Flom Decl.") ¶ 6.  In those 12 states, the Final Rule—by capping GE Programs at the minimum number of hours required by an institution's state—will effectively ban massage therapy schools from the Pell Grant program, and will likewise limit or foreclose massage therapy education for students who otherwise would have attended those schools.  The result will be a significant reduction to member schools' enrollment and operating revenues and lost opportunities for students.

---

[13]  The Final Rule also has the effect of conditioning participation in the federal direct loan programs on criteria that many AMTA member schools need not satisfy under the current regulatory regime.  *See* 34 C.F.R. § 668.8(d)(3), (e).  To the extent the government challenges standing, AMTA will further explain how the Final Rule harms institutions that participate in the direct loan program, irrespective of whether they also participate in the Pell Grant program.

[14]  When this case was filed, an estimated 22 states had minimum hours requirements below 600.

2.    <u>Suspension of Enrollments</u>

If it takes effect, the Final Rule will put AMTA member schools in a damned-if-you-do, damned-if-you-don't scenario.  Because state authorities and accreditors need time to approve changes to programs, institutions will be forced to either violate their accreditation by enrolling new students in shortened programs without approval from their accreditors (which itself jeopardizes the school's participation in FSA programs, *see* 34 C.F.R. § 602.22(a)), or pause their massage therapy programs while their accreditors and other state authorities review and approve the reduced-hour curricula (which will jeopardize schools' ability to stay in business).  *See* ECF No. 3-2, ¶¶ 32, 34; ECF No. 3-3, ¶ 13, ECF No. 3-7 ¶¶ 13–16, ECF No. 3-6, ¶¶ 18–20, ECF No. 3-5, ¶ 18.[15]  Between those two options, the only way to comply with the letter of the law is to temporarily and indefinitely suspend new enrollments while state agencies and accreditors review each institution's revised program curriculum.  To the extent schools can weather that storm and stay in business, they will never recover the tuition that they would have been paid had they been able to enroll students and teach massage therapy programs continuously.

The result will be, at best, significant financial losses to nearly one-third of AMTA member schools, and, at worst, program losses that threaten the existence of many institutions that have labored for decades to provide high-quality massage therapy education.  *See* Flom Decl., ¶ 7; ECF No. 3-2, ¶¶ 20–35; ECF No. 3-3, ¶¶ 14–15, ECF No. 3-7, ¶¶ 13–17, 20, ECF No. 3-6, ¶¶ 14, 18, 20, ECF No. 3-5, ¶¶ 15–16.  Sixty-five percent of massage therapy schools nationwide are small or family businesses.  *See* ECF No. 3-2, ¶¶ 5, 10; *see also* AR-03055, AR-08594, AR-08984.

---

[15] Most, if not all, of the facts in these declarations were before Defendants in sum and substance during the rulemaking process.  However, even if they were not in the administrative record, AMTA may rely on them to establish its standing.  *See Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 174 (D.C. Cir. 2012).

These devastating financial losses will force many AMTA member schools to terminate faculty and staff members who rely on their positions to support their families and pay for living expenses. *See, e.g.* ECF No. 3-5, ¶ 19.

        3.      <u>Undermining Industry Standards and Licensure Examination Results</u>

The average massage therapy school program lasts approximately 625 hours, which is consistent with the minimum hours requirement of the Interstate Massage Compact ("IMpact") developed by the Federation of State Massage Therapy Boards ("FSMTB"). *See* AR-07012, AR-08984. The FSMTB formed IMpact to set a nationwide standard that allows massage therapy students to transfer their licenses seamlessly from state to state. AR-08989. Commenters informed Defendants that the FSMTB considers many state minimum requirements for massage therapy education to be insufficient to protect public safety. *See* AR-05612.

Overriding the massage therapy industry's training and testing standard would have detrimental effects on AMTA members. Massage therapy schools obviously have a reputational interest in producing graduates who will perform massage therapy services safely (and the public has an interest in safe massage therapy). Stripping massage therapy programs down to a length that the FSMTB has deemed unsafe (in some states) puts those interests at risk.

Furthermore, the majority of states require that an applicant for a massage therapy license pass the Massage & Bodywork Licensing Examination ("MBLEx"), which the FSMTB administers. ECF No. 3-2, ¶ 16. In 2022-23, the nationwide pass rate for the MBLEx was 72%. *Id*., *see also* Flom Decl., ¶ 12, Ex. B. However, statistics show that training beyond state minimums can increase a student's odds of achieving a passing score on the MBLEx. The optimal training time is between 600 and 650 hours. *See* ECF No. 3-2, ¶ 16. Eighty-one percent of MBLEx applicants who receive between 600–650 hours of education pass the MBLEx on the first try,

significantly above the national average.  *Id.*

Licensure examination passage rates also bear upon a school's eligibility to participate in Title IV programs.  For example, if an accreditor requires institutions to track licensure examination passage rates, the Department's regulations allow the Department to consider those passage rates when determining whether to certify an institution for participation in Title IV programs.  *See* 34 C.F.R. § 668.13(e)(3).  The Commission on Massage Therapy Accreditation ("COMTA") is one such accreditor.  *See* ECF No. 3-2, ¶ 18; *see also* Exhibit 4, COMTA Accreditation Standards at 12 ("To maintain and/or improve program effectiveness, institutions or programs monitor and report . . . exam pass rates on an annual basis.").

In sum, schools are harmed if they cannot provide students the optimal amount of training to practice safely, meet industry standards, and pass the MBLEx.

## II.    ARGUMENT AND CITATION OF AUTHORITY

### A.    Summary Judgment Standard

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  APA cases present only questions of law "limited to determining whether the agency acted arbitrarily or capriciously,' or in violation of another standard set out in section 10(e) of the APA . . . ."  *Desa Grp., Inc. v. U.S. Small Bus. Admin*., 190 F. Supp. 3d 61, 68 (D.D.C. 2016) (internal citations omitted).

"Under the APA, a reviewing court must set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'  5 U.S.C. § 706(2)(A).  This standard requires the agency to 'examine the relevant [evidence]' and 'articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'"  *Ardmore Consulting Grp., Inc. v. Contreras-Sweet,* 118 F. Supp. 3d 388, 393 (D.D.C. 2015).  Applying these standards to the instant case, the Court should award AMTA summary

judgment and set aside the Final Rule.

**B.    Plaintiff Has Standing and Its Case is Ripe for Resolution.**

To have standing under 5 U.S.C. § 702, a litigant must show that it is injured in fact by the agency action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys*., 144 S. Ct. 2440, 2449 (2024). AMTA, an organization whose membership includes nearly 600 massage therapy schools, is an "object of the challenged regulation" and a paradigmatic "person[ ] injured by agency action." *Id.; Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). Though AMTA is not itself a school, "'[a]ssociational standing,' . . . allows an organization to sue on behalf of its members to protect their interests." *Am. Ass'n of Cosmetology Schs. v. DeVos*, 258 F. Supp. 3d 50, 66–67 (D.D.C. 2017) (*"AACS"*). An organization has associational standing if it shows "that (1) 'its members would otherwise have standing to sue in their own right,' (2) 'the interests it seeks to protect are germane to the organization's purpose,' and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id*.

The Declarations of AMTA CEO Jeffrey Flom dated June 7, 2024 and November 26, 2024 make clear that many of AMTA's member schools will be adversely affected by the Final Rule. Thus, the harms are not unique to one individual member. In addition, the declarations from various schools submitted in support of AMTA's PI further detail the deleterious effects of the Final Rule, many of them fatal. For all these reasons, AMTA has standing to bring this case.

Plaintiff's claims are ripe. Ripeness turns on "(1) whether the disputed claims raise purely legal questions and would, therefore, be presumptively suitable for judicial review; (2) whether the court or the agency would benefit from postponing review until the policy in question has sufficiently 'crystallized' by taking on a more definite form; and (3) whether the agency's action is sufficiently final." *Beverly Enters., Inc. v. Herman*, 50 F. Supp. 2d 7, 13 (D.D.C. 1999) (citing *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149-151 (1967), abrogated on other grounds by *Califano*

*v. Sanders*, 430 U.S. 99 (1977)).  Here, all questions are legal—did Defendants act arbitrarily in violation of the APA or in violation of the HEA?—and Defendants' *final* regulations obviously constitute *final* agency action.  *Beverly Enters.*, 50 F. Supp. 2d at 13.  Given that the case involves only legal questions, more facts will not aid in the Court's analysis.  *Id*.

### C.    The Final Rule Arbitrarily Departs from 30 Years of Practice.

The Final Rule is arbitrary and capricious because it reflects an unjustified departure from decades of past agency practice.  "An agency's departure from past practice can . . ., if unexplained, render regulations arbitrary and capricious."  *Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012).  An agency that is changing an existing rule must "adequately explai[n] the reasons for a reversal of policy . . . ."  *Id*.  Furthermore, "the Supreme Court has held that 'the APA requires an agency to provide more substantial justification when . . . its prior policy has engendered serious reliance interests that must be taken into account.'"  *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 708 (D.C. Cir. 2016) (quoting *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015)).  "In such cases, in order to offer a satisfactory explanation for its action, . . . the agency must give a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 719 (D.C. Cir. 2016).  Specifically, where an agency is "not writing on a blank slate, . . . it [is] required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 33 (2020).  The failure to consider these matters makes a rule "arbitrary and capricious in violation of the APA."  *Id*.

The Supreme Court explained in *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016):

> When an agency changes its existing position, it need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. But the agency must at least display awareness that it is changing position

and show that there are good reasons for the new policy. In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account. In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy. It follows that an [u]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.

*Id.* at 2125-26 (quotation marks and citations omitted) (alteration in original).

*Encino Motorcars* involved a determination by the Department of Labor ("DOL") in 1978 that the Fair Labor Standards Act ("FLSA") exempted service advisors at car dealerships from the FLSA's overtime pay requirements.  DOL suddenly changed its position in 2011 with a new regulation that would not exempt service advisors from overtime.  The automobile industry challenged DOL's 2011 rule, arguing that its dealerships had come to rely on DOL's 1978 interpretation.  The Supreme Court sided with the industry, holding:

In promulgating the 2011 regulation, the Department offered barely any explanation.  A summary discussion may suffice in other circumstances, but here—in particular because of decades of industry reliance on the Department's prior policy—the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position.

*Encino Motorcars*, 579 U.S. at 218.  The D.C. Circuit has since described the agency's obligation as "a substantial explanatory burden" when departing from a longstanding rule that has engendered significant industry reliance.  *MediNatura, Inc. v. FDA*, 998 F.3d 931, 942 (D.C. Cir. 2021) (quoting and following *Encino*); *see also Nissan Chem. Corp. v. FDA*, No. 22-1598, 2024 WL 3724686, at *6 (D.D.C. Aug. 8, 2024) (quoting and adopting *Encino*).

Institutions of higher education, students, and states have all relied on the 150 Percent Rule for the past 30 years in at least the following ways: (1) institutions developed comprehensive curricula meeting current industry standards and prepared students for licensure examination and work in the field with the understanding that their students would be able to apply for Pell Grants

to pay for their educations;[16] (2) institutions used the 150 Percent Rule to maintain eligibility to receive Title IV FSA funds;[17] (3) at least one state relied on the 150 Percent Rule to set minimum clock hour requirements for licensing that fall below the 600-clock hour threshold for participation in the Pell Grant program; [18] and (4) institutions rely on FSA dollars to fund their operations and stay in business.[19]

Unfortunately, Defendants have caused *Encino Motorcars* all over again.  Defendants finalized the Final Rule without accounting for or weighing any of the abovementioned reliance interests, even after receiving myriad comments from students, teachers, small business owners, AMTA, its member schools, and accrediting agencies that detailed the negative impacts of the Defendants' proposed changes to the 150 Percent Rule.  *See, e.g.*, AR-03626, AR-05612, AR-07015, AR-08513, AR-08914, AR-10654.  Despite acknowledging that the 150 Percent Rule "has existed in some form, with only slight variation in its effect, since 1994," 88 Fed. Reg. at 74,638, and further admitting that "institutions rely on the 150 percent rule to qualify their programs for title IV, HEA participation," 88 Fed. Reg. at 74,640, at <u>no point</u> did Defendants actually "assess whether there were reliance interests, determine whether they were significant, [or] weigh any such interests against competing policy concerns."  *Dep't of Homeland Sec.*, 591 U.S. at 33; *see generally* 88 Fed. Reg. 32,300–32,511; *see also* 88 Fed. Reg. 74,568.

---

[16] *See, e.g.,* AR-08622-25, AR-10229; AR-03967, AR-08812.

[17] *Id.*

[18] For example, Florida's state legislature relied on the 150 Percent Rule when it set the minimum number of training hours for massage therapists to 500.  *See* AR-08624 ("[O]n the forefront of every [Florida] legislator's mind was, 'will this reduction in hours cause potential students to lose Title IV financial aid?'").

[19] Recall that the 150 Percent Rule not only allows institutions to offer (and collect tuition for) massage therapy courses that are up to 150 percent of the state minimum length, but also is critical for many schools to meet the minimum program length requirements simply to participate in certain FSA programs altogether.  *Id*., *see also* 88 Fed. Reg. at 74,640; AR-08624.

The Court should look for a substantive, *Encino*-mandated "reasoned explanation" in the Final Rule that weighs schools' decades-long reliance on the current 150 Percent Rule against the "competing policy concerns" in the Final Rule. When it does, it will not find that explanation anywhere. The Final Rule therefore is arbitrary and capricious. *See Int'l Org. of Masters, Etc. v. NLRB*, 61 F. 4th 169, 180 (D.C. Cir. 2023) (Board's rule arbitrary and capricious because it was adopted "with no regard for the parties' reliance interests. The Board did not consider the sweeping impact of its new rule or explain why existing case law does not govern"); *National Lifeline Ass'n v. FCC*, 941 F.3d 1102, 1115 (D.C. Cir. 2019) (tribal telecommunications rule invalid because FCC "d[id] not take into account the reliance interests of both the non-facilities-based providers that had crafted business models and invested significant resources into providing Lifeline service, and the two-thirds of subscribers relying on non-facilities-based providers for their telecommunications service").

Even if Defendants had no "substantial explanatory burden" to explain why the reliance interests of AMTA's member schools should yield to the government's new-found policies, the meager justifications that Defendants use to support the Final Rule are nevertheless fatally speculative. For example, Defendants guess that "Programs that are unnecessarily long *may* interfere with a student's ability to persist and complete a course of study," "unnecessary expenditures *may* then lead to further negative financial impacts," and the 150 Percent Rule "*could* be used simply to increase program length and take in more Federal aid," 88 Fed. Reg. at 74,639, 74,642 (emphases added). But Defendants' mere conjecture is insufficient as a matter of law to overturn any regulation, let alone a 30-year-old policy. *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) ("Though an agency's predictive judgments about the likely economic effects of a rule are entitled to deference . . . deference to such . . . judgment[s] must be

based on some logic and evidence, not sheer speculation.") (alteration in original).  If, as Defendants claim, course-stretching is truly a problem the Department has been combating for "decades," *id*. at 74,640, one would reasonably expect the Department to offer more than speculation about the supposed harms that the 150 Percent Rule causes.  Yet, they do not. Defendants' lack of concrete evidence reflects arbitrary decision-making.

Moreover, the concerns Defendants cite in support of the Final Rule—safeguarding taxpayer dollars, overuse of Pell Grant eligibility, higher student debt, and "overly long programs"—are concerns that have been around for decades, and are in fact concerns that the Department considered when it promulgated the 150 Percent Rule in 1994 and when it amended the rule by consensus in 2020.  *See, e.g*., 59 Fed. Reg. at 9,548 and 22,366 (citing excessive program length and concerns about course stretching and excessive student debt in 1994); 85 Fed. Reg. at 54,776 (considering and rejecting comments claiming that rule did not go far enough to prevent institutions from artificially lengthening their programs).  Defendants have not explained how the facts and circumstances *today* are materially different from the facts and circumstances in 1994 and 2020, or how today's circumstances justify terminating the 150 Percent Rule in light of the heavy reliance interests of schools, industry associations, states, and students over the past 30 years.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (An agency "must" provide a detailed justification when "its prior policy has engendered serious reliance interests that must be taken into account. . . . It would be arbitrary and capricious to ignore such matters.").

These failures mirror arbitrary and capricious actions invalidated in other cases.  For example, in *Council of Parent Attorneys and Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28 (D.D.C. 2019) ("*CPAA*"), this Court set aside the Department's 2018 postponement of regulations it had adopted in 2016.  When postponing the 2016 regulations, the Department cited concerns that the

regulations "could incentivize [local education agencies] to use racial quotas to avoid findings of significant disproportionality" under the Individuals with Disabilities Education Act.  The problem with the Department's reasoning, this Court found, was that the Department based its decision on a purported concern (use of quotas) that it had already "thoroughly discussed and dealt with years before 2018."  *Id*. at 49.  In other words, the potential use of quotas "was not new information to the government, which was aware of this risk when drafting the 2016 Regulations . . . ."  *Id*. at 51.

Far from explaining how circumstances had changed or why its prior reasoning was erroneous, the Department simply "did not address the 2016 Regulations' safeguards to deter the use of racial quotas or responded to them in an inadequate or cursory manner," this Court found.  *Id*. at 50.  This Court also determined that the Department overlooked the reliance interests of states and local education agencies who had incurred costs to comply with the 2016 regulations, rejecting the Department's contention that they were "sunk investments" and further found that the Department did not "account for the costs to children, their parents, and society."  *Id*. at 54.  Moreover, the *CPAA* Court observed that the Department's explanation for its decision was replete with conjectural harms—i.e., that its 2016 regulations "may" or "could" incentivize quotas—and thus "amount[ed] to the type of speculation the Supreme Court and the D.C. Circuit have rejected."  *Id*. at 48, 50-51.

The similarities are obvious.  In the Final Rule, Defendants ignore the reliance interests of schools, states, and students.  Borrowing the words of the *CPAA* decision, Defendants premise the elimination of the 150 Percent Rule on an alleged issue (course-stretching) that is "not new . . . to the government" and that the Department "discussed and dealt with years before [2023]."  *Id*. at 51.  Finally, Defendants justify the Final Rule with mere guesswork about the supposed harms of the 150 Percent Rule.  *CPAA* is on all fours.

Likewise, in *Casa De Maryland v. U.S. Department of Homeland Security*, 924 F.3d 684 (4th Cir. 2019), the court reviewed the government's rescission of the Deferred Action for Childhood Arrivals program ("DACA"), established in 2012. Under DACA, "certain noncitizens who came to the United States as children could receive deferred action–a decision forbearing their removal from the country." *Id*. at 690. Hundreds of thousands of individuals structured their lives on the availability of deferred action. *Id*. at 690, 705. But in 2017, the Acting Secretary of Homeland Security rescinded DACA based on the view that it was unlawful. *Id*. at 690–91. The Fourth Circuit ruled that the agency's "decision to rescind DACA was arbitrary and capricious," largely because the agency failed to "address the 'facts and circumstances that underlay or were engendered by the prior policy.'" *Id*. at 704. In fact, the Fourth Circuit found that the memorandum directing rescission of DACA "ma[de] no mention" of the reliance interests of DACA beneficiaries or the reasons why the government's interests suddenly trumped them, and that court ruled against Homeland Security. *Id*. at 705. So too here.

Applying these concepts, one court has already found the Final Rule is likely arbitrary and capricious. Just as AMTA asserts here, in *Cortiva*, the plaintiffs argued that the "Department failed to explain its 'regulatory changes to the longstanding 150% Rule, which has been in place for 30 years." *Cortiva*, 2024 WL 3092459, at *4 (June 21, 2024). The *Cortiva* court agreed and preliminarily enjoined the Final Rule because Defendants, *inter alia*, failed to "show that there are good reasons for [these] new polic[ies]." *Cortiva*, 2024 WL 3092459, at *4 (June 21, 2024) ("The record similarly reflects a dearth of justification for the Department's pivot on the 150% Rule."). That court's decision should hold considerable weight in this case because it relies on the same standards that govern this case and turns on a straightforward answer to a simple question: *Did Defendants include a rational explanation for their departure from 30 years of precedent in the*

*Final Rule*?  Having reviewed the same Final Rule and similar arguments from the government as those made here, the *Cortiva* court found the answer to be "No."

### D.    Defendants' Reliance on Studies to Support the Final Rule is Misplaced.

Defendants cite research that they claim identifies no "correlation between higher training hour requirements and higher wages in massage therapy or cosmetology."  ECF No. 12 at 18.  The Court should not credit that argument.  In addition to having data gaps that undermine Defendants' conclusions, the studies cited in the Final Rule do not actually say anything about whether educating students for more hours than a state requires confers an economic benefit on the students.

### 1.    Defendants' Studies Answered Irrelevant, Inapplicable Questions.

If an agency relies on statistics and research to support a regulation, those statistics and research must be "reasonably reli[able] . . . to measure what they purport."  *Resolute Forest Prod., Inc. v. U.S. Dep't of Agric.*, 187 F. Supp. 3d 100, 123 (D.D.C. 2016).  Here, Defendants argue that the research they cite in the Final Rule shows that "training beyond State licensure requirements would not financially benefit students."  ECF No. 12 at 19.  The research says no such thing.

One study—*Occupational Licensing and Student Outcomes* ("Acevedo Study")—purportedly measured whether a massage therapist's income is impacted by the number of hours required under state law to obtain a license.  *See* AR-11173.  That measurement, however, sheds no light on whether education *beyond* the state minimum leads to better outcomes.  In order to support the government's proposition, the study would have to have compared (a) the earnings of students whose programs lasted only as long as a given state's minimum hours against (b) the earnings of students whose programs lasted longer than the same state's minimum.  But, it did not.

To illustrate, Tennessee is a 650-hour state, and Connecticut is a 750-hour state.  Defendants claim that "most students seek or obtain employment close to where they live or attend

school." 88 Fed. Reg. at 74,639.  Taking Defendants at their word[20], comparing incomes of students who are assumed to have studied for 650 hours at Tennessee schools against those who are assumed to have studied for 750 hours at Connecticut schools—exactly what the Acevedo Study did—only shows whether massage therapists in Tennessee make more or less money than massage therapists in Connecticut.  That does not inform whether education beyond a state's minimum is financially beneficial.  To be relevant, Defendants' study needed to analyze (for example) whether a student in a 650-hour program *in Tennessee* makes more, less, or the same as a student in a 750-hour program *in Tennessee*.  Defendants cannot stretch the Acevedo Study this far, and they have no other data that speak to that question.

Another study—*Examination of Cosmetology Licensing Issues* ("Simpson Study")—is unsupportive for a similar reason.  In that paper, the authors compared the wages of cosmetologists in states with higher training requirements (e.g., 1,500 hours) versus those in states with lower training requirements (e.g., 1,000 hours).  *See* AR-11376, AR-11384-85.  Like in the Acevedo Study, these comparisons did not differentiate between schools whose programs last only the state minimum length and schools whose programs last longer than the state minimum.  *Id*.  The Simpson Study simply lumped all cosmetology schools in a state together (North Carolina, for example—a 1,500-hour state), assumed those schools all offered programs 1,500 hours long, and then compared the wages of cosmetologists in North Carolina against earnings of cosmetologists in other states (similarly aggregated) with different clock hour minimums.  *Id*.  However, by

---

[20] Accepting Defendants' characterizations of any of the studies cited in the Final Rule is a risky proposition.  In fact, the study cited for this proposition warns, "[A]ssuming that graduates remain in-state or that in-state retention rates are similar across colleges is erroneous," and further warns that "flows of graduates across state or metro-area boundaries are far from uniform, as some areas tend to be strong net-importers of recent college graduates, where others are net-exporters of college-educated workers."  AR-11295.

aggregating all programs in a given state together, the Simpson Study necessarily suppressed any differences in outcomes between schools that teach beyond the minimum and those that do not.

Defendants rely on a third study—*Quick College Credentials* ("Cellini Study")—to support their claim that "[p]rograms with lower training requirements . . . tend to result in lower earnings for graduates," such that spending an "additional few hundred or thousand dollars" to complete a program longer than the state minimum could result in a negative investment.  88 Fed. Reg. at 74,639.[21]  True or not—the Cellini Study does not actually compare short programs with longer programs, and in fact lumps all programs between 300 and 599 hours together—Defendants draw no "rational connection" between the purported facts in the Cellini Study and their choice to eliminate the 150 Percent Rule.  *Ardmore,* 118 F. Supp. 3d at 393.  The Cellini Study did nothing to evaluate the relationship between hours spent in the classroom and wages earned after graduation.  It did, however, conclude that "short-term programs fare well on debt-to-earnings measures . . . due to low borrowing."  Exhibit 5 at 2.  Defendants seem to have ignored that part.

In *Resolute,* this Court found that the Department of Agriculture's actions were arbitrary and capricious where, in crafting a key provision of an order, the agency relied on a report that did not actually have the information the Department claimed it had.  *See* 187 F. Supp. 3d at 124.  This case presents a similar scenario.  Even if the Court takes everything in Defendants' studies as true—and it shouldn't for the reasons explained in the next section—all Defendants have shown is that differences in state training minimums do not impact the wages of massage therapists in their respective states.  That is a far cry from showing whether, within a given state, students who attend schools that teach more than the bare minimum fare better than those who do not.  Defendants acted arbitrarily—and were, in fact, simply wrong—in concluding that these studies

---

[21] Defendants failed to include this study in the administrative record.  It is attached as Exhibit 5.

justify jettisoning the 150 Percent Rule.

2.    Data Limitations Undermine Defendants' Reliance on the Studies.

Reliance on studies is also arbitrary and capricious when the studies have critical limitations that compromise the conclusions the government wants to make.  *See*, *e.g.*, *Resolute Forest Prod.,* 187 F. Supp. 3d at 123 ("[W]here an agency has relied on incorrect or inaccurate data or has not made a reasonable effort to ensure that appropriate data <u>was</u> relied upon, its decision is arbitrary and capricious and should be overturned.") (emphasis in original); *see also Lloyd Noland Hosp. & Clinic v. Heckler*, 762 F.2d 1561, 1564 (11th Cir. 1985) (overturning final rule because agency relied on data derived from a study whose author acknowledged that the study had serious limitations).  The relevant studies Defendants rely upon have those limitations, but Defendants relied on them with abandon anyway.

The Acevedo Study took an "average wage" for all individuals in a given occupation, did not control for the location and type (*i.e.*, part-time v. full-time) of employment, and did not distinguish between different ages and experience levels.  *See* AR-11174.  The full-time/part-time distinction is especially critical: commenters explained that in the massage therapy industry, earnings may be cut in half for therapists who choose to (or must) work part-time, and that any study of their earnings must account for the "many" massage therapists who pursue a part-time schedule.  *See, e.g.,* AR-02783; AR-04096; AR-04615; AR-04774; AR-05680; AR-05960; AR-07012; AR-08984.  In addition, wage discrepancies between entry-level and more experienced workers are significant, since therapists do not reach their full earnings potential until they have worked for a number of years in their industries.  *See* AR-06484.

In the Simpson Study, the authors acknowledged, "[T]here are two primary limitations to these data: (1) the data reported incorporate reported hourly wage information, which excludes data on tips–a significant source of income for those in the service industry; and (2) wage estimates

are for wage and salary workers only, which excludes self-employed persons." *See* AR-11376. While these limitations may have minimal effects in other industries, in the massage therapy industry, they are of enormous importance. Commenters advised Defendants that tips make up a significant portion of therapists' income. *See, e.g.,* AR-03557, AR-03619, AR-03648, AR-03653, AR-03817, AR-04475, AR-04576. Commenters also advised that self-employment is common, if not predominant, in the massage therapy industry. *See, e.g.,* AR-03619, AR-04784, AR-06977. Defendants' explanation in support of the Final Rule gives no indication that they accounted for the amount of part-time work in the massage therapy industry, the effects on income from tips (reported or unreported), the frequency of self-employment, or the differences in earnings for more experienced therapists vis-à-vis junior therapists. Defendants will argue, as they have already, that they need not obtain perfect data, only the best available data. *See* ECF No. 12 at 19. While true, the government cannot deliberately decide to rely on *inaccurate* data. *Dist. Hosp. Partners v. Burwell*, 786 F.3d 46, 56 (D.C. Cir. 2015). Yet, that is exactly what Defendants do in the Final Rule. Defendants conclude that more training does not equal higher wages, even though the wage data in their studies—by the authors' own admissions, and as confirmed by commenters—is marred by incompleteness and underestimation. That is arbitrary. *See*, *e.g*., *St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*, 85 F. Supp. 3d 197, 206 (D.D.C. 2015) (final rule setting pilotage rates was arbitrary and capricious where Coast Guard "provided no rational justification for its decision to continue using data *the sources of which* affirmatively stated was inaccurate").

Not only does this mean Defendants' reliance on these studies was arbitrary and capricious, but it also establishes that Defendants acted arbitrarily and capriciously by failing to respond to the issues raised in comments. "[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Sherley v. Sibelius*, 689 F.3d 776, 784 (D.C.

Cir. 2012); *see also Home Box Off., Inc. v. FCC,* 567 F.2d 9, 35–36 (D.C. Cir. 1977) ("An agency also violates the APA if it fails to respond to 'significant points' and consider 'all relevant factors' raised by the public comments.").  Given that the studies themselves identified part-time work, age, tips, and self-employment as important factors, Defendants cannot reasonably deny that these issues are "relevant factors" that it should have addressed in its responses to comments.

### E.    The Department Makes Improper Assumptions and Ignores Problems With its "Other State" Exception.

The Final Rule is arbitrary and capricious because the Department failed to justify key assumptions related to the "other state" exception proposed in 34 C.F.R. § 668.14(b)(26)(ii)(B), and also failed to grapple with the problems associated with that exception.  "Agencies always bear the 'affirmative burden' of 'examin[ing] a key assumption' when 'promulgating and explaining a non-arbitrary, non-capricious rule.'"  *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018) (quoting *Okla. Dep't of Env'tl Quality v. EPA*, 740 F.3d 185, 192 (D.C. Cir. 2014)).  "That means that an agency 'must justify [a key] assumption' underlying its regulation 'even if no one objects during the comment period.'"  *Id.*  Likewise, "[a]gency action is arbitrary and capricious 'if the agency … entirely failed to consider an important aspect of the problem[.]'"  *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Final Rule states that an institution may offer a program based on *another state's* minimum hours requirement only if the institution can show that: (1) a majority of the program's students lived in the other state during the most recent award year; (2) a majority of the program's students who completed the program in the prior award year were employed in the other state; or (3) the institution is located in a metropolitan statistical area ("MSA") shared by two or more states *and* a majority of students, at the time of enrollment in the program during the most recently

completed award year, stated in writing their intention to work in the other state.  *See* 88 Fed. Reg. at 74,696–97.  These carve-outs—put in place ostensibly to account for massage therapists who may want to practice in a different state than where they attended school, practice in multiple states, or relocate, *see* 88 Fed. Reg. at 74,639—are practically unusable and premised on arbitrary, unsupported, and incorrect assumptions.

### 1.    Unjustified Assumptions Affecting All Three Scenarios

Defendants fail to explain why the "other state" exception is only available to schools if a "majority" of students live in, work in, or intend to work in a specific neighboring state.  "An agency may not pluck a number out of thin air when it promulgates rules in which percentage terms play a critical role."  *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1153 (D.C. Cir. 2013); *see also Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 377 (D.C. Cir. 2013); *Time Warner Ent. Co., L.P. v. FCC*, 240 F.3d 1126, 1137 (D.C. Cir. 2001).  Why did Defendants select 50-percent-plus-one as the triggering percentage?  Why not 33 percent?  Or 25 percent?  Or 75 percent?  And, what about institutions whose students can work in a variety of other states, like in multi-state MSAs (including D.C., Virginia, and Maryland)?  Do those students count as working in just one neighboring state?  Must institutions also survey students who choose to change fields and work in a different profession after graduation—or not to work at all?

"Pluck[ing] a number out of thin air" is exactly what Defendants have done.  The Final Rule contains no discussion of why "a majority" is a rational choice, especially given all of the complicating factors identified above.  Though a "majority" may initially strike a reader as a straightforward benchmark, the APA demands more.  Defendants still have the "affirmative burden" to explain their assumption that a "majority" is the proper threshold.  *Hispanic Affairs*, 901 F.3d at 389.  To be sure, Defendants' counsel asserts that a "majority" threshold is "a perfectly reasonable regulatory design," ECF No. 12 at 21, but the post-hoc, *ipse dixit* rationalizations of

counsel are not a viable stand-in for an actual explanation from the agency itself. *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006); *NAACP v. Trump*, 315 F. Supp. 3d 457, 465-66 (D.D.C. 2018) (subsequent history omitted). That explanation is missing from the Final Rule.

The Department also unreasonably assumes that institutions will have access to the data necessary to establish eligibility for the exception. For the most part, the data necessary to establish these exceptions will come from self-reporting by current or former students. The Department assumes without explanation that institutions will actually be able to obtain sufficient responses from enough students to justify adoption of another state's clock hour requirements. In order to show that a "majority" of students are working in another state, for example, the Department assumes that institutions can gather enough information to prove that an absolute majority of all prior-year graduates worked in a different state. Any institution with a thin majority of students practicing, living, or intending to practice in an adjacent state will have to achieve nearly a 100 percent response rate to prove it is entitled to avail itself of one of Defendants' three exemptions in proposed § 668.14(b)(26)(ii)(B). However, regulations that assume schools can effectively use an alternative process that requires responses from up to 100 percent of students are arbitrary and capricious, as this Court has held before in a case against the Department. *See AACS*, 258 F. Supp. 3d at 74–75 (invalidating rule on the bases that it was capricious to assume that a 100 percent response rate was (1) feasible or (2) statistically significant).

Moreover, all three scenarios provided for in the Final Rule "in which institutions could use another State's program length" suffer from an assumption that graduates will stay put in one state for their entire careers. This assumption is contradicted by the Department's finding in 2020 that "individuals often move from one State to another or live, work, and learn in different States

35

at the same time." 85 Fed. Reg. at 54,776. In the Final Rule, Defendants do not even acknowledge the Department's findings in 2020, let alone explain why they are incorrect. Furthermore, the lone study Defendants cite on graduate mobility ("Conzelmann Study") suggests that at least one-third of massage therapy graduates will move to another state to practice within eight years of graduation. *See* 88 Fed. Reg. at 74,639, n.33. Although the Conzelmann Study did not measure relocation rates for those who had graduated more than eight years prior, it is obvious that graduates can move to another state after being out of school for more than eight years, which further exacerbates the issue of graduate mobility. After all, massage therapy training—like any degree—is a lifelong asset. Defendants have not put forward any data justifying their sweeping assumption that most massage therapists live near home for their entire careers. This "important aspect of the problem" is entirely unanswered and entirely unaddressed. *Animal Legal Def. Fund*, 872 F.3d at 611.

## 2.   Invalid Assumptions Affecting the "MSA" Exception

Under the Final Rule, one of the scenarios in which an institution may adopt another state's minimum is if "the institution is located in a MSA shared by two or more states and a majority of students, at the time of enrollment . . . stated in writing their intention to work in the other state" ("(B)(3) Exception"). In addition to the flaws identified above, the (B)(3) Exception has two additional infirmities.

The first is simple. Defendants assume, with no stated rationalization, that students will not change their minds about the state in which they want to work, like they might do when they get their first job offer. Besides being an obvious possibility that any regulator should realize, this is the sort of key assumption" that Defendants needed to deal with "even if no one object[ed] during the comment period." *Hispanic Affairs* 901 F.3d at 389. It is common sense that job offers, economic conditions, personal relationships, family needs, individual preferences, or a host of

other factors can push students to decide, while enrolled in school, to go to work in a different state than where they had initially planned. If enough students—potentially as few as one—change their minds about where they intend to work, then the math behind the (B)(3) exception no longer adds up. Schools that initially invoked the (B)(3) exception will get to continue using another state's minimum (even though a majority of students no longer intend to work in the other state). The inverse is worse: under the Final Rule, schools that were barred from relying on the (B)(3) exception have no way of invoking it midstream, leaving students unable to complete the training they need to work in another state.

The second is geographical. For schools located in an area with a high concentration of states (e.g., the northeastern United States, the D.C. metropolitan area), it is exceptionally challenging for any institution to show that a majority of students go to *one* nearby state for work. Virginia is one such example. Virginia requires massage therapy applicants to complete a program consisting of at least 500 clock hours. *See* Va. Code § 54.1-3029. It is one of four jurisdictions in the DC metropolitan area, along with Maryland, the District of Columbia, and West Virginia.[22] Virginia also borders North Carolina, Kentucky, and Tennessee, and is close to Delaware and Pennsylvania. Students attending any of the AMTA member schools in Northern Virginia could work in any of those jurisdictions post-graduation. Or, to borrow Defendants' words, all of those states are "close to where they live or attend school." 88 Fed. Reg. at 74,639. However, the

---

[22] Although the NPRM suggested borrowing the Office of Management and Budget's list of MSAs, the Final Rule dropped references to the OMB, making it unclear what the term "MSA" means. Assuming the OMB's definition applies, MSAs cover multiple states, particularly in the Northeast. For example, Philadelphia's MSA includes Pennsylvania, New Jersey, Delaware, and Maryland. Washington, D.C.'s MSA includes the District of Columbia, Virginia, Maryland, and West Virginia. And MSAs can change periodically, further complicating any efforts by an institution to determine what its curriculum will be and what state's hours minimum will apply. *See* OMB Bulletin No. 23-01 (July 21, 2023), available at https://www.whitehouse.gov/wp-content/uploads/2023/07/OMB-Bulletin-23-01.pdf.

training requirements differ among those jurisdictions.  To illustrate, nearby Maryland requires 750 hours of massage therapy education.  *See* COMAR § 10.65.01.07.

The (B)(3) Exception requires a school to prove that an absolute majority of all its students intend to work in *one* state within the same MSA.  But if the students at a Northern Virginia school intend to spread out in roughly equal proportions among three or four states in this MSA, the Northern Virginia school will never be able to show that a "majority" of its students work, live, or intend to work in any given state outside Virginia—and therefore will never be able to qualify for the "other state" exception to the Final Rule.  If any students intend to work in any of the other five states close to Virginia, it becomes even more difficult for the Northern Virginia school to avail itself of the (B)(3) Exception.  In practice, AMTA member schools located in areas with a high concentration of states have no way to take advantage of the (B)(3) Exception.  Defendants' failure to grapple with these problems resulted in arbitrary and capricious decision-making.

### F.    Defendants Disregarded the Accreditation and Legislative Processes.

Defendants issued the Final Rule on October 31, 2023 with an effective date of July 1, 2024.  *See* 88 Fed. Reg. at 74,568.  Defendants' actions gave schools, states, and accreditors only eight months to rework curricula and seek accreditor/regulatory approval.  In so doing, Defendants assumed, with no justification, that the Final Rule gave schools sufficient time to present shortened programs to accreditors *and* sufficient time for accreditors to review and approve them. Defendants failed to justify that assumption even though they admitted that the Final Rule would force institutions that offer GE Programs to request modifications to their accreditations and to seek new approvals from state authorities.  *See* 88 Fed. Reg. at 74,641.

Under the Department's regulations, such a program modification must be approved by an accreditor before it can be offered to students.  *See* 34 C.F.R. § 602.22(a).  As the preamble to the Final Rule admits, commenters raised "concern[s] about accrediting agencies and State agencies

approving changes in program length and the time needed for these actions." 88 Fed. Reg. at 74,641. The commenters suggested a "gradual transition period to bring all GE programs into compliance." *Id*. The Defendants' entire response was:

> The Department does not think an extended legacy eligibility period is appropriate given our concern about the effects of excessive debt on students. As already noted, we will apply this provision to new program enrollees following the effective date of these regulations, so that no currently enrolled student would be negatively affected.

*Id*. This terse rejoinder illustrates the Department's failure to "grapple with th[is] issue in any meaningful way." *AACS*, 258 F. Supp. 3d at 73. The Department claims that its concerns about excessive student debt trump institutions' concerns about delays in re-accreditation. But the Department offers no explanation why its concerns are more valid than the institutions' concerns. Alleged "excessive debt" has *always* been a concern of the Department, *see* 59 Fed. Reg. at 9,548, yet Defendants do not explain why "excessive debt" is suddenly so problematic that it must jeopardize the accreditations that schools across the country rely on to keep their doors open and remain eligible for Title IV participation. *See Ass'n of Private Sector Colleges & Univs.*, 681 F.3d at 441; *Mingo Logan Coal Co.*, 829 F.3d at 719.

The Court need not speculate whether this assumption is material, whether the Department was unjustified in making it, or whether it will cause harm to regulated institutions, because Defendants conceded all three points in the EA. Just five-and-one-half months after it issued the Final Rule, the Department backpedaled in the EA and admitted that "there may be circumstances outside of an institution's control that may prevent compliance with the new requirements under § 668.14(b)(26) . . . by July 1, 2024," including "[t]he inability to obtain approvals from States and/or accrediting agencies for changes in program length in order to comply" with the Final Rule. In short, the Department's failure to justify its assumption not only shows that the Final Rule is arbitrary and capricious, but also demonstrates that the Department was, in fact, flat wrong to reject

commenters' concerns about a rule that threatens the existence of massage therapy institutions.[23]

Relatedly, the Department made unfounded assumptions about the realities of enacting state legislation. Commenters informed Defendants that eliminating the 150 Percent Rule would lower license exam passage rates, disrupt the IMpact interstate course-length compact, and frustrate the efforts of state legislatures (like Florida) that based their training hours requirements on the 150 Percent Rule. *See* 88 Fed. Reg. at 74,641-42. In response, Defendants told commenters, in effect, to "Take it up with your states." *Id.*[24] Inherent in Defendants' flippant responses is an assumption that state legislatures would quickly act to change their laws to increase the minimum hours for massage therapy programs at the urging of massage therapy schools.

Defendants offer no support to back up their assumptions. The Final Rule contains no evidence, much less convincing evidence, that any given state legislature can or will promptly consider changes to its laws before the Final Rule takes effect. It can take years for a legislature to enact a new law. *See, e.g.,* Lauren Rygg, *School Shooting Simulations: At What Point Does Preparation Become More Harmful than Helpful*, 35 Child. Legal Rights J. 215, 223 (2015)

---

[23] The *Cortiva* injunction does not cure the Department's problematic assumption that accreditors will have sufficient time to accredit modified programs before the Final Rule takes effect. That injunction can end at any time, after which the Final Rule would take effect without regard for whether accreditors have reviewed and approved shortened massage therapy programs. Furthermore, some schools may have paused efforts to shorten their programs in reasonable reliance on the *Cortiva* court's finding that the Final Rule is likely arbitrary and capricious. Such schools would not even have requests to accreditors and state authorities pending and would stand no chance of receiving authorization to offer shortened programs if the *Cortiva* injunction ends.

[24] Defendants' responses are: "This rule does not prohibit any State from amending its own State laws. States can and do regularly amend their laws, on an ongoing basis, and this final rule would not interfere with their ability to do so."; "If the commenters believe that graduates cannot pass the State licensing exam following completion of a program that complies with State training requirements, we suggest they discuss with the State whether the hours required are appropriate."; "[A] institution in a State that increases or decreases its minimum hours for certain professions can adjust the lengths of corresponding training programs accordingly. Thus, if the States in this compact adjust the minimum hours for certain licenses, then the programs can adjust too.

(referring to passing legislation "within two years" as "a relatively short timeline"); Megan Rowan, *When Words Hurt More than "Sticks and Stones": Why New York State Needs Cyberbullying Legislation*, 22 Alb. L. J. Sci. & Tech. 645, 649 (2012) (discussing statute "passed after spending nine years in the Assembly and Senate."). Four states only hold legislative sessions every two years.[25] Defendants cannot fulfill their obligation to deal with "important aspect[s] of the problem" by palming schools off onto state legislatures, particularly when Defendants fail to explain any basis for assuming that those legislatures will pick up the mantle before the schools begin hemorrhaging money, losing students, or going out of business altogether. *Animal Legal Def. Fund*, 872 F.3d at 611; *see also AACS*, 258 F. Supp. 3d at 73; *Home Box Off.*, 567 F.2d at 35–36.

### G.  Defendants Respond Capriciously to the Loss of Pell Grant Access.

Defendants admit that, once the 150 Percent Rule disappears, AMTA member schools in states that require fewer than 600 clock hours for licensure will lose their eligibility to participate in the Pell Grant program. *See* 88 Fed. Reg. at 74,640. Defendants downplay the loss of Pell Grants by suggesting that such schools could still participate in direct loan programs authorized under Title IV, provided they meet other regulatory criteria. *Id*. But direct *loans*, unlike Pell *Grants*, must be repaid. Defendants assume, without acknowledgment (let alone justification), that low-income students who would otherwise qualify for Pell Grants will still decide to pursue massage therapy programs even if Pell Grants cannot be used to fund massage therapy education.

Moreover, despite their professed concern about increasing student debt, Defendants fail to explain why it is reasonable to force a student to take out a *loan* to replace the Pell *Grant* that he or she would have received but for the Final Rule. Taking out a loan has the untoward effect

---

[25]  *See* Dates of 2024 State Legislative Sessions, BALLOTPEDIA, https://ballotpedia.org/Dates_of_2024_state_legislative_sessions (last visited Nov. 21, 2024).

of *increasing* that student's debt.  This outcome conflicts with the legislative findings that impelled Congress to pass Title IV of the HEA.  *See* 79 Stat. at 1232 (A purpose of Title IV is "to provide, through institutions of higher education, educational opportunity grants to . . . high school graduates of extreme financial need" who otherwise would not obtain the benefits of higher education).

## H.    Defendants Irrationally Disregard an Obvious Alternative.

"The arbitrary-and-capricious standard . . . also applies to an agency's consideration of regulatory alternatives."  *AACS*, 258 F. Supp. 3d at 75 (citing *Pillai v. Civil Aeronautics Bd.*, 485 F.2d 1018, 1027 (D.C. Cir. 1973)).  While an agency need not consider every conceivable alternative, it must "address obviously germane alternatives proposed by commenters during the notice-and-comment period."  *Id*. (citing *Int'l Ladies' Garment Workers Union v. Donovan*, 722 F.2d 795, 817 (D.C. Cir. 1983)).

Under the Final Rule, if a GE Program's length is a minute longer than the state minimum, the GE Program cannot receive *any* Title IV FSA funds—zero dollars.  One obvious alternative that Defendants claim to have considered was to fund students' participation in GE Programs up to the number of training hours required by the state in which the program is offered.  In other words, if a massage therapy school in Maryland (a 750-hour state) sets its program length at 800 hours, Defendants could allow that student to use federal student aid to pay for the first 750 hours, leaving him or her responsible for funding only the last 50 hours.

While Defendants acknowledge this alternative in the preamble to the Final Rule, they give it short shrift.  Specifically, without providing any support or legal authority, Defendants claim that the Department "did not have the legal authority to partially fund a program."  88 Fed. Reg. at 74,637.  Defendants also offer a second reason for rejecting this alternative: that it would be "[in]appropriate given the potential harms to students who enroll in partially funded programs and

are unable to complete their programs due to a lack of title IV, HEA funds."  *Id*.

Defendants fail to provide any support for their legal argument that they do not have "authority to partially fund a program."  On that basis alone, the Final Rule is arbitrary and capricious.  In *Casa De Maryland*, the Department of Homeland Security attempted to rescind DACA on the basis that it was "unlawful."  924 F.3d at 704.  That action, however, was held to be arbitrary and capricious because "neither the Attorney General's September 4 letter nor the Department's Rescission Memo identif[ied] any statutory provision with which the DACA policy conflicts."  *Id*. (citing *Encino Motorcars v. Navarro*, 579 U.S. 211, 224 (2016)).  Defendants' bare claim that they "do[ ] not have the legal authority to partially fund a program" presents an identically arbitrary scenario, and no post-hoc explanation from counsel can fill the void.  *NAACP*, 298 F. Supp. 3d at 237.  Defendants also cite no evidence of actual harm to students from partial funding (particularly with respect to grants, which students do not have to repay).

## I.    Defendants Disregarded Procedures Required by Law.

The Final Rule must be set aside because the Department engaged in rulemaking without observance of the procedure required by law.  Pursuant to 20 U.S.C. § 1098a(a), the Department must "obtain public involvement in the development of proposed regulations," including the "advice of and recommendations from individuals and representatives of the groups involved in student financial assistance programs . . . ."  This information is to be obtained through "regional meetings and electronic exchanges of information," and it is to be "take[n] into account . . . in the development of proposed regulations . . . ."  *Id*.  Once the Department has done so, and "before publishing proposed regulations" in a Notice of Proposed Rulemaking, the Department must "prepare draft regulations implementing [Title IV programs] and . . . submit such regulations to a negotiated rulemaking process."  20 U.S.C. § 1098a(b)(1).  The Department must form a committee consisting of "select individuals with demonstrated expertise or experience in the

43

relevant subjects under negotiation . . . ." *Id.*

Defendants had several opportunities to disclose their intention to undo the 150 Percent Rule in a manner that would meet the "public involvement" requirements of the HEA. *See supra* at I(B)(4). They forewent those opportunities. Defendants should have mentioned changes to the 150 Percent Rule when requesting input from the public on their "rulemaking agenda." They did not. *Id.* They should have discussed potential changes to the 150 Percent Rule when publishing a notice in the Federal Register of their intent to form a rulemaking committee and to seek nominations for committee members. They did not. *See* 86 Fed. Reg. at 69,607. In fact, Defendants never made their intention to eliminate the 150 Percent Rule clear until Department staffers distributed written materials just before the Committee's first meeting in January 2022, after members had already been chosen and topics (ostensibly) set. *See supra* at I(B)(4).

By concealing their intention to rescind the 150 Percent Rule until after the Committee was formed, Defendants violated section 1098a(a)(1). The public—including AMTA and its members—was entitled to be involved in the "development of proposed regulations" *before* the Committee was formed and *before* Defendants distributed draft regulations to eliminate the 150 Percent Rule. 20 U.S.C. § 1098a(a)(1), (b)(1). As a preliminary step, Defendants were obligated to "provide for a comprehensive discussion and exchange of information," 20 U.S.C. § 1098a(a)(2), but by withholding their proposal from the public's knowledge, they breached that statutory duty. Instead, Defendants foisted rescission of the 150 Percent Rule directly on the Committee, and only on the Committee, without first "obtaining public involvement."

The Department has been reversed for similar conduct in the past. *See Nat'l Educ. Ass'n v. DeVos*, 379 F. Supp. 3d 1001 (N.D. Cal. 2019) ("*NEA*"). In *NEA*, the Department delayed the effective date of a rule issued under the previous administration without first undergoing

negotiated rulemaking. *Id*. at 1028-30. Likening the negotiated rulemaking provisions of the HEA to other statutes that require "consultation," the court found that the Department violated the HEA by skipping negotiated rulemaking, even though it allowed for other public comment. *Id*. The court found it problematic that the Department acted contrary to the process "mandated by Congress" and unlawfully deprived itself of "timely substantive information" that may have affected its discretionary decision-making. *Id*. at 1030.

Here, the specific failure is different, but the effects are the same. Defendants skipped a process—facilitating "comprehensive discussion" with the public before sending draft rules to the Committee—that Congress mandates, and in so doing, missed out on timely, substantive information (including Committee member recommendations) that massage therapy stakeholders could have provided had Defendants not concealed their intention to erase the 150 Percent Rule. Defendants' actions subverted the regulatory process and should be set aside.

## III.    CONCLUSION

When, as here, an agency action violates the APA, a reviewing court "*shall* . . . hold unlawful and set aside" that action. 5 U.S.C. § 706(2) (emphasis added). Given the multiple substantive defects inherent in the Final Rule, as well as Defendants' procedural gamesmanship, the Court should enter judgment in Plaintiff's favor and set the Final Rule aside.

Dated: November 26, 2024                     Respectfully Submitted,

                                                      /s/ Drew T. Dorner
                                             John M. Simpson (D.C. Bar No. 256412)
                                             Drew T. Dorner (D.C. Bar No. 1035125)
                                             Duane Morris LLP
                                             901 New York Avenue NW, Suite 700 East
                                             Washington, D.C.  20001-4795
                                             Telephone:  +1 202 776 7800
                                             Fax:  +1 202 776 7801
                                             E-mail:  jmsimpson@duanemorris.com
                                             E-mail:  dtdorner@duanemorris.com

Edward M. Cramp (admitted *pro hac vice*)
Deanna J. Lucci (admitted *pro hac vice*)
Duane Morris LLP
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: +1 619 744 2200
Fax: +1 619 744 2201
E-mail: emcramp@duanemorris.com
E-mail: djlucci@duanemorris.com

*Attorneys for the American Massage Therapy Association*